Jared J. Braithwaite (UT State Bar No. 12455)
  jbraithwaite@mabr.com
Alexis K. Juergens (UT State Bar No. 16861)
  ajuergens@mabr.com
MASCHOFF BRENNAN
111 South Main Street, Suite 600
Salt Lake City, Utah 84111
(801) 297-1850

Attorneys for Defendant Cloward H2O LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **Crystal Lagoons U.S. Corp.**, and **Crystal Lagoons Technologies, Inc.**, | Civil No. 2:19-cv-00796-BSJ |
| Plaintiffs, | **Cloward H2O LLC's Responsive Claim Construction Brief** |
| v. | District Judge Bruce S. Jenkins |
| **Cloward H2O LLC**, | **REDACTED** |
| Defendant. | |

Pursuant to LPR 4.2(c) and the Court's scheduling order (Dkt. No. 76), Cloward H2O

LLC. ("Cloward H2O") respectfully submits its responsive claim construction brief.

i

# TABLE OF CONTENTS

I. Crystal Lagoons' claim interpretations hidden behind unexplained "plain and ordinary meaning" do not resolve claim construction disputes and improperly delay claim construction issues. ..................................................................................... 1

II. Crystal Lagoons' employee declaration does not address the relevant claim construction issues and such party declarations are generally disregarded as self-serving and of little use. ....................................................................................... 2

III. Construction of Terms and Phrases for the '514 and '822 Patents ........................................ 3

    A. Crystal Lagoons' "the-floor-is-a-wall" argument is not supported by the claims, the patent specifications, or any relevant references that those of skill in the art would be familiar with at the time of filing for the Asserted Patents. ........... 5

        1. Crystal Lagoons coined "sloped walls" in its amended pleadings after learning that the Hard Rock Lagoon did not have plastic covered walls. .......... 5

        2. The De La Cerda Declaration lacks foundation and is not directed to the relevant questions on claim interpretation and is no more than a conduit for Crystal Lagoons' attorneys' "sloped walls" argument. .................. 6

        3. Crystal Lagoons' argument that the "bottom" of a recreational water structure is only the lowest point is contrary to how those of skill in the art use the term and is not supported by the claims. .......................................... 7

        4. Crystal Lagoons' assertion that "walls" includes sloping floors is contrary use by those of skill in the art and is not supported by the claims. .............................................................................................................11

        5. Crystal Lagoons told the Patent Office that the liner needed to be uniform because a liner broken up by floor inlets would be incompatible with the '514 Patent and would disrupt the claimed thorough cleaning of the liner. ....................................................................... 14

    B. Crystal Lagoons presents no evidence or argument that water "removal" by displacement means anything other than elimination of water. ................................. 15

        1. Crystal Lagoons' argument that new water may just replace normal water loss ignores the language of the claims. ............................................... 16

        2. The specification states that elimination of water through the skimmers is a necessary part of the invention. ............................................................... 17

3.      Crystal Lagoons focuses on whether fresh water causes disposal of a "substantially equivalent amount" of displaced surface water avoids the dispute, and Crystal Lagoons does not identify any other possible meaning. ........................................................................................................... 18

C.    Crystal Lagoons shows that it is seeking claim constructions to cover ordinary pool vacuums used with traditional filtration systems as opposed to the inventions' pumping system and suction device that replace filtration systems. ....... 19

IV.   Construction of Terms and Phrases for the '520 Patent ....................................................... 22

A.    The claims are directed to treatment of a "portion of water" within a water body that is delimited from the rest of the water body by a delimiting zone. ............ 22

B.    Crystal Lagoons' argument that the claimed "determination" steps do not require an accused infringer to do anything at all is contrary to the claims— and contrary to fundamental patent law. ................................................................... 24

V.    CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    448 F.3d 1324 (Fed. Cir. 2006) ........................................................................... 15

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) ............................................................................. 8

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) ............................................................................. 21

*Digital Biometrics, Inc. v. Identix, Inc.*,
    149 F.3d 1335 (Fed. Cir. 1998) ........................................................................... 17

*Eon–Net LP v. Flagstar Bancorp.*,
    653 F.3d 1314 (Fed. Cir. 2011) ........................................................................... 21

*Fenner Invs. Ltd. v. Collco P'ship*,
    778 F.3d 1320 (Fed. Cir. 2015) ........................................................................... 16

*Gardner v. TEC Syst., Inc.*,
    725 F.2d 1338 (Fed. Cir. 1984) ............................................................................. 4

*Helmsderfer v. Bobrick Washroom Equipment, Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008) ........................................................................... 14

*Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*,
    540 F.3d 1337 (Fed. Cir. 2008) ............................................................................. 3

*In re Rinehart*,
    531 F.2d 1048 (CCPA 1976) ................................................................................. 4

*Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ........................ 25, 26

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ................................................................................. 2

*Mars, Inc. v. H.J. Heinz Co., L.P.*,
    377 F.3d 1369 (Fed. Cir. 2004) ............................................................................. 9

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874 F.3d 1307 (Fed. Cir. 2017) ..................................................................... 16, 19

*Maytag Corp. v. Electrolux Home Prods., Inc.*,
411 F. Supp. 2d 1008 (N.D. Iowa 2008) ................................................................ 1

*O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ........................................................................... 2

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................................... 6, 7, 8

*Transclean Corp. v. Bridgewood Services, Inc.*,
290 F.3d 1364 (Fed. Cir. 2002) ......................................................................... 12

*Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.*,
141 F.3d 1084 (Fed. Cir. 1998) ........................................................................... 3

*Vernetx, Inc, v, Cisco Systems, Inc.*,
767 F.3d 1308 (Fed. Cir. 2014). ................................................................. passim

## Rules

Federal Rule of Evidence 702 ................................................................................. 7

## Regulations

25 Texas Admin Code § 264.182 ...................................................................... 9, 12

Florida Pool Rules 64E-9.006 ............................................................................... 9

Utah Admin. Code R392-302-10 ......................................................................... 12

Utah Admin. Code R392-302-9 ............................................................................. 9

# TABLE OF APPENDICES

**Joint Appendix ("JA")**

| Document | Page Nos. |
| --- | --- |
| U.S. Patent No. 8,062,514 ("'514 Patent") | 1–22 |
| U.S. Patent No. 8,753,520 ("'520 Patent") | 23–38 |
| U.S. Patent No. 9,708,822 ("'822 Patent") | 39–62 |
| File History for the '514 Patent | 63–384 |
| File History for the '520 Patent | 385–1392 |
| File History for the '822 Patent | 1393–1779 |

**Cloward H2O's Claim Construction Appendix ("Cloward Appx.")**

| Document | Page Nos. |
| --- | --- |
| Excerpts of Final Design Plans for the Hard Rock Lagoon | 1–10 |
| Excerpts from the American Heritage Dictionary (4th ed. 2000) | 11–15 |
| Utah Admin. Code R392-302-10 | 16–18 |
| 25 Texas Admin Code § 264.182 | 19–33 |
| U.S. Patent No. 4,640,784 to Peter Cant ("Cant Prior Art") | 34–44 |
| Response to Restriction Requirement, dated December 16, 2009, from the File Wrapper of the application for U.S. Patent No. 7,820,055 | 45–48 |
| Originally Filed Claims, dated June 25, 2007, from the File Wrapper of the application for U.S. Patent No. 7,820,055. | 49–53 |

**Cloward H2O's Supplemental Claim Construction Appendix ("Supp. Cloward Appx.")**

| Document | Page Nos. |
|---|---|
| Declaration of Douglas R. Ferrell in Rebuttal to the Declaration of Javiera De La Cerda Regarding Claim Construction | 54–68 |
| Selections of Cloward H2O projects from http://clowardh2o.com/our-work/ | 69–90 |
| Excerpts from King County Washington, Surface Water Design Manual (Apr. 24, 2016) | 91–112 |
| Ye, Seepage Behavior of an Inclined Wall Earth Dam under Fluctuating Drought and Flood Conditions, Geofluids (Pub. Jul. 9, 2018) | 113–124 |
| Selections from schematics for Crystal Lagoons' Epperson Ranch Florida project, dated June, 24, 2015, bearing production control numbers CL0007686–87 | 125–126 |
| Crystal Lagoons, Reducción de Costos, dated September 24, 2015, bearing production control numbers CL0009556–67 | 127–138 |
| Utah Admin. Code R392-302-9 | 139 |
| Florida Pool Rules 64E-9.006 (effective May 27, 2004) (available at https://www.flrules.org/gateway/notice_Files.asp?ID=2560817) (rule history available at https://www.flrules.org/gateway/ruleNo.asp?id=64E-9.006). | 140–144 |
| Selections from schematics for Crystal Lagoons' Laguna La Portada project, dated January 18, 2012, bearing production control number CL0006046 | 145 |
| Selections from Webster's Spanish-English Dictionary (2001) | 146–154 |
| Printout of website located at https://www.ieccovers.com/pond-liner-manufacturer | 155–162 |
| Selections from Philip H. Perkins, Swimming Pools (4th ed. 2000). | 163–166 |
| Email correspondence between counsel dated June 16, 2021 | 167–170 |

Crystal Lagoons states that it seeks "plain and ordinary" claim constructions but then argues for anything but plain and ordinary meanings of the disputed claim terms in the context of the Asserted Patents. The '514 and '822 Patents are unmistakably both directed to and claim the replacement of traditional filtration of water by the use of flocculants and a suction device together with skimmers to dispose of water contaminated with impurities and surface oils. And the '822 Patent is directed to and claims the treatment of a portion of water within a water body according to a specific set of steps with specific calculations. Crystal Lagoons' arguments, however, indicate that it seeks an interpretation of its patents to cover water structures employing traditional filtration and traditional water treatment applied to the whole water body.

Crystal Lagoons' arguments and interpretations are contrary to the language of the claims, contrary to the specifications of the Asserted Patents, contrary to other documents relevant to recreational water structures, and contrary to Crystal Lagoons' own documents. Crystal Lagoons' arguments should be rejected by the Court as inconsistent with the patents, and Cloward H2O's proposed constructions should be adopted.

## I.   Crystal Lagoons' claim interpretations hidden behind unexplained "plain and ordinary meaning" do not resolve claim construction disputes and improperly delay claim construction issues.

Crystal Lagoons couches its claim constructions as "plain and ordinary." But, except where the inventor gave meaning to specific terms, Cloward H2O also argues that its proposed constructions are also the plain and ordinary meaning of the terms in the context of the patents. So, the parties' respective "ordinary" meanings for the claim terms do not agree, which is not unusual. *See Maytag Corp. v. Electrolux Home Prods., Inc.*, 411 F. Supp. 2d 1008, 1037 (N.D. Iowa 2008) ("[P]arties in patent cases rarely agree on the 'ordinary meaning…' so that asserting

that such a meaning should apply, without further construction, merely begs the question of what that meaning is.") For example, Cloward H2O states that a "wall" is a wall as that term would be ordinarily employed with respect to recreational water structures. Crystal Lagoons argues for a more peculiar use of "wall" to refer to any surfaces of the water structure. Additionally, Cloward H2O states that water and impurity "removal" means that water and impurities are removed—not just recirculated (because impurity recirculation hardly achieves the purpose of keeping a pool clean). Crystal Lagoons seems to think something different but does not exactly say what.

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Stating that a disputed term has an ordinary meaning, and nothing more, does little to clarify the infringement issues and merely delays a determination of its meaning for a later date.

## II. Crystal Lagoons' employee declaration does not address the relevant claim construction issues and such party declarations are generally disregarded as self-serving and of little use.

The landmark case establishing claim construction as a matter for the Court, *Markman v. Westview Instruments*, recognized that "the testimony of Markman [the inventor] and his patent attorney on the proper construction of the claims is entitled to no deference." 52 F.3d 967, 983 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Party declarations, such as those from the inventors, are generally disregarded as biased, litigation-driven, and of little use regarding the question of what those of skill in the art, as opposed to the patentee, would understand by the claim terms at the time of the filing of the patent application.

The Declaration of Javiera De La Cerda in support of Plaintiffs' Proposed Claim Constructions ("De La Cerda Decl.") is no different than a self-serving party declaration. The De La Cerda Decl. purports to interpret claim terms from the vantage of Crystal Lagoons—not as understood by persons of ordinary skill in the art at the time of the inventions.

For example, there is no foundation in the declaration to believe that Ms. De La Cerda was a person of ordinary skill or was familiar with the understanding of those of ordinary skill at the time of the filing for the '514 and '822 Patents in 2006. Instead, the De La Cerda Decl. replicates figures from irrelevant references (some of which she does not know the actual source) and that significantly post-date the filing of the Asserted Patents.[1] The declaration also includes selections from several internal Crystal Lagoons documents that are admittedly not in the public knowledge by their "ATTORNEY EYES ONLY" designation. Finally, the declaration simply reproduces attorney-generated figures from Crystal Lagoons' pleadings.

So, while Crystal Lagoons uses the De La Cerda Decl. to advance claim constructions at odds with the claims and patent descriptions, the declaration itself is little more than attorney argument dressed up in declaration form. *See Vehicular Techs. Corp. v. Titan Wheel Intern., Inc.*, 141 F.3d 1084, 1092 (Fed. Cir. 1998).

## III.  Construction of Terms and Phrases for the '514 and '822 Patents

Crystal Lagoons argues that before the inventor of the Asserted Patents came along, there were only man-made lakes and ponds and small-sized swimming pools, such as typical backyard

---

[1] Crystal Lagoons' counsel states that "Ms. De la Cerda recalled getting Fig. 2 online and thought it was from The King County, Washington Surface Water Design Manual [bates range], which was produced for that reason. We agree that we cannot locate the exact image in the document …." Apparently, the effort was to find anything to support Crystal Lagoons' position without recording where the information came from. (Cloward Supp. Appx. at 167.)

pool. (*See* Crystal Lagoons' Opening Claim Construction Brief at 2.) Crystal Lagoons argues that it invented and its patents cover all man-made bodies of water larger than traditional backyard swimming pools. It is a preposterous claim that is entirely contrary to the Asserted Patents and common experience.[2]

The claims of the '514 and '822 Patents do not merely recite "a method and structure for a water body larger than 15,000 m$^3$, for recreational use with color, transparency and cleanness characteristics similar to swimming pools" with nothing more. In fact, the Patent Office rejected the notion that a large traditional swimming pool could be the subject of a patent. (JA at 1626, Office Action Rejection ("Regarding the size of the pool, it is well settled that it is an obvious matter of design choice to change the general shape or size of a known element in the absence of a disclosed non-obvious advantage associated with the change" citing *Gardner v. TEC Syst., Inc.*, 725 F.2d 1338, 1349–50 (Fed. Cir. 1984) (holding unpatentable a claimed invention only different from the prior art as a matter of size)).) *See also In re Rinehart*, 531 F.2d 1048, 1053 (CCPA 1976) ("mere scaling up of a prior art process capable of being scaled up, if such were the case, would not establish patentability in a claim to an old process so scaled.").

Thus, the claims include numerous specific limitations that limit the claimed water structures and methods for treating them to those with a particular construction for a flocculation-based cleaning system with skimmers and a suction device for removing contaminated water as opposed to traditional filtration systems. Crystal Lagoons' arguments that

---

[2] *See* Cloward Supp. Appx. at 69–87 (showing some of Cloward H2O's projects and experience with large recreational water projects long pre-dating the Asserted Patents, including enormous hotel/resort water structures, various water parks, water rides, aquariums, etc.); *see also* Cloward Supp. Appx. at 63–64 (CV of Douglas R. Ferrell noting work on large, familiar water projects such as the "Finding Nemo" ride (a.k.a the "Submarines") at Disneyland.)

the patents cover large swimming pools whether traditionally filtered or not is contrary to the claims themselves, the specification of the patents, and Crystal Lagoons' own statements about the Asserted Patents. Crystal Lagoons' advancement of "plain and ordinary" meaning of the claim limitations to cover traditionally filtered pools is anything but in the context of these patents and in view of the meaning ascribed to them by those of ordinary skill in the art.

**A. Crystal Lagoons' "the-floor-is-a-wall" argument is not supported by the claims, the patent specifications, or any relevant references that those of skill in the art would be familiar with at the time of filing for the Asserted Patents.**

Crystal Lagoons argues that "walls" are not walls but could be any surface of a water structure. This interpretation, which Crystal Lagoons mischaracterizes as plain and ordinary, cannot be found in statements relevant to the those of ordinary skill in the art at the '514 and '822 Patents' time of filing. Crystal Lagoons' entire argument rests on the self-serving declaration of Crystal Lagoons' own employee that relies on baseless opinion and irrelevant documents, that all significantly post-date the relevant time period. There is nothing in the record that is public and concerns the construction of recreational water structures and is dated at the time of filing the applications for the '514 and '822 Patents showing that those of skill in the art would believe a "wall" covered in plastic able to be thoroughly cleaned was anything other than a substantially vertical structure covered in exposed plastic.

**1. Crystal Lagoons coined "sloped walls" in its amended pleadings after learning that the Hard Rock Lagoon did not have plastic covered walls.**

The asserted claims of the '514 Patent require "a bottom and walls covered with a plastic liner made of a non-porous material able to be thoroughly cleaned." (JA at 22, '514 Patent at claim 1.) Crystal Lagoons' initial Complaint and First Amended Complaint make no mention of "sloped walls" and have no annotated figures purporting to identify "sloped walls" of the

accused Hard Rock Lagoon. (Dkt. No. 2, Complaint; Dkt. No. 11, First Amended Complaint.) Crystal Lagoons' only alleged that the walls of the Hard Rock Lagoon were, in fact, covered in plastic able to be thoroughly cleaned. (*See* First Amended Complaint at ¶ 56.)

Cloward H2O then disclosed the plans for the Hard Rock Lagoon which showed that the completed walls were not covered in plastic. (*See* Dkt. No. 23, Cloward H2O's Motion to Dismiss the First Amended Complaint, at p. 10 (noting the wall construction).) Only after learning this, Crystal Lagoons responded by advancing the sloped-walls theory in an effort to avoid dismissal of its case. The annotated figures and photographs of "sloped" walls make their first appearance on June 1, 2020 with the filing of Crystal Lagoons' Second Amended Complaint. (Dkt. No. 39 at p. 17–18.) Crystal Lagoons now repackages its sloped-walls theory and figures from its Second Amended Complaint in the De La Cerda Decl., which is nothing more than attorney argument re-presented through a self-serving declaration.

> **2.     The De La Cerda Declaration lacks foundation and is not directed to the relevant questions on claim interpretation and is no more than a conduit for Crystal Lagoons' attorneys' "sloped walls" argument.**

The purpose of claim construction is to make an objective assessment about what a person of ordinary skill in the art at the time the patent was filed would have understood by the words in the claims. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313, 1316–17, 1321–23 (Fed. Cir. 2005) (en banc). This objective assessment does not rely on the subjective belief of the patent owner or inventor. (*See* Section II, *supra*.) Nevertheless, although "less reliable" than the intrinsic record of a patent itself and its prosecution history, expert testimony can be useful to a court, for example, "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the

patent or the prior art has a particular meaning in the pertinent field." *Id. at* 1318. But the De La Cerda Decl. does not address those questions or lay an appropriate foundation for any opinions regarding the meaning of terms to those of ordinary skill in the art in 2006.

Ms. De La Cerda does not set forth any facts to indicate that she is a person of skill in the art or was familiar with those of skill in the art at the time of the invention. She does not indicate her academic qualifications, or other scientific, technical, or other specialized knowledge as of 2006 to lay a foundation for any opinions that she expresses. *See* Federal Rule of Evidence 702(a). The only thing we know about her is that she works for Crystal Lagoons—which is not foundation for an "objective" assessment about the meaning of the claims.

Accordingly, the De La Cerda Decl. is, if anything, unsupported subjective argument from a party dressed up as a supposed expert declaration but lacking the indicia of admissibility under Federal Rule of Evidence 702. It is filled with self-serving testimony at odds with the patents, cited material therein, and Crystal Lagoons' own documents. In contrast, Cloward H2O provides the rebuttal declaration of Douglas R. Ferrell, who is one of skill in the art, had extensive experience in the field as of 2006, and actually addresses the question of what those of skill in the art would understand by "wall"—it is not the floor. (Cloward Supp. Appx at 54–60.)

### 3. Crystal Lagoons' argument that the "bottom" of a recreational water structure is only the lowest point is contrary to how those of skill in the art use the term and is not supported by the claims.

In support of Crystal Lagoons' argument that "bottom" means only the lowest point, Ms. De La Cerda cites to a figure, from the King County, Washington, Surface Water Design Manual,[3] and to Crystal Lagoons' non-public, internal documents. But these documents do not

---

[3] *See* fn. 1, *supra*. Ms. De La Cerda does not know where the precise cited figure comes from.

address the question of the meaning of terms to those of skill in the art at the time of the invention. Crystal Lagoons' arguments are also contradicted by those documents that those of skill in the art would reference regarding recreational water structures, by Crystal Lagoons' own documents regarding its recreational water structures, and by the patent claims themselves.

First, each of the documents cited by the De La Cerda Decl. significantly post-dates the purported invention date of the '514 and '822 Patents and are therefore irrelevant. (*See* Cloward Supp. Appx. at 91 (April 2016 as date of Surface Water Design Manual); *id.* at 113 (July 2018 as publication date of cited academic article); *id*. at 127–33 (September 2015 as date of Figure 12 of the De La Cerda Decl.); *id*. at 125–26 (June 2015 as date of schematics for Crystal Lagoons' Epperson Ranch Project).) *See also Phillips*, 415 F.3d at 1313 ("We have made clear … that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.") Thus, none of these materials should be considered for the meaning of the claim terms. *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (declining to consider references dated after the patent).

Despite the late date of the cited materials, none of them support the De La Cerda Decl. and Crystal Lagoons' arguments. Figure 2 of the De La Cerda Decl. depicts a "bioswale," which is "a long, gently sloped, vegetated ditch designed to remove pollutants from stormwater." (Cloward Supp. Appx. 112, Surface Water Design Manual at definition of "bioswale.") A bioswale is intended for stormwater management and is not a water structure intended for recreation. (*Id.*; Cloward Supp. Appx. 58, Ferrell Decl. at ¶ 22.) Persons of skill in the art of designing recreational water structures would not typically design such water structures in accordance with

the construction and design of bioswales (*Id.*) And it appears as though the only public documentation Crystal Lagoons could find for the bottom being the lowest point comes from a stormwater management manual dated a decade after the filing of the patents, which is not surprising because the ordinary meaning of "bottom" is the floor, whether sloped or not.

For example, pool codes almost universally describe the bottom of a pool as any part of the floor, including the sloped bottom. (Cloward Supp. Appx. at 139, Utah Admin. Code R392-302-9 ("The horizontal slope of the pool bottom …"); Cloward Appx. at 24, 25 Texas Admin Code § 264.182(61) ("Floor—The interior bottom surface of a pool or spa.." effective September 1, 2004).); Cloward Supp. Appx. at 140, Florida Pool Rules 64E-9.006 (noting that "floor slope shall be uniform" and that transitions in floor slope require "dark contrasting tile marking across the bottom"); Cloward Supp. Appx. at 58, Ferrell Decl., at ¶ 19 ("I am not aware of any pool code that limits the "bottom" of a pool or water structure to only the lowest part ….").) *See also Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1374 n.1 (Fed. Cir. 2004) ("regulations issued by regulatory agencies can be helpful to a claim construction analysis if they are probative of an industry-specific meaning for a disputed claim term.").

But in addition to being contrary to most, if not all, pool codes, the "bottom" as only the "lowest point" makes no sense with respect to the language of the claims and Crystal Lagoons' own documents. The term "bottom" is also used in the claims to refer to where precipitated impurities fall for removal by the suction device. (JA at 62, '822 Patent at claim 1.) It would make little sense if flocculent caused the accumulation of impurities at only the lowest point for

removal by the suction device.[4] And although the patentee's own structures should not be used to construe the claims, Crystal Lagoons own documents show that the definition for "bottom" used by Crystal Lagoons is contrary to their own use:



Cloward Supp. Appx. 145, Crystal Lagoons' Schematics (red annotations translated and added)[5]; Cloward Supp. Appx. 125–26, Crystal Lagoons' Eperson Ranch Schematics (contrasting sloped "floor" and vertical "walls").)

Accordingly, Crystal Lagoons' argument that the bottom is only the lowest portion of the structure is contrary to the patent claims, Crystal Lagoons' own designs, and documents relevant to those of skill in the art such as pool codes. The argument is entirely litigation-driven and not rooted in the understanding of those of skill in the art. The Court should thereby reject it.

---

[4] If Crystal Lagoons is serious, the lowest point of the Hard Rock Lagoon would likely be the bottom of the floor drains for the traditional filtration system—a point neither covered in plastic nor cleaned by any traditional pool vacuum. (*See* Cloward Appx. at 9 (showing the bottom of the floor drain extending beneath the floor of the lagoon and noting concrete shell).)

[5] Cloward H2O does not contend that the meaning of claim terms should be taken from Spanish or that Spanish—English translations should provide the meanings as ascribed by those of skill in the art. The translations are, however, useful to show that Crystal Lagoons' arguments are litigation driven and not based on actual use. *See* Cloward Supp. Appx. at 146–54, Webster's Spanish–English Dictionary (translations also available on Google Translate at Google Translate (for "línea de fondo terminado") and Google Translate (for "muro tipo en piscina").

**4.      Crystal Lagoons' assertion that "walls" includes sloping floors is contrary use by those of skill in the art and is not supported by the claims.**

Crystal Lagoons, through Ms. De La Cerda, argues that "wall" has a "very precise technical definition and background (i.e., not an ordinary meaning). Yet, in support of her argument, Ms. De La Cerda cites to a figure from a 2018 research article on dam construction, Crystal Lagoons' non-public, internal documents post-dating the invention, and attorney-authored figures from Crystal Lagoons' Second Amended Complaint. Again, these documents do not address the meaning of terms to those of skill in the art at the time of the invention. Crystal Lagoons' arguments are also inconsistent with the claims themselves and Crystal Lagoons' own documents and other references showing the meaning of the terms for recreational water structures.

First, Ms. De La Cerda indicates that the "precise technical definition" for "wall" is found as only one of many definitions for "wall" in Webster's Dictionary. But Webster's Dictionary is not a technical dictionary and there is no basis to believe that those of skill in the art of recreational water features would gather *technical* definitions for water structures from it.

Again, for technical uses, Ms. De La Cerda has to look beyond references regarding recreational water structures to a 2018 geotechnical academic journal for any support for her argument. Figure 3 of the De La Cerda Decl. includes a diagram from "Seepage Behavior of an Inclined Wall Earth Dam under Fluctuating Drought and Flood Conditions" from the Geofluids academic journal. (Cloward Supp. Appx. 113–18, Article at 6 (referencing a test model).) The article significantly post-dates the invention and those of skill in the art would not consult geotechnical journals to provide definitional meaning to the terms applicable to recreational water structure design. (Cloward Supp. Appx. 59, Ferrell Decl. at ¶ 23.) The article's use of "inclined wall" is unusual and would be contrary to the ordinary use of "wall" in connection with

water structures designed for recreational use. (*Id.*) In other words, the idea of a sloped wall is so peculiar that Crystal Lagoons was only able to locate it only in a 2018 geotechnical research article (because it is nowhere to be found in references relevant to recreational water design).

For those references consulted by those of skill in the art for recreational water structures, walls are described as substantially vertical and are clearly contrasted with the bottom. (*See* Cloward Appx. at 16, Utah Admin. Code R392-302-10 ("Pool walls must be vertical or within plus three degrees of vertical to a depth of at least two feet and nine inches"); *see also* Cloward Appx. at 32, 25 Texas Admin Code § 264.182(158) ("Walls – The interior pool or spa wall surfaces consisting of surfaces from plumb to a slope of 11 degrees from plumb." Effective September 1, 2004); Cloward Supp. Appx. at 140, Florida Pool Rules 64E-9.006(c) ("The upper part of pool walls … shall be within five degrees of vertical" except for the point at which the wall may join the floor); Cloward Supp. Appx. 57–58, Ferrell Decl. at ¶¶ 15–20 ("I am not aware of any pool code for which the sloped bottom of a pool or other large water structure would be considered a "wall").) *See also Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1375 (Fed. Cir. 2002) ("to the extent there is a difference between the common and technical meanings of the terms, the term 'resilient' is used in the '080 patent in a technical context to describe a component of a mechanical apparatus, and a technical dictionary is therefore a better source to inform the meaning of the term to a skilled artisan in this case).

Crystal Lagoons citations to its own internal documents also do not support Crystal Lagoons' argument. Figures 11–12 of the De La Cerda Decl. are to a September 2015, non-public Crystal Lagoons document written only in Spanish. (Cloward Supp. Appx. at 127–38 (showing document date and designated by Crystal Lagoons as "ATTORNEYS EYES ONLY".)

The late date again means the document does not address the interpretation question at the time of the invention, and its internal, confidential nature also means that the ordinary person of skill in the art would not be familiar with it. The relevant question is also what "wall" means—not what "muro" in Spanish means because "muro" is not a term used in the claims of the '514 and '822 Patents. Figures 13–14 of the De La Cerda Decl. are to other Crystal Lagoons projects. Again, each significantly post-date the purported invention date, and neither call the sloped floor a wall. (Cloward Supp. Appx. at 125–26, Epperson Ranch Schematics (dated June 2015 and noting vertical surfaces as "walls" and sloped bottom as the "floor"). Crystal Lagoons also argues that construction of "wall" to be substantially vertical surfaces would result in the patent not covering Crystal Lagoons' own projects—an argument also belied by its own documents (*See* Cloward Supp. Appx. at 132 (pointing to exposed "liner" covering the concrete wall).)

The remainder of Ms. De La Cerda's figures and annotations do not originate in the cited material but are, rather, attorney creations first presented in June 2020 in Crystal Lagoons' Second Amended Complaint. (*Compare* De La Cerda Decl. Figures 1, 15, and 16 *with* Dkt. No. 39, Second Amended Complaint, at p. 14, 17–18.) Ms. De La Cerda also took liberties to modify a photograph from a liner company's website without indicating the modification:





**Original photograph**
(***See also*** **Cloward Supp. Appx. at 158–59.)**

**Modified photograph used as an example of large water bodies using "sloped walls."**
**(De La Cerda Decl. at 3–4.)**

13

Thus, these annotated figures are only reflective of Crystal Lagoons' changing litigation positions in an effort to maintain this lawsuit—not reflective of the understanding of those of skill in the art at the time of the invention.

Lastly, Crystal Lagoons' definition for "wall" as any "structure that serves to hold back pressure" cannot be reconciled with the language of the claims themselves. The claims require that plastic covers both the "bottom *and* walls" meaning that the "walls" are different than the bottom/floor of the structure. But under Crystal Lagoons' definition of "wall," the bottom would also be a wall as a structure that holds back pressure, and "bottom" would thereby be indistinguishable from "wall." *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("Our precedent instructs that different claim terms are presumed to have different meanings.") (citing *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings....")).

Crystal Lagoons' argument that a "wall" could also be the floor is contrary to the patent claims, Crystal Lagoons' own designs, and documents relevant to those of skill in the art, such as pool codes. Again, Crystal Lagoons' argument is litigation-driven in an effort to maintain its infringement case against the Hard Rock Lagoon and is not rooted in the understanding of those of skill in the art. The Court should reject it and adopt Cloward H2O's proposed constructions.

> **5.** **Crystal Lagoons told the Patent Office that the liner needed to be uniform because a liner broken up by floor inlets would be incompatible with the '514 Patent and would disrupt the claimed thorough cleaning of the liner.**

In addition to arguing that the wall can be the floor, Crystal Lagoons argues that the plastic liner does not need to be uniform or be able to be thoroughly cleaned. This position is also at

odds with the language of the claims themselves and representations made by Crystal Lagoons to the Patent Office. The claims themselves require a structure with "a bottom and walls covered in plastic liner … able to the thoroughly cleaned" and "suction device for cleaning the plastic liner." It does not get more straight-forward than that. The specification also notes that it is the liner that is cleaned. (JA at 17–19, '514 Patent at col. 9, lns. 27–32, at col. 13, lns. 38–48.)

When prosecuting the patent application for the '514 Patent, Crystal Lagoons also argued that if the plastic liner were not uniform and were broken up by floor inlets, then thorough cleaning of the plastic liner would not be possible. Specifically, Crystal Lagoons argued that "[The prior art] is incompatible with the present invention, as the present invention includes a bottom covered with a plastic liner that is able to be thoroughly cleaned, whereas the spray jets located in the bottom of the structure disclosed by [the prior art] would not allow the normal functioning of a bottom cleaning device (e.g., a suction device). Also the installation of spray jets in the bottom might cause damage to the liner …." (JA at 193, Amendment and Response at p. 6.) *See also MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1312 (Fed. Cir. 2017) ("this explanation presented by the inventor during patent examination is relevant to claim construction, "for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented.") (quoting *Fenner Invs. Ltd. v. Collco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015)).

The Court should, therefore, adopt Cloward H2O's proposed constructions.

**B.    Crystal Lagoons presents no evidence or argument that water "removal" by displacement means anything other than elimination of water.**

Crystal Lagoons' arguments deflect from the claim interpretation issue in need of resolution by the Court. In particular, the claim terms require a fresh water feeding pipe or inlet water to

displace surface water and removal of the displaced surface water through the skimmers. (JA at 22, '514 Patent at claim 1; JA at 62, '822 Patent at claim 1 (top of column 20).) Crystal Lagoons' arguments focus on *how much water* must be removed by displacement. Accordingly, at least by the arguments in its opening brief, Crystal Lagoons does not appear to dispute that the claimed skimmers must remove water and only disputes whether the amount of removed, displaced water must be "substantially equivalent" to the amount of water fed into the structure.

1. **Crystal Lagoons' argument that new water may just replace normal water loss ignores the language of the claims.**

Crystal Lagoons argues that water loss from a water structure may occur based on a number of causes such as "leakage, evaporation of water," etc. There is no dispute about that, and make-up water is certainly added to traditional pools to make-up for evaporation, leakage, splashing water out of the pool, etc. But Crystal Lagoons' argument deflects from the claim language which requires that the addition of water itself causes the water loss through the skimmers. In other words, the claimed structure is an "open" system or a "flow-through" pool in which dirty water is ejected rather than continually recycled through a traditional filtration system. (*See* Cloward Supp. Appx. at 166, Swimming Pools (4th ed. 2000).)

Crystal Lagoon argues that "nothing in the specification of the '822 patent requires that the new water be removed [by the skimmers]." But the plain language of the claims of the '514 and '822 Patents themselves require it: "water removal by displacement of surface water through the skimmer system" and "removing displaced surface water using the skimmers." (JA at 22, '514 Patent at claim 1; JA at 62, '822 Patent at claim 1.) And the claims consistently reference, and therefore require, the "removal" of impurities and surface oils as well as "removal" of precipitated impurities from the bottom of the structure with the movable suction device. (*Id.*)

16

*See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998) ("the same word appearing in the same claim should be interpreted consistently.").

### 2. The specification states that elimination of water through the skimmers is a necessary part of the invention.

The specification of the '514 and '822 Patents states that an "open" or "flow-through" system with elimination of water through the skimmers is necessary according to the invention of those patents.  (JA at 17, '514 Patent at col. 9, lns. 17–26.) Further, the patents state that the "structures or ponds *must have* water intakes that allow using low cost water since, *in contrast to swimming pools that recycle water through their filters*, in this case *the water from the skimmers and the suction cart or device is disposed of*." (JA at 17, '514 Patent at col. 10, lns. 31–36 (emphasis added).) And it is this "process of movement of superficial water toward the skimmers caused by fresh water entry together with the flocculant-suction device system [that] replaces the traditional filtering system of swimming pools." (JA at 17, '514 Patent at col. 9, lns. 54–62.)

Over and over again, the '514 and '822 Patents state that water disposal through the skimmers is necessary to achieve replacement of traditional filtration, which is repeatedly and consistently stated as the central purpose of the invention and is therefore strongly suggested to be a part of the claims. *See Vernetx, Inc, v, Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014). (*See also* JA at 1–22, '514 Patent at Abstract (removal of surface water with its impurities and surface oils "replaces traditional filtration"), at col. 4 lns. 54–67 (removal of water through dumps to fulfill objective), col. 9, lns. 1–16 (removal of water through skimmers complements water removal through suction device to replace traditional filtration), col. 9, lns. 6–9 (necessity of controlling "injection of fresh water to ensure the correct displacement and removal of superficial water with impurities and oils through the skimmers"), col. 9, lns. 43–53 (necessity of

skimmers that remove water and surface oils for replacement of traditional filtration), col. 9:54–62 (if water is not removed then chemical treatment may be rendered inefficient and frustrate the purpose of the invention).)

Accordingly, water disposal through the skimmers—in addition to being explicitly claimed as part of the invention—is described in the specification as absolutely necessary to the invention. Thus, when applying for the patents, Crystal Lagoons told the Patent Office that water recycling through filtration systems was nothing like the flow-through fresh water causing water removal through displacement. (JA at 195, Amendment and Response at p. 8 ("The filtration system of [the prior art] neither discloses nor suggests 'a fresh water feeding pipe system that allows entrance of fresh water and results in water removal by displacement of surface water through the skimmer system'").) *See also MasterMine*, 874 F.3d at 1312 (Fed. Cir. 2017) (noting that statements made during prosecution are relevant to interpretation of the claims).

Crystal Lagoons' apparent current interpretation of its patents to cover recycling of water through filters as opposed to removal is at odds with the language of the claims, specification, and its own representations during the prosecution of the patents. The Court should, therefore, adopt Cloward H2O's proposed constructions.

### 3. Crystal Lagoons focuses on whether fresh water causes disposal of a "substantially equivalent amount" of displaced surface water avoids the dispute, and Crystal Lagoons does not identify any other possible meaning.

The claims require that entrance of fresh water results in removal of "displaced" surface water. (JA at 22, '514 Patent at claim 1; JA at 62, '822 Patent at claim 1.) "Displace" is not an unusual term—it means "to take the place of." Thus, for surface water to be removed by water taking its place, a substantially equivalent amount of water must be introduced into the structure.

Crystal Lagoons' arguments indicate that it takes issue with the ordinary meaning of displacement. But Crystal Lagoons states only that the "plain and ordinary meaning" should apply but does not ever say what alternative "plain and ordinary" interpretation it believes should apply, which does nothing to help the Court resolve the claim interpretation dispute. (*See* Section I, *supra*.) Crystal Lagoons' undisclosed, alternative interpretation only serves to delay the claim construction issue about "displacement," if there is one at all. If there is no claim construction issue regarding displacement, then Crystal Lagoons' argument on the point is nothing more than a sideshow.

The claim construction issue is whether "removal" means what it says—that water is removed from the structure through the skimmers. Crystal Lagoons' opening claim construction brief does not appear to dispute the point. Therefore, the Court should adopt Cloward H2O's proposed constructions.

### C. Crystal Lagoons shows that it is seeking claim constructions to cover ordinary pool vacuums used with traditional filtration systems as opposed to the inventions' pumping system and suction device that replace filtration systems.

Crystal Lagoons argues that there is nothing about the '514 and '822 Patents that requires the claimed pumping system and moveable suction device to replace a traditional filtration system. The argument is baseless because *everything* about the '514 and '822 Patents is about the replacement of traditional filtration.

The '514 and '822 Patents gave a special definition to the term "suction device"—in contrast to an ordinary pool vacuum—as "replac[ing] completely the traditional filtering system of swimming pools together with the use of flocculants." (JA at 17, '514 Patent, col. 9, lns. 1–15; *see also* JA at 18, *id.* at col 12, lns. 3–9; JA at 21, *id.* at col. 17, lns. 29–31.) But, in addition, the

'514 and '822 Patents repeatedly and consistently characterize the invention as one to completely replace traditional filtration, which "strongly suggests that [replacement of traditional filtration] should be read as part of the claim. *Vernetx,*, 767 F.3d at 1318.

In *Vernetx*, the Federal Circuit reversed the district court's construction of "secure communication link" as requiring only data "security" and not "anonymity" as well. 767 F.3d 1308, 1319 (Fed. Cir. 2014). The issue came down to context. "Secure" with respect to the disclosed invention required both security and anonymity, in the context of the asserted patent. The Federal Circuit noted that "the addition of anonymity is presented as one of the primary inventive contributions of the patent." *Id.* at 1317. It also noted the "fact that the Summary of the Invention gives primacy to [both] these attributes strongly indicates that the invention requires more than just data security." *Id.* at 1318 (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term.")). Finally, "[t]he fact that anonymity is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim. *Id.* (quoting *Eon–Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1321–23 (Fed. Cir. 2011)).

Like in *Vernetx*, the '514 and '822 Patent repeatedly and consistently characterize the invention in connection with the "suction device" as a complete replacement for traditional filtration. The Abstract notes that the ejection of surface water, flocculation, and ejection of flocculated impurities with the suction device "replaces traditional filtering." (*See* JA 1–22.) The introductory summary states the same. (*Id.* at col. 1, lns. 24–30.) The summary of the invention provided in the State of the Art section also notes that "the present invention" substitutes

20

traditional filtration with the ejection of flocculated impurities through the suction device and skimmers. (*Id.* col. 4, lns. 45–52.) The Description of the Invention section also notes that, through removal of water with flocculated impurities and removal of water through the skimmers, "traditional filtering processes used in swimming pools are replaced." (*Id.* at col. 8, lns. 45–47.) Then, the very "objective of the suction device" is for the "suction device [to] replace[] completely the traditional filter system of swimming pools together with the use of flocculants." (*Id.* at col. 9, lns. 4–5.) The patents repeatedly describe the primary inventive contribution of the patents as replacing traditional filtration. (*Id.* at col. 9, lns. 50–53 ("replaces the traditional filtering system of swimming pools"), col. 17, lns. 34–35 ("the replacement of filtering by a suction device and skimmers"), col. 18, lns. 30–32 ("Flocculation and bottom cleaning by suction together with skimmers replace the filter system of conventional swimming pools"), Table 5 (contrasting the traditional filtration of the water once every 24 hours against the "suction device" of the '514 and '822 Patents).) "The fact that [replacement of traditional filtration by the suction device] is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim. *See Vernetx*, 767 F.3d at 1318.

Because the "suction device" replaces traditional filtration, the suction device and "pumping system" must dispose of water with the flocculated particles. (JA at 17, *id.* at col. 10, lns. 31–36.) Specifically, the pumping system is coupled to the suction device for the purpose of pumping water with flocculated impurities on the bottom of the structure and disposing of it. (*Id.* ("The crystalline structures or ponds must have water intakes that allow using low cost water since, in contrast to swimming pools that recycle water through their filters, in this case the water from the skimmers and the suction cart or device *is disposed of*.") (emphasis added).)

Accordingly, Crystal Lagoons argument that the '514 and '822 Patents do not require the claimed pumping system and moveable suction device to replace a traditional filtration system is baseless because such replacement is the very purpose of the patented invention. Additionally, Crystal Lagoons' suggestion that "pumping system" and "mobile suction device" be construed as a traditional "suction pump" and pool "vacuum" shows the unreasonable meaning that Crystal Lagoons gives to the claims. For these reasons, the Court should adopt Cloward H2O's proposed constructions.

## IV.   Construction of Terms and Phrases for the '520 Patent

Crystal Lagoons' arguments regarding the claim terms for the '520 Patent show that it seeks Court blessing for its interpretation that the claimed methods steps do not require an accused infringer to do anything at all except treat a pool with chlorine. But no person of skill in the art would completely ignore the claim language and interpret the claims of the '520 Patent as Crystal Lagoons does. And the Court should reject Crystal Lagoons' arguments to that end.

### A.   The claims are directed to treatment of a "portion of water" within a water body that is delimited from the rest of the water body by a delimiting zone.

Crystal Lagoons argues that "portion" is an ordinary term that needs no construction—it just fails to identify what supposedly ordinary definition it is operating under that is other than the plain and ordinary definition of "portion" as "part of." By avoiding the issue, Crystal Lagoons seeks a determination that "portion of a water body" can mean the "whole water body." Crystal Lagoons position is inconsistent with the claims, which require a "delimiting zone" that delimits the portion of the water body from the rest of the water body. Construction of "portion" to include "whole" eviscerates the idea of the claimed "delimiting zone." Similarly, Crystal Lagoons argues that the term "delimiting zone" does not mean that the water beyond the

22

delimiting zone is not treated according to the claimed method. Again, if the water beyond the delimiting zone is treated in the exact same way according to the claimed method as the water within the delimiting zone, then what is "delimited"? Crystal Lagoons' arguments render these claim terms meaningless.

The claims of the '520 Patent themselves are drawn to a "method for controlling microbiological properties of a portion of water within a water body"—not for treating an entire water body in the same way. (JA at 37, '520 Patent at claim 1.) Additionally, the specification of the '520 Patent repeatedly and consistently describes the invention as treatment of only a portion of a water body according to the claimed method and not the entire water body. (JA at 28–31, '520 Patent at col. 1, lns. 10–13, at col. 4, lns. 38–43 (noting that treatment and circulation of an entire water body is prior art and incompatible with creation of the sanitary compliance zone of the invention), at col. 7, lns. 53–66 (noting the "limitation or impossibility of treating the whole water body" such that only a portion is treated).) Crystal Lagoons' citations to the disclosure of the '520 Patent in its argument also do not support that the area outside the portion of water is treated according to the claimed method. (JA at 31–34, '520 Patent at col. 7, lns. 5–19 (noting a part of the water body is to be treated for maintenance of sanitary compliance), at col. 12, lns. 4-10 (noting chemical treatment only at a portion of the water body), at col. 13, lns. 24–28 (noting application of chemicals to the portion of water within the large water body).)

Accordingly, Crystal Lagoons' claim interpretations of "portion" as including the whole and "delimiting zone" to not delimit between areas treated with the claimed method and those not treated with the claimed method are entirely at odds with the claims and specification. The repeated and consistent characterization of the invention as treating only a portion of water

according to the claimed method "strongly suggests that it should be read as part of the claim." *Vernetx*, 767 F.3d at 1318. The Court should therefore adopt Cloward H2O's constructions.

### B. Crystal Lagoons' argument that the claimed "determination" steps do not require an accused infringer to do anything at all is contrary to the claims—and contrary to fundamental patent law.

Crystal Lagoons argues that "determining" salinity or temperature cannot be only testing or measuring but could include "deciding the salinity and temperature of the water during design of a water body or obtaining values from public knowledge." This argument is incompatible with the claims themselves and with the description of the invention.

The claims describe a portion of water with a most unfavorable zone that actually "exhibits the lowest ORP value" and determination of the salinity at water temperature at that most unfavorable zone. (JA at 37, '520 Patent at claim 1.)  In other words, it is not a theoretical exercise. The measured salinity and water temperature are then used in the claimed decision trees and equations. (*Id.*)

The specification also specifically contrasts "determination" of salinity and water temperature with simply "knowing" them from other sources:

> The salinity [(1)] can be determined by empirical or analytical methods such as visual tests; Salinometers that are based on the conductivity of electricity in the water; hydrometers that are based on the specific gravity of the water, or refractometers that are based on the index of refraction of the water; or [(2)] may be publically [sic] known or [(3)] can be information from other sources, among others.

(JA at 35, '520 Patent at col. 15, lns. 22–28; *see also id.* at lns. 29–33 (same with respect to water temperature).) The claims are directed only to the first of these, and "determination" is by either "empirical" methods such as testing and measurement or "analytical" methods such as by indirect calculation. Cloward H2O has no issue with adding "calculated" to testing and

measuring as part of determining salinity and water temperature. The point is that the claims require the accused infringer to do something—the salinity and water temperature just being known or capable of determination is not enough. *See Limelight Networks, Inc. v. Akamai Techs., Inc.,* 572 U.S. 915, 921 (2014) ("A method patent claims a number of steps; under this Court's case law, the patent is not infringed unless all the steps are carried out.").

Crystal Lagoons also argues that the claimed determination steps do not require "that calculations based on equations [of claim 1] must actually be performed." (Crystal Lagoons' Opening Brief at 24.) This argument is also contrary to the claims themselves that repeatedly state that the determined values are "calculated by" the recited equations. *See Limelight*, 572 U.S. at 921 (patent infringement requires that method steps be carried out).

Crystal Lagoons' argument that the claims do not require an accused infringer to do anything with salinity measurements, temperature measurements, or the provided calculations simply ignores the claim language. The claims would be reduced to treating a standard swimming pool with chlorine—which is not how a person of skill in the art, the Patent Office, or anyone else would interpret the claims. The claim terms have to mean something and require an accused infringer to do what they say.

Crystal Lagoons' arguments only confirm that it seeks to eliminate the vast majority of the language from its claims by asking the Court to go along with the interpretation that the claims do not require a determination of anything or that the claim steps be performed. The Court should reject this argument that is at odds with fundamental patent law.

## V.   CONCLUSION

For the foregoing reasons, the Court should adopt Cloward H2O's proposed constructions.

Dated: June 21, 2021.                    Respectfully submitted,

                                         MASCHOFF BRENNAN

                                    By:  */s/ Jared J. Braithwaite*
                                         Jared J. Braithwaite
                                         Alexis K. Juergens

                                         Attorneys for Defendant Cloward H2O LLC