IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

CENTRAL DIVISION


CRYSTAL LAGOONS U.S. CORP.,        )

              Plaintiff,           )

vs.                                )   Case No. 2:19-CV-796BSJ

CLOWARD H20,                       )

              Defendant.           )

_____)



BEFORE THE HONORABLE BRUCE S. JENKINS
-------------------------------------

September 2, 2021


Claim Construction Hearing

1

2                    A P P E A R A N C E S

3

4

5    For Plaintiff:              ANTHONY ZEULI
                                 KAREN BECKMAN
6                                150 South Fifth Street
                                 Suite 2200
7                                Minneapolis, Minnesota

8                                JAMES WATSON
                                 230 South 500 East
9                                Suite 300
                                 Salt Lake City, Utah

10

11

12   For Defendant:              JARED BRAITHWAITE
                                 ALEXIS JUERGENS
13                               111 South Main Street
                                 Suite 600
14                               Salt Lake City, Utah

15

16

17

18

19

20

21   Court Reporter:             Ed Young
                                 351 South West Temple
22                               Room 3.302
                                 Salt Lake City, Utah 84101-2180
23                               801-328-3202
                                 ed_young@utd.uscourts.gov

24

25

1   September 2, 2021                              10:00 a.m.

2                    P R O C E E D I N G S

3

4          THE COURT:  Good morning.

5          Why don't we go ahead in Crystal Lagoons U.S.

6   Corp. versus Cloward H20.  It is 2:19-C-796, here today

7   calendered as a construction hearing to consider the

8   concerns of each of the parties.

9          Those who are making appearances, if you will be

10  good enough to make a record and tell us who you are and

11  whom you represent.

12         To begin with I note that counsel had asked for a

13  client to be able to Zoom in and that is fine.  I should

14  point out, of course, that the only record made is that by

15  the official court reporter.  So there is no recording on

16  the part of anybody other than the official court reporter.

17  It is that understanding that the Court has in reference to

18  those who observe.

19         At any rate, those who are here as counsel for the

20  litigants, if you will again make a record for us and tell

21  us who you are and whom you represent.

22         MR. ZEULI:  Good morning, Your Honor.

23         I am Tony Zeuli from the law firm of Merchant and

24  Gould.  I represent the plaintiff Crystal Lagoons in this

25  matter.  With me today as attorneys are Karen Beckman from

my law firm and also James Watson, local counsel from the
Trask Britt firm.  To my right is a client representative,
Fernando Fishman, who is the owner and president of Crystal
Lagoons and also the inventor in this case.

        THE COURT:  Okay.  Thank you.

        MR. ZEULI:  Thank you.

        MR. BRAITHWAITE:  Good morning, Your Honor.

        Jared Braithwaite on behalf of Cloward H20,
L.L.C., the defendant.  With me today is the president of
Cloward H20, Cory Cloward.  I also have from my firm Alexis
Juergens accompanying me.

        THE COURT:  Okay.  We're concerned, as you know,
today primarily about language and the adequacy of language
and the clarity of language.  We're not dealing with any
subject other than the language and the adequacy of the will
claims as written to adequately convey the alleged claim and
the extent of the claim of the inventor.

        I think procedurally it would make sense if we had
the defendant begin today.  In looking at the language,
we're all concerned with whether or not the language
adequately conveys information.  The information has to do
with both the structure and the process and the application.
Our job is to look at the language and our job today is not
to construe the application of the language to the process
or to the structure or the related matters.  Our job is to

1    see if the language as language conveys information that is

2    agreeable with the recipient here, the reader, so that we're

3    talking about the same subject.

4         So I think it would be appropriate under the

5    circumstances, looking at the questions raised, if the

6    defendant took time to deal with his concern, if there is a

7    concern, with the language that is of concern to him, after

8    which we'll deal with the first concern.  We'll have the

9    defendant respond -- that is the plaintiff respond through

10   counsel, and then we'll deal with the second one and we'll

11   deal with each one as we go, so that we can identify what

12   defect or flaw or need may exist for clarity and simplicity

13   so that we're all talking about the same thing.

14        So, counsel, why don't you start.

15        MR. BRAITHWAITE:  Thank you, Your Honor.

16        Permit me a moment.  To the extent anything visual

17   is needed, it will come out on the overhead.

18        THE CLERK:  I think you're going to have to take

19   your mask off.  Thank you.

20        MR. BRAITHWAITE:  Good morning, Your Honor.

21        As I understand what the Court is asking, is we're

22   not concerned today about applying the claims to the accused

23   product, but rather determining what the meaning of claim

24   terms are.

25        THE COURT:  That is right.

1           MR. BRAITHWAITE:  And so I think the most

2   important aspect of this case is context.

3           THE COURT:  I agree with you.  So it is.

4           MR. BRAITHWAITE:  That is what we're doing here on

5   claim construction.  The seminal cases on claim construction

6   are the Markman case and the Phillips case, Markman from the

7   Supreme Court establishing the procedure for claim

8   construction, and Phillips from the Federal Circuit talking

9   about what courts should generally look at, because the task

10  here today is to understand what those of skill in the art

11  would come to understand by reading the patent and reading

12  the claims to understand what it is supposed to cover.

13          THE COURT:  I'm always interested in what skill

14  and what art.

15          MR. BRAITHWAITE:  What we proposed, Your Honor, is

16  that the person of skill in the art is someone with a

17  bachelor's degree in civil engineering that would be

18  familiar with and have some experience in building

19  recreational water facilities, whether they be large

20  swimming pools, large wave pools, things of that nature.

21  There are kayaking training facilities and --

22          THE COURT:  I want you to focus on the words of

23  the specific claims that you say are in need of some help.

24          MR. BRAITHWAITE:  I understand.

25          The first one I think that we briefed and that

we're going to address is the term walls.  What would a
person of skill in the art understand is a wall or would be
encompassed within the meaning of the term wall.  Again,
this is where context is important, because I can talk about
a long day in court and it is 6:00 in the afternoon and I
have hit a wall.  Well, I have not literally run into a
wall.  It is a form of speech to say that I'm tired and I'm
exhausted.

So in one context such as exhaustion, wall might
mean some sort of ethereal term of exhaustion, but that is
not what we are talking about.  We're talking about
recreational water structures.  What does wall mean in that
context?  What the court said is ultimately the
interpretation of a term can only be determined and
confirmed with the full understanding of what the inventor
actually invented and intended to envelope with the claim.
The construction stays true to the language and most
naturally aligns with the patent's description of the
invention will be in the end the correct construction.

Another aspect of what we're not doing today is
looking at what --

THE COURT:  What don't you understand about wall?

MR. BRAITHWAITE:  Let's move on to wall directly.

THE COURT:  That is what you're focusing on.

MR. BRAITHWAITE:  Yes.  Correct, Your Honor.

1          The context for this dispute and why it is even an

2    issue for the Court to decide and determine what wall means

3    is because on the one hand Crystal Lagoons' interpretation

4    in this case has been that wall can be anything.  It can be

5    any surface of a water structure.  It could be the wall.  It

6    could be the floor.  It could be another portion of the

7    floor.  It could be the sloped floor.  It could be any

8    surface, and that does violence to the terms of the claims

9    and is counter to the description of the patent and is not

10   how anyone of skill in the art would understand the term

11   wall.

12          That is why it is an issue is that the decision

13   point for the Court is is the scope of the word wall

14   anything, including the floor, or is it --

15          THE COURT:  Well, why don't you describe your

16   understanding of the structure.

17          MR. BRAITHWAITE:  Our understanding starts with

18   the plain and ordinary definition that would be given by any

19   layperson and that is consistent with how a person of skill

20   in the art would view wall.  I have a wall on the left hand

21   and I have a wall over here and I have a wall behind Your

22   Honor in the --

23          THE COURT:  I understand that the function is

24   contextual.  Tell me your understanding of the context of

25   the use of the term here.

1          MR. BRAITHWAITE:  So the context of recreational

2     water structures -- we can look at how people of skill in

3     the art use these terms.  In particular, before this case

4     was ever filed, the defendant here, Cloward H20, used the

5     term wall and the term floor in their plans for the accused

6     product.  The wall is the vertical sidewalls to the

7     structure and the floor is the bottom, what people would

8     walk on, and that is a distinction that others of skill in

9     the art would make as well.

10          What we have, on the other hand, from Crystal

11     Lagoons is one of their employees, Ms. De la Cerda, she

12     submitted a declaration saying wall is broader than that.

13     Look, I found a paper about bioswells --

14          THE COURT:  No.  Why don't you just tell me your

15     trouble -- your trouble, if there is trouble, with wall.

16     Are we talking about the sides, the sides of the structure,

17     the pond, the lake, the lagoon --

18          MR. BRAITHWAITE:  That is --

19          THE COURT:  -- the depression?  What are we

20     talking about?

21          MR. BRAITHWAITE:  What we're talking about when we

22     say wall, and what we think all those of skill in the art

23     would understand by wall is the sides, the vertical sides.

24          THE COURT:  That is your impression.  Okay.  Now

25     does the claim say that?

1          MR. BRAITHWAITE:  Yes, the claims do say that.

2          THE COURT:  Well, you don't have any trouble then

3     with that, do you?

4          MR. BRAITHWAITE:  Well, yes.  It is a dispute

5     because --

6          THE COURT:  It might be a dispute, but it is a

7     dispute down the road.  It is not a dispute on claim

8     construction.  It says what it says.

9          MR. BRAITHWAITE:  I agree, Your Honor, and that is

10    how the claim should be approached, but the problem we have

11    in this case is a dispute over the term scope of the wall.

12         THE COURT:  Well, scope is a different question.

13    Meaning is what we're concerned with.  We're concerned with

14    the use of words and what the word conveys, what is behind

15    the word.

16         MR. BRAITHWAITE:  Exactly.  That is where the

17    parties have a dispute and that is the function of the Court

18    during claim construction to decide which understanding of

19    the term is correct.

20         THE COURT:  Well, your understanding is sides.

21         MR. BRAITHWAITE:  Yes, the substantial vertical

22    sides of the --

23         THE COURT:  I don't know where substantial comes

24    from, but I understand your suggestion that --

25         MR. BRAITHWAITE:  Yes, the sides.

1        THE COURT:  Okay.  I will hear from them as to

2   their attitude toward your suggestion as to the

3   interpretation to make sure that you're operating on the

4   same wavelength.

5        MR. BRAITHWAITE:  Yes.  That is what we're trying

6   to do here, and what I have prepared is to really show that

7   those of skill in the art consistently do not understand a

8   wall to refer to the floor, the bottom, what people walk on.

9        THE COURT:  I don't have any trouble with that

10  concept, frankly.  Language is what it does and language has

11  inherent defects, and I just want to make sure that you're

12  talking about the same thing.  If they want to suggest that

13  a wall refers to something other than the sides, let them

14  put that pitch.

15       MR. BRAITHWAITE:  I understand, Your Honor, that

16  that question is technically teed up in our motion for

17  summary judgment next month and we are not addressing that

18  here today.

19       THE COURT:  No, we are not.

20       MR. BRAITHWAITE:  But I think what we're trying to

21  do, and I will get on that same page so we have a common

22  definition so in October when we approach that question

23  there are not disputes where Crystal Lagoons is still

24  saying, well, the floor can be a wall or the term wall --

25       THE COURT:  Well, let's see what happens.

1          As you suggest and the function of language, and

2     it is one of the odd things in the rules that suggest

3     construction prior to the time that we engage in summary

4     judgment or at the time we engage in pretrial, but I

5     understand your suggestion.

6          What is your next term besides wall?

7          MR. ZEULI:  Excuse me, Your Honor.  I think the

8     parties had agreed, if it is okay with the Court, that we

9     were going to go term by term.

10         THE COURT:  Yes, we're going to do it term by

11    term, but my question is what is your next term?

12         MR. BRAITHWAITE:  The next term would be covered

13    with a plastic liner made of nonporous material able to be

14    thoroughly cleaned.

15         THE COURT:  Now we're going to have counsel take a

16    moment and talk about walls.

17         MR. BRAITHWAITE:  Thank you.

18         MR. ZEULI:  Good morning, Your Honor.  Again, I'm

19    Tony Zeuli.  I represent the plaintiff in this case.

20         Before I talk to you about walls, may I remove my

21    mask?

22         THE COURT:  Yes.

23         MR. ZEULI:  Thank you.

24         I failed to introduce, when we started this

25    morning, Bill Hamilton.  Bill is seated right behind me and

Bill is a trial graphic specialist and he will be running

the PowerPoint.  If the court would be kind enough to switch

over to the plaintiff's side, we will get talking about

walls.

I also wanted to ask, and perhaps your assistant

is dealing with this, but our client representative who is

on the Zoom is unable to hear.  We are wondering if there is

a microphone switch that would allow her to hear the

proceedings?

THE COURT:  Is she the one viewing from outside?

MR. ZEULI:  Yes, sir.

THE COURT:  Okay.  Kim, have we got something that

would be helpful?

THE CLERK:  We're trying to keep it on.

MR. ZEULI:  Thank you very much for trying.  We

will go ahead and proceed and if you are able to join her,

wonderful, but, otherwise, I will talk to you.

THE CLERK:  Our I.T. guy is going to come up.

They are there, but I don't know why it is muted.

MR. ZEULI:  Thank you very much for looking.

THE CLERK:  We are doing the best we can right

now.

MR. ZEULI:  Thank you very much.  It is greatly

appreciated.  If we could switch the dial to the plaintiff's

side, we will put our presentation up.

1        While that is coming up, Your Honor, I just want

2   to talk about a couple of things that the Court mentioned.

3        THE CLERK:  I think we're good, Judge.

4        THE COURT:  Okay.

5        MR. ZEULI:  Good.

6        You know, one of the things Your Honor said is is

7   there a defect in the patent?  Do we need to address the

8   clarity or simplicity?  I believe at an earlier hearing the

9   Court talked about when we got to this day that we would

10  look to see was there ambiguity or confusion in the patent

11  and the answer to that is no, there is not.

12       THE COURT:  Okay.

13       MR. ZEULI:  Defendants, as is often the case in

14  these patent litigation cases, will raise claim construction

15  issues with the hopes of creating a noninfringement defense.

16  The way that it works quite simply is that they take a look

17  at something that is fairly straightforward on their product

18  and they say, well, look, our liner, which we'll talk about

19  next, or our walls are not vertical or they are wrinkly.  If

20  we can get the Judge to require that this word, wall, that

21  is not modified by vertical, get them to change that, then

22  we have got a defense.

23       The same thing with liner.  They are wrinkly.  If

24  we can get the Judge to say that the liner can't be wrinkly

25  and it has to be smooth or uniform, then they have a

1    defense.  I think the Court was correct in thinking about

2    this problem in the way that it does.

3           Let's look at the patent.  What does the patent

4    tell us, because that is the intrinsic evidence.  Those

5    cases that Mr. Braithwaite cited to you, Phillips and

6    Markman, that is what they talk about.  First we're going to

7    look at the intrinsic evidence.  Let's look to see what the

8    intrinsic evidence says.

9           The word in the patent claim is walls.  They want

10   to add the word substantially vertical.

11          THE COURT:  Well, it is nonexistent and I

12   understand that, and as far as those words are concerned,

13   we're stuck with what is there, and the question is what

14   does that mean in the context of what we're talking about.

15          MR. ZEULI:  It is a simple word that jurors will

16   understand.  It is a common English term that needs no

17   definition.

18          THE COURT:  You say it is plain and ordinary.

19          MR. ZEULI:  Plain and ordinary.

20          THE COURT:  I say the same thing and there is no

21   construction necessary.

22          Let's move on to the second one.

23          MR. BRAITHWAITE:  Thank you, Your Honor.

24          The next term is covered with a plastic liner made

25   of a nonporous material able to be thoroughly cleaned.  Now,

1   using the words of the claim, because this is where it

2   matters, first it falls in the context of the claim, and

3   there on about line 5 what it describes is a bottom and

4   walls covered with a plastic liner made of a nonporous

5   material able to be thoroughly cleaned.  I think the issue

6   here is what does covered mean, especially in light of the

7   intrinsic evidence of the patent and the prosection history

8   as described by the inventor and what doesn't it refer to.

9         So when it talks about the bottom covered with a

10  plastic liner, that is distinguishing the floor of the

11  structure from the sides, the walls covered with a plastic

12  liner.  But the purpose for it being covered is so that it

13  can be cleaned.  So on the one hand we're dealing with in

14  this case a question of whether covered means not covered,

15  it means plastic that is not exposed and that can't be

16  cleaned.

17        The plain and ordinary meaning of able to be

18  cleaned and --

19        THE COURT:  Let me ask a direct question.  We're

20  talking about claims and we're talking about a description

21  of the use of a plastic material at a particular location.

22        Is there some ambiguity on that?

23        MR. BRAITHWAITE:  There is because of how the

24  patent applicant described it.  Crystal Lagoons has noted

25  that we want the Court to construe it as a uniform plastic

1    liner, and Crystal Lagoons has gone on at length about

2    wrinkles.  This has nothing to do with wrinkles.

3           Here is the issue, Your Honor, is during the

4    prosecution of this patent, so as the patent applicant was

5    engaged in a back-and-forth with the patent office, a

6    question came up over what does this cover and does it not

7    cover.  The examiner used a piece of prior art, something

8    that predated the patent called the Cant patent.

9           THE COURT:  Yes.  That is the --

10          MR. BRAITHWAITE:  So the patent examiner said,

11   hey, look, here is a pool and it would have been obvious to

12   put a plastic liner on the bottom so you don't get a patent.

13   What the patent applicant said in response is important and

14   provides context for what the patent applicant meant by

15   plastic liner that is able to be thoroughly cleaned.

16          I have put on the screen what the patent

17   application submitted to the patent office and their

18   argument in response was, therefore, the system disclosed by

19   Cant is incompatible with the present invention, as the

20   present invention includes a bottom covered with a plastic

21   liner that is able to be thoroughly cleaned, whereas the

22   spray jets located in the bottom of the structure disclosed

23   by Cant would not allow for normal functioning of a bottom

24   cleaning device.

25          Spray jets that interrupt the plastic liner, and

that is what we mean by uniform, and if there are spray jets
or inlets that interrupt the plastic liner, the patent
applicant says then you can't thoroughly clean the bottom.
So that is what makes us different than Cant and that is why
we should get a patent.

THE COURT:  We don't have jets.

MR. BRAITHWAITE:  We are dealing with jets, Your
Honor.

THE COURT:  Are we talking about the Cant claim?

MR. BRAITHWAITE:  No, we are not talking about the
Cant claim.  We are talking about the claims in the 514
patent and --

THE COURT:  Are there jets there?

MR. BRAITHWAITE:  No, there are not.

THE COURT:  We're talking about an absence of
jets?

MR. BRAITHWAITE:  Correct.

They need to be absent, because the patent
applicant said if there are inlets and jets, our claims
don't cover it and that is what makes us different than
Cant.

THE COURT:  Well, okay.  So what?

MR. BRAITHWAITE:  The liner on the bottom -- that
is what we're asking the Court to decide is that the liner
on the bottom then needs to be uniform.  That is what is

actually claimed is a uniform plastic liner.  If the plastic
liner is interpreted as being broken up by spray jets and
inlets, then the recapturing ground that they gave up before
the patent office, and that is part of our function on claim
construction is to say a person of skill in the art who read
the patent and read the prosecution history would not
understand that a plastic liner on the bottom that is broken
up all over the place with inlets and jets is a plastic
liner that is able to be thoroughly cleaned.

THE COURT:  Okay.  So what?

MR. BRAITHWAITE:  Well, and it is not the question
for today, but when we move down the line --

THE COURT:  Well, let's look at it down the line.
Let's look at the questions for today.

MR. BRAITHWAITE:  Your Honor, the interpretation
point, the claim interpretation point is what the claims
say.  Is the liner able to be thoroughly cleaned?

THE COURT:  Sure.

MR. BRAITHWAITE:  And so inherent in that term is
it can't be broken up with inlets and spray jets.

THE COURT:  Ultimately we'll talk about whether
there is a violation here or whether there isn't.

MR. BRAITHWAITE:  Correct.

THE COURT:  They either suggest that your
defendant has in some fashion infringed or he hasn't.  Okay.

1    That is contextual it seems to me and that is application it

2    seems to me, and I think people understand in reading what

3    is there that the impervious plastic liner does what it does

4    at a particular location.

5           MR. BRAITHWAITE:  Right.

6           What we're trying to resolve, Your Honor, is down

7    the road revisiting this idea of claims scope, because here

8    is how I see things playing out.  We come to October and

9    then we're faced with arguments by Crystal Lagoons that,

10   hey, a plastic liner able to be thoroughly cleaned, that can

11   include spray jets all over the place.  So they will be

12   arguing --

13          THE COURT:  Well, let's see if they make that

14   argument.  Let's not anticipate their argument.  You're

15   pointing out that the plastic liner needs to comply with

16   what it says it is complying with.

17          MR. BRAITHWAITE:  That is correct, Your Honor.

18          THE COURT:  And that is pretty plain, isn't it?

19          MR. BRAITHWAITE:  I believe it is.

20         Here is the problem on claims construction.  A lot

21   of times party A comes to the court and says we have the

22   plain and ordinary meaning, and party B comes to the court

23   and says we have --

24         THE COURT:  Well, that only exists if there is an

25   ambiguity in the language that requires the so-called expert

1    help, the so-called those skilled in the art.  Actually an

2    ordinary soul can read something and have an opinion

3    concurrent with the same opinion of one so-called skilled in

4    the art.  It is a matter of meaning and it is a matter of

5    having the symbols represent in your head and in his head

6    and in my head what it is that we're talking about.  What

7    you're insisting here is that they need to have a plastic

8    liner that does what they say it does.

9            MR. BRAITHWAITE:  Correct.  And so --

10           THE COURT:  Let's see if he says they have got it

11   and what --

12           MR. BRAITHWAITE:  So on the defense side, in our

13   head the term covered by a plastic liner able to be

14   thoroughly cleaned means what we're envisioning is that it

15   is a uniform liner.  It is not broken up by spray jets and

16   inlets and things.  I think on this side it is already

17   pretty well established in the papers that on Crystal

18   Lagoons' side they are thinking in their head, no, it can

19   have holes all over the place for spray jets and inlets.

20           THE COURT:  Well, let's see what they say.

21           MR. BRAITHWAITE:  Okay.  I think that is what

22   we're trying to resolve today.

23           THE COURT:  Okay.

24           MR. ZEULI:  The Federal Circuit and the Court of

25   Appeals is where all these cases ultimately end up, right,

1  and this one is probably headed there, too.  Most patent

2  cases I have been involved with over my 25 years, if claim

3  constructions are involved, we're going to the Court of

4  Appeals.  The Court of Appeals confirmed exactly what Your

5  Honor just said, that the ordinary meaning can come from

6  people like laypersons, including lay judges, and the term

7  may be readily apparent even to lay judges.  I think Your

8  Honor understands that really what we have is an issue of

9  application, not of construction.

10          THE COURT:  Yes.

11          MR. ZEULI:  The claim says plastic liner.  We're

12  going to be arguing about whether their plastic liner,

13  because they certainly have a plastic liner, infringes that

14  limitation, but that is in October.  What they are asking

15  you to do today is insert an adjective before plastic liner

16  that --

17          THE COURT:  Tell me about your plastic liner.

18          MR. ZEULI:  Yes.  I would like to tell you about

19  that.

20          THE COURT:  I am interested in what it lines.

21  Does it line the whole expanse?

22          MR. ZEULI:  It really --

23          THE COURT:  Is it placed on everything?

24          MR. ZEULI:  Yeah, it pretty much really does.

25          Let me explain why.  Before we talk about -- let

1    me just show you one thing and then I want to talk to you

2    about that, because I think it is really helpful.

3           I didn't bring my clicker.  Bill, could you go to

4    the second slide on this?

5           I just wanted to point out to the Court, if you

6    can see the screen, is that the claim language just says

7    covered with a plastic liner.  They want to insert this

8    adjective uniform.

9           THE COURT:  Well, I understand that.

10          MR. ZEULI:  What really is uniform?  He was

11   talking about jets.  I don't know what uniform means.  Now

12   we have got a --

13          THE COURT:  You don't use jets, I take it?

14          MR. ZEULI:  We do use jets.  In fact, I'm going to

15   show you that.

16          Let's go first to slide number one.

17          Here is one of the Crystal Lagoons.  One of the

18   things I have talked to this Court about many times when we

19   look at this beautiful picture and you see this multi-acre,

20   gigantic --

21          THE COURT:  I understand the size and I am

22   fascinated by the whole process, but I am interested in the

23   claim.

24          MR. ZEULI:  The liner is key.  The liner is key,

25   Judge.  That is the question I wanted to answer.  What is

different between this and a traditional pool?  One of the
key differences is with a traditional pool you dig a hole
and you put thick concrete walls and structure in there.
This does not do that.  What they do, and you can kind of
see it in this picture, is they grade the soil --

THE COURT:  I understand that.

MR. ZEULI:  -- and then they take a tarp, a
plastic material like a tarp and they cover the entire
expanse.

THE COURT:  People do that in their backyard
swimming pools.  I understand that.

MR. ZEULI:  Here is what they are not able to do.
They are able to maybe create that structure, and there were
tarps and there were plastic liners that were used in lakes.

Maybe, Bill, you can even bring up the lake
picture and show the Judge how murky those are.

What Crystal Lagoons created was additional
structure that made that water look like tropical seas, that
made that water blue.  What was that additional structure?
This all goes to the liner and I am going to bring it all
back to the jets.

What we do is when you put the water over the
liner, right, the liner has to be able to support the water,
but then you have got to have the skimmers and the suction
device to clean that liner, because what happens is the

sunlight is coming through the water and it is reflecting

off of the liner which needs to be clean so that the water

looks like that.  That is what the lakes that you remember,

or maybe on a golf course, didn't have.  There might have

been a black tarp that they laid down or a plastic liner.

They weren't either white or blue or clear.

          THE COURT:  Well, you can have a colored plastic

liner.

          MR. ZEULI:  Right.

          THE COURT:  Okay.  I understand that.

          MR. ZEULI:  Bill, could you go to -- let's start

with figure ten of the 514 patent.

          What they are asking you to do -- again, the claim

is not ambiguous.  We can talk about their plastic liner and

our plastic liner.  Our plastic liner has jets.  This is

figure ten from the 514 patent, and if the Court looks on

the left, and Bill is pulling it up, you can see that 41 is

the water.  39 is the recycling pipe.  40 are the jets.

          THE COURT:  How do you reconcile that with the

patent history?  Counsel suggests that folks pointed out to

the patent office that the infusion of jets would be of some

difficulty.

          MR. ZEULI:  No, not at all.  In fact, that is

totally taken out of context.

          If we could bring up --

1          THE COURT:  Well, why don't you tell me what is

2    wrong with that argument of counsel.

3          MR. ZEULI:  I will.

4          I think you understood how Cant and that patent

5    worked.  It had these jets in it, but it was used for the

6    exact opposite purpose.  I just got done telling you that in

7    the invention the way that the liner is cleaned is that the

8    sediment and the soot is vacuumed off of that liner.  So all

9    of the liner that is exposed needs to be cleaned so the sun

10   can reflect.

11         Cant had a totally different idea.  What Cant did

12   is it took jets on the sides only and blasted water down

13   onto the bottom and it stirred up that water.

14         In fact, maybe you can bring up figure three of

15   Cant so the Judge can see it.

16         It stirred up that water and the sediment went up

17   and then it was skimmed off the top.  So you got the bottom

18   cleaning invention versus the top cleaning, Cant.  The

19   problem is you have got -- the psi of those jets in Cant is

20   20 psi and there were a lot of them, so it would be like

21   having a bunch of garden hoses on full, firing at --

22         THE COURT:  Where can I find reference to jets in

23   the patent claims?

24         MR. ZEULI:  No, it is not in the patent claims.

25   It is in --

1          THE COURT:  Are there claims for jets in the

2     patent claims?

3          MR. ZEULI:  In the claims I don't think we have

4     jets, but the jets can be found at column 9, lines 63 to

5     about 65.

6          THE COURT:  Of what?

7          MR. ZEULI:  Of the 514 patent.

8          Can I read it to you?

9          THE COURT:  Yes, please.

10         MR. ZEULI:  Maybe Bill can bring this up.

11         It is column nine of the 514 patent beginning at

12    line 63.

13         This is describing the picture that we just saw.

14    The structure has a pipe network with injectors that allow

15    an efficient application of products and water

16    homogenization.  That is what it is describing in that

17    picture.

18         The liner does not need to be -- I don't even know

19    what uniform is, Judge.  That is the question for today.  Do

20    you need to add that adjective?  Not today.  That is a

21    factual issue.  It is not a claim construction issue.  The

22    claim with regard to the plastic liner is very clear.  There

23    is nothing that happened in the prosecution history that

24    would say you can't have jets.  The vacuums that go along

25    this plastic liner go right over jets and all sorts of other

1    structures.

2              Maybe we could bring up for the Judge -- let's

3    bring up slide 56.

4              Plastic liners are not uniform, not theirs and not

5    ours.  They are wrinkly.  You're talking about almost a mile

6    long tarp.  Can you imagine laying down a mile long tarp

7    that is not going to have ridges?  Again, this is over

8    graded soil.

9              THE COURT:  Is there a distinction between the

10   tarp and the liner?

11             MR. ZEULI:  I am using tarp as a shorthand.  The

12   plastic liner is what it is called.

13             THE COURT:  Are we talking a plastic liner?

14             MR. ZEULI:  We are, Your Honor.

15             THE COURT:  When you say tarp, you're talking

16   about the plastic liner?

17             MR. ZEULI:  Correct.  I am just using that as an

18   analogy, kind of shorthand.

19             As you can see, the plastic liner that both

20   parties use are not uniform.  They know that and they are

21   hoping that by getting you --

22             THE COURT:  I don't know what you mean by uniform.

23             MR. ZEULI:  I don't either.

24             THE COURT:  Do you use different kinds of plastic

25   liners?

1          MR. ZEULI:  I don't know.  Maybe there are

2    different thicknesses, but that is their word.  They are

3    asking this Court --

4          THE COURT:  No.  I'm asking you.  Your plastic

5    liners, your tarps, in quotation marks, are they the same

6    kind or are they a different kind?

7          MR. ZEULI:  They are the same.

8          THE COURT:  They are the same?

9          MR. ZEULI:  Yes.  Same liner.

10         So the intrinsic evidence, and if you go back to

11   your statement is there any ambiguity about a plastic liner,

12   no, there is not.  Is there any reason to add the adjective

13   uniform?  It actually invites ambiguity.

14         Do you need anything more on that?

15         THE COURT:  No.

16         MR. ZEULI:  Thank you.

17         THE COURT:  Do you want to respond at all?

18         MR. BRAITHWAITE:  I do, Your Honor, if you will

19   permit me.

20         THE COURT:  Okay.

21         MR. BRAITHWAITE:  Your Honor, the word uniform

22   seems to be the hang-up here, and perhaps the better word

23   and more descriptive is uninterrupted.

24         THE COURT:  Say that again.

25         MR. BRAITHWAITE:  The word uninterrupted.

1          THE COURT:  Okay.

2          MR. BRAITHWAITE:  Again, talking about the Cant

3   reference and what the patentee said, and what we heard from

4   counsel over here is that, oh, vacuums can go right across

5   these spray jets and these inlets.  Well, that is not what

6   the patent says and that is not what the prosecution history

7   says.

8          Again, what they told the patent office is spray

9   jets and inlets on the bottom interfere with the suction

10  device of the claims.  Again, on the slide is an excerpt of

11  what they told the patent office.  About halfway down they

12  said whereas the spray jets located in the bottom of the

13  structure disclosed by Cant would also not allow the normal

14  functioning of a bottom cleaning device, e.g., a suctioning

15  device.

16         Also, the installation of spray jets in the bottom

17  might cause damage to the liner, for example, potentially

18  allowing the formation of cracks that could cause leakage.

19         What they said is that the liner had to be

20  uninterrupted and that anything on the bottom shooting water

21  up would interfere with the whole purpose of the patent.

22         Just a little bit of a preview, and I know we are

23  not deciding this today, but in the bottom of the accused

24  structure aren't just garden hoses.  They are three-inch

25  pipes, about the size of a fire hose, that are injecting

1    water into the structure.  That is what we're going to be

2    dealing with.

3           Now, sticking with the patents, since it is all

4    about the patents, so let's look at the patents and what

5    they say.  Counsel brought up figure ten and let's start

6    there, and column nine.  I think both are good.  Counsel

7    stopped just before the context of what the piping network

8    does.  At the bottom of column nine starting on line 65, the

9    patent recites the structure has a pipe network with

10   injectors that allow an efficient application of the

11   products and water homogenization, and what they are talking

12   about is potentially the application of chlorine or other

13   water maintenance products, and that allows the water to be

14   homogeneous.

15          In these large lakes, if the water does not move,

16   then it is going to stagnate.  The purpose of this pipe

17   network was just to get the water to move, get things moving

18   and mix things up a little bit.  It even says later, you

19   know, if you build this in a windy spot, maybe you don't

20   even need the pipe network because the wind will cause the

21   water to mix and be homogeneous.

22          The patent goes on, and I am reading from line 65,

23   in swimming pools this is irrelevant.  It is saying the

24   injectors of swimming pools that mix the water, that is

25   irrelevant to this patent, just like they said the injectors

1     at the bottom of a Cant swimming pool, those were irrelevant

2     to what is being claimed.  But in large volumes of water,

3     you might have stagnant zones that create contamination

4     centers, and so what the patent describes are these

5     injectors along the sides of the lagoon and that is what

6     counsel showed in figure ten.  I will move back to figure

7     ten, because I think it is pretty telling.

8          Here in figure ten we see the diagram of what was

9     invented and counsel talked about the injectors labeled 40.

10    Now, those are all along the perimeter.  Notice that there

11    are no injectors on the floor, on the bottom because it

12    would interfere with the cleaning of the plastic liner.  It

13    would make it so that it couldn't be cleaned as claimed.  So

14    this is all just water mixing stuff up on the edges, up

15    above the plastic liner, but not interrupting it, so maybe

16    the better term is uninterrupted.  That is what is claimed

17    in the patent and that is what is going to be the issue down

18    the line, is there are injectors all over the place in the

19    accused product such that these claims never should have

20    been --

21         THE COURT:  You suggest or at least the picture

22    suggests a periphery.

23         MR. BRAITHWAITE:  Sure.  They have got like you

24    might have in a backyard pond, just to keep the water moving

25    so that it does not stagnate, but it is not interrupting

that plastic liner, because it says you would interfere with
the whole purpose of the patent and all of the cleaning.
The idea of this patent was to get all of the gunk and the
crud on the bottom, and if you have anything interrupting
the liner, shoot it back into the water like a fire hose
size pipe that is shooting the gunk and crud back into the
water, then that is antithetical to this patent.  Again,
perhaps the better term is this is an uninterrupted liner is
what they are claiming and that is what we are asking the
Court to construe.

        We have looked at what Crystal Lagoons' commercial
embodiments are, and I hesitate to do this because the
Federal Circuit says it is legal error to look at the
commercial embodiment of the patented device in determining
infringement or in the claim construction process, but they
are not going to show you any inlets or anything else at the
bottom of their water structure either.  But looking at the
commercial embodiment is legal error, and while the
presentation may be filled to the brim with looking at what
their lagoons look like, that is not the process of claim
construction.  It is the claims and what is in the patent in
black and white and not in pretty pictures and amazing
colors, and that is what we are looking at.  Again, an
uninterrupted liner is what is claimed and that is what we
are asking the Court to construe.

1          THE COURT:  Why doesn't the patent as a patent say

2     that?

3          MR. BRAITHWAITE:  It does.  It does not use the

4     word uninterrupted.

5          THE COURT:  It does not use the word, but it says

6     what it says.

7          MR. BRAITHWAITE:  It also does not say a liner

8     that can be interrupted with spray jets and liners.

9          THE COURT:  No, it says what it says.

10          MR. BRAITHWAITE:  You're right, Your Honor, and

11     that is why this is a context specific exercise in which we

12     look at the claim, but not the claim in isolation.  We are

13     also looking at the rest of the patent and the figures, for

14     example.  We're looking at the prosecution history, because

15     those of skill in the art are presumed to have read the

16     whole thing --

17          THE COURT:  Well --

18          MR. BRAITHWAITE:  -- not just the --

19          THE COURT:  Isn't the claim in reference to the

20     plastic liner plain and ordinary, suggesting the same thing

21     in your head as his head and my head?

22          MR. BRAITHWAITE:  I don't think so.  We're all

23     approaching this with different understandings of what it

24     means to be able to claim --

25          THE COURT:  Tell me your understanding then if it

1  is different than what the claim says.

2         MR. BRAITHWAITE:  It is not different than what

3  the claim says, but the understanding is that the claim says

4  that the plastic liner needs to be able to be thoroughly

5  cleaned.

6         THE COURT:  That is right.  That is the function.

7         MR. BRAITHWAITE:  And so in our heads if there are

8  inlets and spray jets in the plastic liner, the patent and

9  the prosecution history say it can't be thoroughly cleaned

10  within the meaning of the claim, and so that is what we're

11  thinking, but over here, on the other hand, they are

12  thinking that is just fine.  Put in as many inlets as you

13  want.  You can thoroughly clean everything.  You can have a

14  vacuum over it, even though we said that wasn't permitted,

15  but --

16         THE COURT:  Well, you're talking about different

17  locations too, are you not?

18         MR. BRAITHWAITE:  No.  Just as in --

19         THE COURT:  Jets at the bottom are different than

20  jets at the perimeter.

21         MR. BRAITHWAITE:  That is true.  That is true, but

22  what we're dealing with and, again, the understanding is

23  that our accused structure has jets in the bottom --

24         THE COURT:  Well, that may be a distinction.

25         MR. BRAITHWAITE:  -- and we are going to address

1    that down the line during infringement, but our

2    understanding is that can't be thoroughly cleaned then,

3    because it is mixing up the water from the bottom, and they

4    said that our patent does not cover that because that is

5    like Cant.  We don't do that.  That is not what our patent

6    covers, but their actions in this case are different.  They

7    have accused this structure that they know has jets in the

8    bottom, so they're under a different impression and their

9    impression is you can thoroughly clean it, jets or no jets,

10   and what we said about Cant in convincing the patent office

11   to give us a patent does not matter and it does.

12        THE COURT:  We're looking at the plain language

13   and not dealing, at this point anyway, with the prosecution

14   history.  It says what it says.

15        MR. BRAITHWAITE:  We're dealing with the claim

16   language, but the Phillips case, the seminal case on claim

17   construction from the Federal Circuit says that you look at

18   the claims along with the prosecution history.  It is not

19   just the claim in a vacuum in isolation.  You look at it

20   with the prosecution history and you look at it with the

21   specifications.

22        THE COURT:  Well, they say no jets at the bottom.

23        MR. BRAITHWAITE:  And if we are all in agreement,

24   great, and let's get rid of this case next month when we

25   address the motion for summary judgment on noninfringement.

1          THE COURT:  Okay.

2          MR. BRAITHWAITE:  Thank you.

3          THE COURT:  Let me hear from counsel.

4          MR. ZEULI:  Go to slide 54.

5          Your Honor, we started this conversation with

6   whether the word uniform should be added.  That is what the

7   defendants came to this Court and said, Judge, you should

8   add the adjective uniform to plastic liner.  I think I

9   showed the Court that uniform is not in the claim language

10  and the Court recognized that.  Uniform is never mentioned

11  anywhere in the patent and I think we sort of agreed that

12  uniform is ambiguous.  What does that really mean?

13          Mr. Braithwaite came back up and shifted and he

14  said, well, what it should really mean is uninterrupted.

15  Well, I don't know why we would inject uninterrupted into a

16  claim that does not use that term.  Uninterrupted is not

17  found in the patent.

18          The process for claim construction is specific.

19  It is you look at the intrinsic evidence.  You start with

20  the claims.  Is that word found there?  No, it is not.  You

21  look at the specification.  Is that word found there?  No,

22  it is not.  You look at the file history.  Did the patentee

23  say, oh, we only use an uninterrupted liner?  No, they did

24  not.  There is no mention of the word uninterrupted

25  whatsoever.

If you look at the screen, this is the preferred embodiment that's described in the patent.  It is wrinkly.  The liner is wrinkly.  We talked about how it has a recycling system around the sides that has injectors.  There is nothing in here that says that it would be uninterrupted or uniform.  There is no ambiguity.  It is what Mr. Braithwaite said.  He said in our heads we are thinking that if we have inlets and drains in the bottom, it can't be thoroughly cleaned.  That is an application.  That is a fact issue.  We'll be talking about that.  Is it thoroughly cleaned or isn't it because, as we talked about, you do have to clean the liner that is exposed so that you get that beautiful looking water, but it does not need to be uniform or uninterrupted.

Can we bring up the Cant file history statement?

Mr. Braithwaite really relied heavily on the statement that the patent owners -- it is the therefore paragraph, if we could just blow that up for the Court, Bill.  Thank you.

Mr. Braithwaite relied heavily on this paragraph from the file history.  His point to you was from this the patent owner unequivocally, because that is what it has to be, disclaimed either a nonuniform liner, the opposite of what they want, or a non-uninterrupted liner, or maybe at the very minimum a liner that does not have jets, but that

1    is not what it says.

2          Remember that Cant was the opposite of what

3    Crystal Lagoons does.  They take water and they blast it

4    toward the bottom and they get the sediment to rise off the

5    bottom and go to the top and they clean it.  Crystal Lagoons

6    uses a vacuum that goes along the bottom.  No trouble

7    whatsoever in either one of these products going over those

8    ridges, of going over these little injectors or drains.  No

9    problem.  The cleaning gets done and that is what we're

10   going to be talking about in a month.

11          Look at what the applicant said and think about it

12   in the context of the invention has the vacuum working its

13   way across this almost a mile long liner, right?  What Cant

14   is talking about is having these water jets coming in from

15   the side.  What we're talking about here is how those jets

16   would interrupt the vacuum, right?  One, the jets would

17   knock the vacuum of course.  The vacuum is coming down the

18   liner and it is cleaning.  Why would you shoot jets of water

19   against it?  And then the very sediment that the vacuum is

20   to be picking up is no longer there because the jets are

21   sending it up into the air.

22          Look at what they said.  They said the present

23   invention includes a bottom covered with a plastic liner

24   that is able to be thoroughly cleaned, whereas the spray

25   jets located in the bottom of the structure disclosed by

1    Cant would not allow the normal functioning of the bottom

2    cleaning device.  Didn't say uniform.  Didn't say

3    non-interrupted.  Didn't say it couldn't clean over the

4    little jets and irregularities that pale in comparison to

5    this liner over the ground.  It just said it would not allow

6    the normal functioning of the suctioning device, the vacuum,

7    for the two reasons I mentioned.  The jets are putting

8    pressure on it and moving it and the sediment is being put

9    back up toward the top where the vacuum is not.

10          Also, the installation of spray jets at the bottom

11   might cause damage to the liner, for example, potentially

12   allowing the formation of cracks that could cause leakage.

13   The fact of the matter is is that there is leakage in liners

14   all the time.  The liners have leakage.  That is why we're

15   going to be talking about the pipe refill system.  There is

16   nothing in this statement that talks about the adjectives

17   that they want the Court to add to an otherwise plain

18   meaning.

19          Yes, we're going to have a discussion in a month

20   about whether it thoroughly cleans.  That is a different

21   issue.

22               THE COURT:  Yes.

23          You use vacuums?

24               MR. ZEULI:  They both do.

25               THE COURT:  You use a vacuum?

1          MR. ZEULI:  They both do.  Sure.  They both use

2     vacuums.

3          Bring up the vacuum and just show the Judge real

4     quick.  I think it is on slide -- I wanted to show you that

5     vacuum.  We're going to talk about it a little later.  I

6     don't know if I can bring it up real fast.  There.  Right

7     there.

8          Look at that.  It looks like the Mars lander or

9     the moon rover.  I mean that thing can travel over bumps and

10    crevasses.  It does not have any trouble cleaning over a

11    drain or a spray nozzle, not at all.

12         So with regard to claim construction, yes, it

13    would be in error to insert any one of the adjectives that

14    they are suggesting.  The language is plain.

15         THE COURT:  Yes.  Well, I think that there is no

16    construction necessary.  I think we're dealing with a plain

17    and ordinary meaning, frankly.

18         MR. ZEULI:  Yes.

19         Thank you, Your Honor.

20         THE COURT:  Let's deal with your third issue.

21         MR. BRAITHWAITE:  Your Honor, the next term --

22    there are two terms that are almost identical.  They are the

23    freshwater feeding pipe system that allows the entrance of

24    freshwater and results in water removal by displacement of

25    the surface water through the skimmer system.

1        The other one that is close to it, but stated in

2   not structural but method form, is feeding the water body

3   with inlet water to generate the displacement of surface

4   water, ellipses, and removing displaced surface water using

5   the skimmers.

6        MR. ZEULI:  Your Honor and Mr. Braithwaite, I

7   apologize for the interruption, but we think it would be

8   easier for the Court and preferable if we just stayed with

9   patent by patent and didn't mix the two.  So just stay with

10  the structure patent terms and then move --

11       THE COURT:  I understand.  It is fine.  Let's do

12  it one at a time as best we can, recognizing that we're

13  dealing with interrelated matters over a period of time and

14  integrated one with another.

15       Go ahead.

16       MR. ZEULI:  That is great, Your Honor, I just --

17       THE COURT:  Talk about freshwater.

18       MR. BRAITHWAITE:  Okay, Your Honor.

19       There is a technology issue here, just to

20  understand what the different types of water flow systems

21  are in swimming pools.  I put on the screen a slide that we

22  had in our technology tutorial that we submitted to the

23  Court.  Both of these pictures are taken from a little book

24  written by a Mr. Perkins called Swimming Pools.  It is the

25  fourth edition of the book printed in 2000.  It talks about

1    different types of pools.

2          One is a flow through system in which you bring in

3    new water, and it could be water from a lake or a river or

4    something, or if you had enough money it could be municipal

5    water, but you bring it in to the pool and then that causes

6    the ejection of water on the other side.  It is called a

7    flow through.  It comes in the inlets and it goes out the

8    outlets or the skimmers.  So you're continually replacing

9    the water in the structure.

10          And then the other and, you know, where we live in

11   a desert, and most people are concerned with conserving

12   water, is you have a filtration system where you use the

13   same water over and over again, but you bring it in through

14   the floor drains and through the skimmers, and then you pass

15   it through a filter to clean up the water and put that old

16   water right back into the pool.  That is what we're probably

17   most familiar with, that most lay jurors would be familiar

18   with, but these other systems do exist.

19          What we're talking about in the patent is pretty

20   clearly a flow through system.  The asserted claims say it.

21   The specifications say it and the prosecution history says

22   it.  It specifically says that the patent is not directed to

23   a filtration system where you take the water from the

24   skimmers and pass it through a filter and put it back into

25   the pool.  The specification says that is not the case.  The

1    claim says that that is not the case and the prosecution

2    history of the patents says that that is not the case.

3           Starting with the words of the claims, we're

4    talking about water removal, so the first place we see

5    removal is about halfway down the claim and it says wherein

6    the structure includes a system of skimmers for the removal

7    of impurities and surface oils.  So removal in a vacuum, not

8    in the context of the claims, but just in a vacuum and

9    someone says remove and it could have a number of meanings

10   in different contexts, but here it is talking about getting

11   rid of and disposing, eliminating the impurities and surface

12   oils.  You don't want to recirculate impurities and surface

13   oils because that would be antithetical to keeping a clean

14   and clear pool, so they remove impurities and surface oils.

15          THE COURT:  Where do the surface oils come from?

16          MR. BRAITHWAITE:  Mainly from our bodies.  If you

17   had a pool and no one jumped in it, it stays pretty clean.

18   But humans are dirty, and when we put on sunscreen and just

19   the natural oils of our skin and we get in the pool they

20   come off and they don't sink to the bottom.  The floor drain

21   is not going to suck them up.

22          So if you were to block off the skimmers of your

23   pool you could see this sheen, you know, you get those oily,

24   rainbow slicks on the top of your pool.  The skimmers take

25   off that top layer and in our normal pools they send it to

1  the filter and get rid of those oils, and then once it is

2  oil free water, you put it back in the pool.

3          Here what is claimed is a freshwater feeding pipe

4  system that allows the entrance of freshwater and results in

5  water removal by displacement of the surface water through

6  the skimmer system.  We're not talking about recirculated

7  water.  We're talking about removing it.  It is a

8  pass-through system.

9          So we have got these multiple instances of the

10  word removal and we should understand them the same.  It is

11  the same word and we interpret it consistently and it is

12  talking about injection and disposal, not recirculation.

13          We have cited the cases and the principles of

14  claim construction, that the same words are interpreted

15  consistently and different words are presumed to have

16  different meanings.  So if we look at the unasserted claims,

17  they are very instructive.

18          When Crystal Lagoons brought this case, they only

19  asserted certain of the numbered claims in the patents and

20  chose not to assert others.  If we look at claim five, and

21  this is one that is not asserted, and this says take all of

22  those limitations of claim one and add to it a recycling

23  system that uses pipes with injectors which allow

24  maintaining water homogeneity by avoiding stagnating zones

25  and allowing the application of chemicals.

These are the side injectors that we looked at in figure ten that mix up the water and keep it from stagnating. It is not a filter. We're going to see that. They are not talking about a filtration system. They knew how to say the word recycling when they wanted to, but they used in claim one the word remove the water. Don't recycle it. Recycle and removed are presumed to have different meanings and we know they know how to say the word recycle.

Then in claim eight, and this is like claim one, and it is kind of like claim one and claim five together actually. Here you have the system of skimmers. I'm about halfway down. It says a system of skimmers disposed along the border for the removal of impurities and surface oils, semicolon, and then next it says a recycling piping system installed around the border of the structure and including a plurality of water injectors distributed along the border for injecting water into the water body to maintain homogeneity. That is what we just saw in connection with claim five.

Then we have the same limitation from claim one, a freshwater feeding pipe system that allows the entrance of freshwater and results in water removal by displacement of surface water through the skimmer system. If water removal meant the same thing as recycling it, then that means that the recycling element is vitiated and it has no meaning at

1　　all.  So these mean different things.  That is what we're

2　　talking about is water removal.

3　　　　　　Now let's move to the specification.  What does

4　　the patent specification and description say?  Well, this

5　　comes from column ten, lines 32 through 36.  It says that

6　　the crystalline structures or ponds must have water intakes

7　　that allow using low cost water, since in contrast to

8　　swimming pools that recycle water through filters, in this

9　　case the water from the skimmers and suction cart or device

10　　is disposed of.

11　　　　　　If you have really expensive water, this system is

12　　not going to work, or at least it is not going to be cost

13　　effective.  It depends on how much money you have, I

14　　suppose.  It says that you need to be using low cost water,

15　　because you're going to be getting rid of it.  The claims

16　　claim a structure where the water is completely disposed of.

17　　It is that pass through system.

18　　　　　　Then in column nine, 43 through 53, the

19　　specification says the structure must have skimmers to

20　　remove surface oils and particles, since otherwise they

21　　accumulate and deter water quality, even after performing

22　　all of the chemical treatment steps, since these do not

23　　remove floating greases or solids.  In this way the final

24　　objective of obtaining color transparency and cleanliness

25　　characteristics similar to swimming pools or tropical seas

1    at low cost would not be fulfilled without these skimmers.

2            The process of moving superficial water toward the

3    skimmers caused by freshwater entry together with a

4    flocculant suction device system replaces the traditional

5    filtering system of swimming pools.

6            Again, we are not talking about recycling through

7    a traditional filtration system.  We are talking about

8    getting rid of that water.  Think of how it is built.  If it

9    is built without a filter, and if the skimmers just took the

10   water out and put it back in, there is nothing to get rid of

11   the oil because there is no filter.  So they are ejecting

12   the water and that is the structure that is being described

13   and the process that would also be described in the process

14   patent.

15           In the file history of one of the family members,

16   and the Federal Circuit says that you can even look at

17   different patents in the same family to figure out how one

18   of skill in the art would understand these terms.  The

19   patent applicant said the structure also has systems to

20   harvest and constantly supply freshwater with certain

21   quality needed for the maintenance of the water at low cost.

22   This is also not a requirement of standard pools that filter

23   and recirculate water, because they do not need a constant

24   supply of freshwater with certain physiochemical parameters.

25   Again, we are not talking about filtering water.  Our

1  skimmers don't go through a filter.  They dump and inject

2  the water.

3          I'm going to bring up Cant again because it

4  actually came up in this context as well.  The patent

5  examiner said, hey, look at Cant.  It has got skimmers and

6  we're going to reject your claims.  The patent applicant

7  said no, no, no.  Cant is different.

8          Let's look at Cant real quick.  I put it again on

9  the screen.  The important point here -- the filter is

10  identified as item 54 over there on the left.  That is a

11  filter.  The skimmer is up there at 56.  The water flows

12  through that skimmer and comes down and moves along the

13  bottom pipe and gets reinjected into the pool.

14          Here is what the patent applicant said during

15  prosecution.  In response to the examiner saying, hey, Cant

16  discloses skimmers, the patent applicant said specifically

17  Cant in its entirety is silent with respect to the

18  freshwater feeding pipe system of claim one.

19          In contrast, Cant merely describes a filtration

20  system in which pool water is forced through one or more

21  filters, filter 54 or filter 72, to remove debris from the

22  pool water.  The filtration system of Cant neither discloses

23  nor suggests, quote, a freshwater feeding pipe system that

24  allows the entrance of freshwater and results in water

25  removal by displacement of surface water through the skimmer

1  system.

2          So this picture of the skimmers going through a

3  filter is entirely silent with respect to water removal, but

4  that is not what they're claiming here and that is why we

5  need claim construction is to say if water removal means

6  what it says, removing, then we are good, but if the

7  interpretation is recycling, then that is a whole other

8  thing and the patent specifically disclaims that and the

9  prosecution history disclaims that and that is not found in

10  the claims of the patent either.

11          The other filter here I will just note, was

12  described as numeral 72, and that is kind of on the bottom,

13  and what is happening is there is a floor drain there at 62

14  that is pulling in water from the floor and passing it

15  through the filter and then it is coming out of those inlets

16  on the bottom, 47.

17          There was a little bit of a misstatement before I

18  think about Cant and the vacuums and everything.  What Cant

19  shows there on the side, the inlets right at the bottom, on

20  the wall but at the bottom, and they are pushing water in so

21  that the water gets mixed up.  Well, that is the

22  interruption of the plastic liner.  That whole system of

23  bringing water in at that low level interferes with the

24  cleaning as well and that is, again, what we're dealing with

25  in this case.

1          A preview down the line here and what the Court is
2     going to see is what is highlighted here on the left, these
3     wall injectors on the side, just like in Cant, interrupting
4     the concrete on the wall, because the wall is not actually
5     covered in a plastic liner, but interrupting the whole thing
6     so it mixes up the water and does not allow things to be
7     thoroughly clean.  At every instance this patent says not
8     like a pool, not like filters and not like anything else,
9     and we are bringing in water and what that is doing is
10    causing the dumpage of the extra water, displacement.

11          What we have in the brief, and I don't know if it
12    is still an issue, is what does displacement mean?  Is that
13    an equivalent amount or is it something lesser?  I guess
14    this is the construction of another word, but I think
15    displace literally means to take the place of, and so it is
16    like anything else that if you put a gallon of water in,
17    then you are displacing a gallon of water and a gallon of
18    water gets dumped through those skimmers.  That is what
19    we're asking the Court to construe that removal means
20    removal, not non-removal or recycling.
21          THE COURT:  You say that is what the claim says?
22          MR. BRAITHWAITE:  Yes.
23          THE COURT:  Okay.  You agree with that?
24          MR. BRAITHWAITE:  I completely agree that removal
25    means removal.

1          THE COURT:  Okay.

2          MR. ZEULI:  Let me just clarify something for the

3     Court before I launch into why removal is a different word

4     than elimination.  I think I just heard counsel say removal

5     means removal.  That is the claim term that is in dispute

6     here and I don't think we need to have construction.

7     Removal is the word in the claim.  The briefing was that the

8     defendant wanted to change the word removal to the word

9     elimination, but unless I'm misunderstanding, Judge, I think

10    he just agreed that they agree that the claim does not need

11    to be construed because removal is the word that was in

12    dispute.  Sure we can have a discussion in a month about

13    what gets removed and how much gets removed out of the

14    accused structure, but I think for claim construction, if I

15    heard it right, I don't think there is any construction

16    needed here.

17         THE COURT:  I don't think so either.

18         MR. ZEULI:  Thank you.

19         THE COURT:  Your next one?

20         MR. BRAITHWAITE:  Your Honor, the next one is

21    pumping system, but it really goes hand in hand with the

22    suction device.  They are not really evaluated in isolation

23    and should be brought together.

24         Is that okay with the Court if I address both,

25    pumping system and suction device?

1          THE COURT:  Yes.  You go ahead.

2          MR. ZEULI:  Your Honor, if I could just interrupt

3    again.  We are okay with that as long as we stay on the 514,

4    the structure patent, and we are not getting into the other

5    two patents yet.

6          THE COURT:  Okay.  You go ahead.

7          MR. BRAITHWAITE:  All right.  Let's start with

8    movable suction device.  It is kind of a generic term and it

9    does not say vacuum, but the alternative construction

10   proposed by Crystal Lagoons is just an ordinary

11   run-of-the-mill pool vacuum.  That is not what these patents

12   describe in the claims and it is not what they describe in

13   the specification and it is not what is described in the

14   prosecution history.  Again, the entire context of the

15   patent is that this is not talking about pool vacuums.

16          Instead, it is talking about a suction device that

17   operates as a complete replacement for a filtration system.

18   The patentee gave special definition to the term suction

19   device and specifically contrasted it with a vacuum.  At

20   column nine, lines 1 through 16, the patentee said this.

21   They are essentially giving the definition of a suction

22   device.

23          It is important to keep in mind that the objective

24   of the suction device is not only the cleaning of the bottom

25   of the described process, as is the case of vacuum devices

1    of traditional pools, but that said suction device replaces

2    completely the traditional filtering system of swimming

3    pools together with the use of flocculants.

4          Furthermore, the fact that the process

5    contemplates the displacement and removal of superficial

6    water with impurities towards the structure slots

7    complements the action of the suction device.  In other

8    words, the suction device not only removes material

9    naturally deposited on the bottom, leaves, branches, earth,

10   et cetera, but also the suspended particles that are

11   eliminated by filtration in the case of swimming pools and

12   are converted into floccules or large particles and are

13   suctioned by the device in this invention, thus decreasing

14   their removal cost by an order of magnitude.

15         That idea that this was a complete replacement for

16   traditional filtration was so important that they restated

17   the whole thing twice.  Again, at column 12, 3 through 9,

18   the patent applicant says the identical thing.  It is

19   important to keep in mind that the objective of the suction

20   device or suction cart is not only the cleaning of the

21   bottom in the described process, as is the case of a vacuum

22   in swimming pools, but that the suction device replaces

23   completely the traditional filtering system of swimming

24   pools together with the use of flocculants and the skimmer

25   system.  So where, as here, the patentee has clearly defined

1    a claim term, that definition is usually dispositive.  That

2    comes from the Jack Guttman case we cited in the briefs.

3        But, more importantly, this is an instance in

4    which these claims don't say the words traditional

5    filtration, but they do through the term suction device,

6    because suction device as defined is a complete replacement

7    of traditional filtration.

8        This is where the Virnetx case from the Federal

9    Circuit comes into play.  In that case the literal language

10   of the claims was to a secure communication link.  It just

11   used the word secure.  It didn't say anything about

12   anonymity.  What the patentee was saying is our claims don't

13   require anonymity.  That word does not appear in the claims.

14   The defendant was saying, yeah, but your whole patent is

15   directed to anonymity in connection with security.  The

16   entire purpose of the whole thing is anonymity.

17       So the Federal Circuit said secure, that term

18   secure as used in that asserted patent, means both data

19   security and anonymity.  It incorporates that concept,

20   because it was so front and center of the patent under

21   examination, and so the court construed secure to require

22   both data security and anonymity.

23       It said the fact that the summary of the invention

24   gives primacy to both these attributes strongly indicates

25   that the invention requires more than just simple data

1    security.  That is on page 1318 of that Virnetx case.

2              THE COURT:  What is your point?

3              MR. BRAITHWAITE:  Well, the point here is that,

4    again, the interpretation of suction device can't just mean

5    the mere pool vacuum.  One of skill in the art wouldn't

6    think, oh, that is an everyday pool vacuum when reading

7    these claims.  What they would understand, based on the

8    entire context, is that suction device means that that is

9    the way the claim structure is cleaned.  It is not cleaned

10   through filtration, because the suction device completely

11   replaces a filtration system.  That is what the patent

12   applicant said over and over and over again ad nauseam in

13   the specifications of the prosecution history.

14             THE COURT:  So what?

15             MR. BRAITHWAITE:  Well, it matters because what

16   Cloward H20 designed was a traditionally filtered pool.

17             THE COURT:  I'm sorry?

18             MR. BRAITHWAITE:  They designed a traditionally

19   filtered pool.  They have a whole host of skimmers and

20   inlets and outlets that send water to huge filters, two big

21   filter houses on the side of this lagoon that is accused by

22   Cloward H20, and they filter the entire volume of this

23   two-acre lagoon twice each day.  They don't rely on simple

24   pool vacuums as a replacement for filtration.

25             So the suction device that is claimed is not just

1    the little robotic pool vacuum, everyday pool vacuums that

2    have been in use for 30 some odd years.  That can't possibly

3    be the suction device, because what the patent claimed was a

4    suction device that completely replaces traditional

5    filtration.

6            THE COURT:  That is fine.  It says what it says.

7            MR. BRAITHWAITE:  It does, but Crystal Lagoons is

8    going to come up here and --

9            THE COURT:  Well, let's wait and let them assert

10    whatever they assert.

11            MR. BRAITHWAITE:  Let's see what they assert.

12            THE COURT:  Okay.

13            MR. BRAITHWAITE:  Thank you, Your Honor.

14            THE COURT:  I might indicate here that when we

15    break today, we'll break at a quarter to 12:00 and we'll

16    reassemble about 1:30.

17            MR. ZEULI:  That should work perfectly, Your

18    Honor, because we're on the last two terms of the 514

19    structural patent, which Mr. Braithwaite has covered

20    together and I will do the same as well.

21            What I was going to say is it is so fascinating --

22    it is so fascinating, and I think that is why I love the job

23    that I have because I get to talk to people like you about

24    language, and I just remember going back to the hearing, and

25    I don't know when we had it but, you know, you said

1    something about, you know, is there ambiguity in this

2    document?  We'll look at the entire document.  The entire

3    document that we're talking about is the 514 patent and it

4    is the structure.

5           I talked at the beginning about how important it

6    was that this invention was a liner over soil, not a

7    concrete traditional pool, and then you had to have three

8    structural elements that allowed that liner over soil to

9    provide that crystal clear water, and they were the skimmer

10   system, the pumping system and the vacuum.  We're going to

11   talk about the pumping system and the vacuum.

12          Let's look at what the claim language says,

13   because there is really no ambiguity in the words.  I think

14   Your Honor keeps saying that they say what they mean and I

15   think that is exactly right.

16          Thank you, Bill.  Actually, Bill, could you bring

17   up claim one?

18          Let's look at it together.  Here are the terms

19   that we're talking about now.  We're talking about these

20   last lines at the end, a pumping system, including a

21   coupling means connected to a removable suction device for

22   cleaning the plastic liner.

23          I mean where is the ambiguity?  Do we not think a

24   jury will be able to assess our evidence as to their pumping

25   system and their vacuum?  I already showed you their vacuum.

It is that cool moon lander thing.  I think it is pretty cool and the jury is going to look at that and they are going to say it is a suction device.

Bill, go back to the presentation.

What they are suggesting is they want you to add 49 new words.  We are not talking about something super technical that a layperson or a lay judge has never encountered.  This is not a X.M.L. load file from who knows what.  It is a pump.  We have them all over our houses.  It is a vacuum.  We have them.  They want to add 49 new words to have the Court say things such as, and let me use my cursor here if I can, that it is going to remove not only the settled debris, and that is the soot on the bottom of the liner, right, and you have to remove that and we agree with that.

Suspended solids?  No, that is not what the vacuum pumping system removes.  Those would be suspended.  It is suction.  It sucks things off the bottom.  So even the 49 words that they have come up with is wrong.  It would defeat the very invention that this gentleman created and now has over 70 working lagoons around the world.

One of the things that Mr. Braithwaite said is water is expensive.  Water is expensive.  They have a 100-acre lagoon in Sharm el Sheikh, Egypt.  Where there was desert, there is a 100-acre Crystal Lagoons because this

technology works and it is water efficient.  It is very
water efficient.  All you have to do is keep the liner clean
so when the sun comes in the water looks good.  Why do we
need 49 words to be added to this?  It makes no sense at
all.  Those words are not found in the claims.  They are not
found.

The reference in the patent that Mr. Braithwaite
talked about, yes, it mentions one embodiment where the
water is disposed of, but that is not the only thing it
mentions.  I will show the Court where it talks about
recycling far more times.  I believe the disposal of the
water and the quote Mr. Braithwaite showed you, and I will
bring it up, they use that once and then right below it they
talk about recycling the water, because if you have got 100
acres in the Egyptian desert you are not throwing out the
water.  There is no way.  It makes no sense.  The invention
wouldn't even work.  You remember the skimmers I talked
about and that struck and you have to have that.  If you
throw out the water, that water level would go below those
skimmers and it wouldn't go anywhere.  It wouldn't even
work.  Why would you do this?

Here is what it would look like.  This sort of
points out the error here of the defendant's proposal.  They
would take from claim one, pumping system, and if Your Honor
looks on the screen, and look how it would look with 49

1    different words in there.  Does that make any sense?  I

2    don't think so.

3         It also introduces a step.  I keep mentioning to

4    the Court let's keep these patents separate because they are

5    separate.  One covers the structure for holding the water

6    and the structure that keeps it looking the way Crystal

7    Lagoons looks.  The other two we're going to talk about

8    after lunch, they go to the process for doing that and they

9    are separate.  You could have the structure and you could

10   use different processes for cleaning that water and for

11   treating that water and you might use what they invented and

12   you might use something different, but that does not have

13   anything to do with the structure.  The structure is the

14   structure.  It has a pump and a vacuum.  It is not that

15   hard.

16        When we talk about the methods, they could be used

17   with different things too.  They don't have to be used with

18   that structure.  They are separate and independent.  Here

19   they are trying to mix the two, because it talks about

20   removing the water.  That is not what it requires.

21        I want to go to the vacuum for a moment.

22        Can we get to the removal suction device?  I will

23   talk about that briefly.

24        This goes back, you know, and this is sort of

25   treaded ground, and you may recall that you ruled -- you

1 denied their earlier summary judgment and this was this

2 issue.  They came before the Court and they wanted in this

3 patent, the 514 patent, they wanted you to insert all of

4 those words.  We did this already.  The Court said no, I'm

5 not going to do that.  That is process.  There is nothing in

6 the claims that requires that the disposal of the water not

7 be with tradition filtration, nothing at all.

8          Bill, could you bring up column 10, please.  First

9 I want to go to lines 32 to 36.

10          I think the Court is familiar with that there can

11 be different embodiments in a patent.  Now, this is the

12 language that Mr. Braithwaite talked about and basically

13 this is what they are hanging their hat on.  They are saying

14 that here in the patent the inventor said, you know, we

15 dispose of the water.  Sure.  Sometimes they do, but not

16 always.

17          Let's leave this, Bill, and if you can maybe up in

18 the top, let's blow up for the Judge lines 56 through 61.

19 Could you just highlight recycling system?

20          In that same paragraph, in that very same

21 paragraph of the patent the inventor, Mr. Fishman, is

22 describing that there is structure that recycles, and we

23 have talked about that earlier and we saw that in figure 10,

24 the recycling system.  Sure, sometimes you might dispose of

25 the water, but you don't always have to.

1          If you think about it, why would you?  Water is

2     expensive.  It makes no sense that you would have this

3     enormous, multi-acre piece of structure and you would dump

4     the water out.  The claim makes no requirement for that.  It

5     just requires a pump and a suction device to clean the

6     plastic liner.  That is all.  They have a pump and a suction

7     device and so do we.  We'll talk about those next month but,

8     you know, when you go back to the claim construction, what

9     is the context where somehow we should inject 49 new words

10    for a pump and a vacuum.  It just makes no sense.  It just

11    makes no sense at all.  It is not found in the claims.  The

12    patent office didn't require it.  In the specification

13    itself, yes, sometimes they do dispose of the water but not

14    always.

15         They also talk about recycling.  In fact, disposal

16    of water is only mentioned one time in the patent, Your

17    Honor, one time, and Mr. Braithwaite found it.  Of course it

18    is in there and that is one option.  Seven times it mentions

19    recycling, because if you think about it, you're not

20    throwing out the water.  It just does not make any sense and

21    there is nothing in this claim that would cause it to be

22    ambiguous, and that would require you to put in 49 different

23    words, 49 new words.

24         Essentially, again, this is where the Court ruled

25    last time when we were here at summary judgment the first

1  time.  They wanted you to add these words and the Court

2  correctly said that that is a process step and it is not

3  structure and we're talking about structure, and there isn't

4  anything in the claim or the patent or file history that

5  says that you have got to use this -- and what do they say

6  here -- the disposal of water with mixed debris.  We have

7  already covered this ground and you rejected it then and I

8  would suggest it should be rejected now.

9              THE COURT:  Thank you.

10             Any response, counsel?

11             MR. BRAITHWAITE:  Yes, please.

12             Your Honor, we are not injecting words into the

13  claim and the argument that this is just an exercise to

14  inject words is not really an argument.  We're trying to

15  figure out what is claimed.  What is the scope of what the

16  patentee invented?  There are a couple of issues here, and

17  on the one hand Crystal Lagoons has marched into this court

18  saying it is just so simple.  We just have some plastic

19  liner and a skimmer and a vacuum and that's what our patent

20  covers.

21             Well, that is every pool ever.  That is the

22  problem with this case.  They have come into this court

23  saying we have a patent on a swimming pool.  Cloward and his

24  company have been building swimming pools plus enormous

25  recreational water features since the nineties with plastic

1    liners, skimmers and injectors.

2          That is not what they claimed.  When we get down

3    into the claim, it is a claim to a swimming pool.  It is a

4    claim to their particular process.  It is not just a simple

5    vacuum.  It is not a traditional pool filtration system and

6    it is not just simple skimmers that recycle the water,

7    because they said it wasn't that.

8          One of the words in which they encapsulated this

9    whole idea that this is not a traditional swimming pool and

10   it is not traditional cleaning methods is the word suction

11   device.  Counsel got up here and said suction device does

12   not clean suspended particles.  Well, tell the author of the

13   patent that, because that is exactly what the patent says.

14   Where?

15         We read previously from the section paragraph and

16   it explicitly states that that is the very purpose of the

17   suction device is to clean up suspended particles.  It says,

18   in other words, the suction device not only removes material

19   naturally deposited on the bottom, leaves, branches, earth,

20   et cetera, but also the suspended particles that are

21   eliminated by filtration in the case of swimming pools, and

22   that are converted into floccules and suctioned by the

23   device in this invention, the one of the 514 patent.

24         With respect to what happens with the water of the

25   suction device, well, if they don't have a filter and they

are not filtering the water and they are not relying on
filtering, then they have got to dispose of it, because
there is nothing to get the suspended particles out.

So what is described in the patent is the
elimination of the water.  They use the word remove in the
claims and that is what they do.  They remove it.  They
don't recycle it.  It says the crystalline structures or
ponds must have, not may have, not in some embodiments have,
must always have water intakes that allow using low cost
water, since in contrast to swimming pools that recycle
through the filters, in this case the water from the skimmer
and the suction cart or device is disposed of.  In this case
and in this patent what we're talking about in the claims of
the 514, it is disposed of and that is what the patent says.

Now, the argument is to move beyond the patent, to
go to Egypt, and there is nothing said about Egypt in this
patent.  They do talk about something in Chile.  In Chile
the embodiment pulls water from the ocean and brings it into
the lagoon and they clean it up and then it is ejected back
out to the ocean through the skimmers.  It passes through.

Now, in Egypt maybe water is in short supply and
they can't do that.  Well, that just means that Egypt is not
covered by this patent.  That is why the Federal Circuit has
said it is error for a court to compare in its infringement
analysis the accused product or process with the patentee's

1  commercial embodiment.  That comes from the Zenith Labs,

2  Inc. case versus Bristol-Meyers Squibb, 19 F3d 1418, pincite

3  1423.  It is a 1994 case.

4        But even in this last year, 2020, the Federal

5  Circuit said in Myco Industries, Inc. vs. Blephex,

6  B-l-e-p-h-e-x, at 995 F3d 1, pincite 15, and this is in

7  2020, the law is clear, however, that, quote, infringement

8  is determined on the basis of the claims, not on the basis

9  of comparison with the patentee's commercial embodiment of

10  the claimed invention.  Similarly, claim construction from

11  which an infringement analysis depends focuses on the

12  recited limitations, not the features of the commercial

13  embodiment.

14        THE COURT:  What difference does it make if they

15  use a process for recycling the water after the claim

16  process has been used to dispose of the water?  Think about

17  that.

18        I'm going to break right now because of another

19  commitment.  1:30 and we'll keep going.

20        MR. BRAITHWAITE:  Thank you, Your Honor.

21        THE COURT:  We'll be in recess.

22        (Recess)

23        THE COURT:  Good afternoon.

24        It looks like we're all here.  We had fun during

25  the noon hour.  There was a ceremonial occasion that

1    occurred naming this courthouse for Senator Orrin Hatch,

2    which was conducted very nicely, and most of us attended by

3    Zoom, but it was worth attending.

4         At any rate, I have looked at the matters we were

5    discussing prelunch and I am of the opinion that there is no

6    need for construction of the provisions that we were talking

7    about.  I think they are clear and they are simple enough

8    and they are understandable.

9         Let's move on to the next one.

10        MR. BRAITHWAITE:  Your Honor, if you will permit

11   me, you asked me a question right before we broke, and I

12   think it was along the lines of so what and why are we

13   talking about this traditional filtration thing and I have a

14   response.

15        THE COURT:  I'm happy to have you respond.

16        MR. BRAITHWAITE:  It has to do with how justice is

17   achieved in the patent system and with a patent case.  What

18   we had here and the background of this case is Crystal

19   Lagoons bid a project down at the Hard Rock Casino in

20   Florida.  They put forth their proposal about how to build a

21   lagoon with the flocculation and their suction device and

22   everything they talked about in their patent.  The property

23   owner didn't want to go along with that so they reached out

24   to Cloward at Cloward H20 and said can you do this.  Cloward

25   said I can do it like a swimming pool.  I can put in a

1     filtration system so that it is a filtered thing.  I don't

2     want to do nor am I going to do what Crystal Lagoons does.

3     So Crystal Lagoons lost the project and Cloward was the

4     designer on the project.

5     I think this case bubbles out of that, one company

6     selected over the other.  What we had in the initial

7     complaint -- this is almost two years ago -- paragraph 67

8     from that complaint says on information and belief the Hard

9     Rock lagoon was previously designed as a conventional

10     swimming pool with a swimming pool filtration system and a

11     large number of inlets and outlets to filter the entire

12     volume of water and, therefore, would not infringe Crystal

13     Lagoons' patents.

14     However, from what has been observed at the site,

15     there would not be a traditional filtration system, since

16     there is a small number of inlets and outlets that would not

17     allow filtering the entire volume of water, as well as not

18     having the proper amount of filtration for this purpose.

19     The small number, and those are kind of vague

20     terms in and of themselves, but what Crystal Lagoons was

21     referring to is shown in 71.  They talk about initial

22     drawings.  Again, when it is like a conventional swimming

23     pool, it had 80 inlets located on the lagoon's bottom and

24     walls, which are not present in the currently built lagoon

25     at the Hard Rock Hollywood project.

This initially brought to mind, hey, you guys are wrong. There are two big filter houses that filter this entire thing more than twice a day. There are over 100 inlets and outlets in this system, way more than the 80 you thought was sufficient. So we brought an early summary judgment motion because of their admission. Their patents are not directed to this traditional filtration. That was the earlier summary judgment motion in this case. We provided prediscovery our construction plans for the lagoon showing the hundreds of inlets. It is not like these are hidden. You can go down to Florida and put your foot in the water and touch them and figure out where the inlets are and you can count them up. If you did your pre-suit investigation, you should have counted up 130 some inlets, but it didn't happen.

What we got during that hearing was a request to this Court to kick the can down the road to claim construction. In the transcript of that hearing Mr. Zeuli says they are trying to confuse the Court early before there is discovery that a patent related to the structures of these lagoons has something to do with filtration. It doesn't. If they want to make that argument when we are doing claim construction, we can have a fully briefed, you know, issue on why that is not the case, but it shouldn't come this way raised for the first time in their reply

1 brief.

2      It was let's kick that issue down the road until

3 today.  So here we are at claim construction when Mr. Zeuli

4 said the time would be appropriate, and now the request

5 again let's kick the can down the road.

6      THE COURT:  Well, it may be appropriate to kick it

7 down the road in reference to the existence and operation of

8 a filtration system.  It is either an auxiliary system or a

9 concurrent system or an afterthought system, but we're

10 concerned with the patent claims.

11      MR. BRAITHWAITE:  Exactly, Your Honor.

12      THE COURT:  The patent claims.

13      MR. BRAITHWAITE:  I am not here asking the Court

14 today to determine whether or not the Hard Rock lagoon has a

15 filtration system or not.  That is for another day.  We

16 don't think there is any dispute because there is a massive

17 filter house and anyone with eyes can see it, but not for

18 today.

19      The question today is what is the scope of these

20 claims?  Do they cover structures with the traditional

21 filtration system?  The claims say they don't.  The

22 specification -- we put up on the screen all of the places

23 where they say our system of skimmers that eject water, and

24 our system with the suction device replaces the traditional

25 filtration system, so inherent in these claims is we are not

1    talking about traditional filtration.

2          So we're asking the Court what is the scope of the

3    claims?  Does the scope cover traditionally filtered pools?

4    We can have the question later about whether the Hard Rock

5    meets that.

6          THE COURT:  They have disclaimed any interest, as

7    far as I can determine, in the so-called traditional

8    swimming pool filtration system, but we're dealing with a

9    question of what activity is permissible activity after the

10   so-called contaminated water is extracted from the pond, the

11   lake, whatever you want to call it, and the manner in which

12   that is subsequently used.  That is not involved in this

13   lawsuit.

14         As far as I can determine, nobody has asserted at

15   this point that they claim an interest.  They disclaim an

16   interest as far as their system is concerned in the

17   traditional swimming pool filtration system.  They say,

18   look, flocculants, freshwater, disposal, displace, and if

19   there is some proficient or some suggestion that they are

20   indeed using a traditional filter system, then one would

21   have to ask to what extent does that in some fashion assist

22   in our determination as to the scope of the claims?

23         MR. BRAITHWAITE:  But, Your Honor, it is the scope

24   of the claims that says that the system, the claimed system,

25   the affirmatively claimed system has a suction device which

1    completely replaces --

2              THE COURT:  It says what it says.

3              MR. BRAITHWAITE:  Right.

4              THE COURT:  It has a device and that is what it

5    says.

6              MR. BRAITHWAITE:  But the device and the meaning

7    of that suction device is the complete replacement of a

8    traditional replacement system, and where we have a

9    difference of --

10             THE COURT:  Assuming that -- assuming that it says

11   what it says and does what you claim it does and is involved

12   as far as the limits go, the fact that they may have an

13   adjacent system of some kind is an interesting question.  It

14   is an interesting question.  They do or they don't, and that

15   may have some bearing on the outcome of what we're dealing

16   with.

17             MR. BRAITHWAITE:  But what we are not addressing

18   today is what they do.  That is what the Federal Circuit --

19             THE COURT:  I understand that.  I understand that.

20   We are doing what is known as the impossible.  We are

21   dealing with matters as hypotheticals almost, which is a

22   rather strange way of thinking about a problem, but at this

23   point the question becomes is the language the kind of

24   language that in some fashion requires, because of ambiguity

25   or vagueness or lack of specificity, some kind of a rational

1  construction.  I think it says what it says.  I don't think

2  it requires construction at this point.

3          MR. BRAITHWAITE:  Your Honor, if I might refer to

4  the 02 Micro International case from the Federal Circuit in

5  2008, they dealt with this problem that we have here.  They

6  said a determination that a claim term, quote, needs no

7  construction, end quote, or has the, quote, plain and

8  ordinary meaning, end quote, may be inadequate when a term

9  has more than one ordinary meaning.

10          THE COURT:  Well, that is right.  It is an

11  ambiguous term and you have got to tell me what the

12  ambiguity is and you have yet to do that.

13          MR. BRAITHWAITE:  Your Honor, the ambiguity is

14  each party is saying that these terms are ambiguous.

15          THE COURT:  No, they don't.

16          MR. BRAITHWAITE:  They are coming at the terms

17  with different interpretations and different understandings.

18          THE COURT:  No.  It says what it says.

19          You tell me your view of why it is ambiguous.

20  That is the whole process.

21          MR. BRAITHWAITE:  The ambiguity seems to be coming

22  because what these claims state is they don't cover a

23  traditionally filtered body of water.

24          THE COURT:  Do they?

25          MR. BRAITHWAITE:  No, they don't.

1          THE COURT:  Then what are we talking about?

2          MR. BRAITHWAITE:  What we have here is a lawsuit

3     that is premised on these claims actually covering a

4     traditionally filtered body of water.

5          THE COURT:  How do we know that?

6          MR. BRAITHWAITE:  Because Crystal Lagoons brought

7     the lawsuit.

8          THE COURT:  So what?

9          They are saying, hey, our system is this.  You're

10    suggesting that they have got an auxillary system, a

11    tagalong system as I understand your argument.

12         MR. BRAITHWAITE:  Okay.  I think I understand now,

13    Your Honor.  I am sorry.

14         So the system down at the Hard Rock lagoon does

15    not do what they claim and what the patent describes.

16         THE COURT:  It may not.  That is their proof

17    problem.

18         MR. BRAITHWAITE:  That is and that is what we'll

19    be addressing in October, but this is a predicate to that

20    question.  Down at the Hard Rock lagoon it is not an

21    auxillary system.  It is the whole system.

22         THE COURT:  Well, it may well be.  If it is the

23    whole system, they have got problems.

24         MR. BRAITHWAITE:  Thank you, Your Honor.  That may

25    have just answered my question.

1          The only point I guess to answer your question so

2   why does it matter is that the case has gone on for almost

3   two years, and while the Patent Act allows a patent

4   defendant that has been unreasonably accused of patent

5   infringement such as Cloward H20 to collect their attorneys'

6   fees and everything else at the end of the day, the end of

7   the day has to come sometime.  And the persistent request to

8   kick it down the --

9          THE COURT:  That is right.  As soon as we pretry

10  this matter, we'll set it for trial.

11         MR. BRAITHWAITE:  Okay.  I will move on, Your

12  Honor.  Thank you.

13         THE COURT:  I'm sure that you and I and others

14  have been concerned with the virus and that the virus has

15  been an interplaying partner in everything that we do.

16         You're one of the few times I have had people show

17  up in court.  I do that deliberately because of the nature

18  of the case.

19         MR. BRAITHWAITE:  Thank you, Your Honor.  We

20  appreciate that and thank you for indulging me for a moment.

21  It is a pleasure to be back here in this courtroom with you.

22         Moving on to the next term, portion of water, this

23  implicates an entirely different patent and patent family.

24         THE COURT:  Yes.

25         MR. BRAITHWAITE:  So the 514 patent and the 822

1  patent are part of the same family that was filed back in

2  the year 2006.  This 520 patent from which the phrase

3  portion of water comes is something entirely separate.  It

4  was based on an application filed in 2012, so some six odd

5  years later.  I have put a portion of claim one up here on

6  the screen that uses this phrase a portion of water.  It

7  talks about the portion of water -- that someone needs to go

8  and identify a portion of water intended for recreational

9  purposes within the water body.

10         Now, I think the ambiguity --

11         MR. ZEULI:  Mr. Braithwaite, I apologize for

12  interrupting and, Judge, I apologize for interrupting.  Our

13  position is that portion of water does not need to be

14  construed.  However, if the Court wanted to construe it, we

15  don't have an objection to the defendant's portion of the

16  entire water body, so we could move on to the other claim.

17  Portion of water does not need construction, but for the

18  sake of moving this along --

19         THE COURT:  Are we talking a cup?

20         MR. ZEULI:  What is that?

21         THE COURT:  Are we talking a cup?  What kind of a

22  portion are you talking about?

23         MR. BRAITHWAITE:  Your Honor --

24         THE COURT:  I though it was all recreation.

25         MR. BRAITHWAITE:  I completely agree.  The vagary

1    that we're trying to resolve is what we understand portion

2    to mean as a part, not the whole thing, and what we

3    understand Cloward's interpretation of portion is is the

4    whole thing.

5         THE COURT:  Well, no.  He just indicated that he

6    agreed with you.

7         MR. BRAITHWAITE:  Then I think we are fine.

8         THE COURT:  Okay.  No need to worry about it.

9         Ultimately somebody is going to have to define it

10   for the Court on a factual basis in contrast to a claim

11   basis.

12        MR. BRAITHWAITE:  Thank you, Your Honor.

13        THE COURT:  I am interested in the term recreation

14   as well.  People seem to focus in on swimming.  Are we

15   talking kayaks or are we talking surfboards?  What are we

16   talking about?  Somebody is going to have to say the whole

17   thing is a recreational activity.  Then we get into the

18   interesting question as to which portion do you measure

19   chemically and what portion do you measure for temperature?

20        MR. BRAITHWAITE:  Correct, Your Honor.

21        Recreation has not been one of our terms, but I

22   think the patent describes recreation as everything from

23   swimming to kayaking to all sorts of recreation.

24        THE COURT:  Walking on water.

25        MR. BRAITHWAITE:  That, too, I suppose.

1          I am not sure we have a construction issue on

2    that, but there is going to be a dispute, a factual dispute

3    about -- I think Crystal Lagoons focuses on swimming not

4    being allowed in certain portions.  You know, I think it

5    raises an interesting question with respect to the next term

6    which is delimiting zone.  I don't know if Your Honor has

7    been up to the Jewish Community Center up by the University

8    of Utah, but this is a picture of a pool where I take --

9          THE COURT:  I had been there before it was ever

10   the community center as a matter of fact.

11         MR. BRAITHWAITE:  This is a portion of their pool.

12         THE COURT:  Prior to the time that Izzy Wagner

13   bought it and dedicated it.

14         MR. BRAITHWAITE:  Well, it is still in active use

15   today and this is where my daughter swims.

16         There are portions of this pool that are dedicated

17   to different recreational purposes.  There is this broad,

18   sweeping, zero entry zone where kids can splash around and

19   play without having to worry about the deep end.  There is

20   the shallow end of the pool where swimmers can generally

21   swim and then there are the diving boards.

22         One time my daughter went to cross the buoy line

23   and go towards the diving boards and the lifeguard was no,

24   no, no.  You don't swim.  People are going to jump on your

25   head.  There is no swimming under the diving boards, but it

1    is still a recreative end of the pool.  That is kind of what

2    we're dealing with here.  We have swimming zones and

3    kayaking zones and everything else.

4          One of the terms here is delimiting zone, because

5    what the 520 patent talks about is a portion of water that

6    is treated to sanitary compliance and that portion of water

7    has three different zones in it.  It describes them using

8    these terms sanitary compliant zone, delimiting zone, and

9    most and favorable zone.  They are all part of the portion.

10          So what I have put on the screen is kind of a

11    description of that and what is described.  You have the

12    sanitary compliant zone, which might be roped off and it

13    might not be roped off.  It does not really matter.

14          Then you have the delimiting zone, which is the

15    edge, and then there is the rest of the lake out there.

16    Then there is this idea of the most and favorable zone.

17    What is being described is these chemical dispensers at

18    three, the little triangles, spitting out chlorine or some

19    other chemical cleaner, and so it cleans this portion of

20    water.  At this furthest point, the edge of your sanitary

21    compliant zone, that is where your water quality is probably

22    going to be the worst because it is the furthest from your

23    chemical dispenser.

24          So the question that is inherent in the delimited

25    zone is delimited from what?  Both parties agree on the

1    general construction that a delimiting zone is a virtual

2    zone that delimits the sanitary compliant zone and does not

3    require a physical barrier, but the construction has

4    inherent in it what Cloward has proposed for construction,

5    that it is delimitating it from the non-sanitary compliant

6    zone, the rest of the water, the place that is not treated.

7    That is what the dispute centers around.

8         We continue on with the vagary of delimiting zone

9    with the unanswered question, delimited from what, if we

10   just go along with Crystal Lagoons' construction.  That is

11   why we have proposed the additional language to describe

12   what is delimited, which is inherent in the term, and it is

13   the rest, the non-sanitary compliance area.  There is not

14   much more to say about it than that, because that is the

15   entire purpose of the 520 patent.

16        With that I will turn my time to Mr. Zeuli.

17        MR. ZEULI:  Bill, could you go to slide 93,

18   please.

19        Sometimes claim construction is hard and you have

20   to look at all of the intrinsic evidence and sometimes

21   extrinsic evidence if there is ambiguity, but only if there

22   is ambiguity.  The one time claim construction is not hard

23   is when the inventor acts as his own lexicographer, a fancy

24   word for providing a definition in the patent.

25        THE COURT:  You have done that with one of your

1    terms, if I remember correctly.

2              MR. ZEULI:  That is correct.  That is the one that

3    we are on, the delimiting zone.  It is the only one that the

4    defendants have asked this Court to construe where the

5    inventor --

6              THE COURT:  Tell me again how you define it.

7              MR. ZEULI:  I will read it right out of the

8    patent.  As used herein, the delimiting zone corresponds to

9    a virtual zone --

10             THE COURT:  A zone is a zone.

11             MR. ZEULI:  -- that delimits the sanitary

12   compliant zone and does not require a physical barrier.

13             THE COURT:  Okay.  Tell me what you really do.

14             MR. ZEULI:  Sure.  I will talk about that, but I

15   do want to mention one other thing before I leave this.

16             When there is a definition provided by the

17   inventor that --

18             THE COURT:  You're stuck with it.

19             MR. ZEULI:  That is right.  For better or for

20   worse you're stuck with it.  Here the defendant has come to

21   say, look, you should reject the definition that the

22   inventor wrote in his patent, and ignore the law on being

23   his own lexicographer, and add that there is delimitation

24   between this chemically treated area and a non-treated area.

25   There is no non-treated area.  Lagoons are treated.  We'll

1  talk someday about recreational --

2          THE COURT:  The whole thing?

3          MR. ZEULI:  The whole thing.

4          THE COURT:  The whole thing is chemically treated?

5          MR. ZEULI:  That is correct.  The whole thing is

6  chemically treated.

7          Can you bring up figures one and two?

8          What Mr. Fishman came up with, though, is when

9  you're chemically treating a swimming pool in your backyard,

10 it does not require all that much chemistry.  It is not that

11 big in context to the structures we're talking about here,

12 and so it is reasonable to have it be homogeneous.

13         THE COURT:  Well, you don't have zones if you

14 treat everything then.

15         MR. ZEULI:  That is right.  That is one of the

16 principles of how traditional filtration and traditional,

17 conventional swimming pools work is they don't have

18 stagnation zones.  It is homogeneous is the word that we

19 typically talk about.

20         THE COURT:  Well, why worry about zones if you

21 don't have any?

22         MR. ZEULI:  Because in these gigantic structures

23 you're going to have an area, and the swimming area would be

24 one example, that is going to be required to meet stricter

25 standards of --

1          THE COURT:  But you're meeting the standards

2    through the whole thing.

3          MR. ZEULI:  No.

4          THE COURT:  You are not?

5          MR. ZEULI:  You are not.

6          You are treating throughout the whole thing, but

7    you do not have to meet the standards throughout the whole

8    thing.  So what Mr. Fishman realized is he said, aha -- if

9    you could blow up figure two please, Bill.  Okay.

10         I don't have to spend all that money on all that

11   chemistry for treating this entire lagoon if I only have

12   swimming in a particular area.  I can comply and spend a lot

13   less money, if you look on the screen, by treating one zone

14   with that chemistry.  That is pretty clever.  He defined it

15   as such.  I mean --

16         THE COURT:  How do you define the area so that

17   people are aware of it?

18         MR. ZEULI:  People don't need to be aware of it.

19   They don't need to know.

20         THE COURT:  You can swim anywhere?

21         MR. ZEULI:  No, you can't swim anywhere.  Some

22   places --

23         THE COURT:  How do you tell them not to swim

24   anywhere?

25         MR. ZEULI:  So the way that it works at Cloward's

1    lagoon is -- let's bring it up -- let me just find the

2    slide.  They have got a sign that says don't swim in the

3    lagoon.

4              It is slide 17, please.

5              Bill, if you could just bring up the lower right

6    quadrant and just zoom in on that for the Judge.

7              That is the sign at Cloward's lagoon.

8              THE COURT:  What is the sign that you use?

9              MR. ZEULI:  What is that?

10             THE COURT:  What is the sign that you use to

11   effect your claim?

12             MR. ZEULI:  Actually this isn't in the claim.

13   This isn't in the claim and I don't know exactly what signs

14   they use.  It depends on which lagoon you're probably at.

15   The point is that this invention very cleverly deals with

16   the situation where you have a massive structure but only a

17   portion needs to be chemically treated at a certain level.

18   It all needs to be treated, but only a portion needs to meet

19   the stricter guidelines and that is what it does and it does

20   it quite well.  The inventor defined it.  I mean I have

21   never -- yeah, I can't imagine not accepting the inventor's

22   definition.

23             THE COURT:  The definition is there and the law is

24   what it is.

25             MR. ZEULI:  Yes.

1      THE COURT:  You can be your own lexicographer, but

2   when you provide the definition, you're stuck with it.

3      MR. ZEULI:  That is exactly right, for better or

4   for worse.  Here it is for better and we take it and we

5   shouldn't mess with it.

6      THE COURT:  How does it help us at all in the long

7   run?

8      MR. ZEULI:  Well, it helps us because what we'll

9   be able to show the Court and the jury is that this is how

10  Cloward addresses its lagoon as well.  There is an area that

11  has a higher chemistry.

12      THE COURT:  So what?

13      MR. ZEULI:  Well, so it infringes that claim.

14      THE COURT:  So what?

15      MR. ZEULI:  So it infringes the claim.

16      THE COURT:  What is wrong with putting up a sign?

17      MR. ZEULI:  There is nothing wrong.  That actually

18  proves our point and that is the evidence we'll be bringing

19  to you when we show you the factual disputes about whether

20  Cloward treats their lagoon so-called homogeneously or

21  whether there are areas where there are lots more nozzles

22  that put lots more chemistry in there.  It infringes.

23      THE COURT:  What suggests by way of a legal

24  proposition anywhere that one is required to do anything

25  like that?

1          MR. ZEULI:  I don't understand your question, Your

2     Honor.

3          THE COURT:  Why have divisions?  Why have areas?

4     Why be virtual?

5          MR. ZEULI:  Cost.  Because of the cost.

6          Well, let me take them in order.  Why have areas?

7     Because it would be cost prohibitive or considerably more

8     expensive to treat a two, four, 20 or 100-acre lagoon with

9     the chemistry that is required for a swimming area.  The

10    swimming area might only be, Your Honor --

11         THE COURT:  Well, why can't everybody do something

12    like that in taking care of the swimming area and provide

13    chemicals?  What is so unique about that?

14         MR. ZEULI:  What is so unique is it had never been

15    done.  Pool technology had always been homogeneous.  You

16    treat the whole structure the same.  When you expand your

17    thinking into these much, much larger structures, that

18    becomes very cost prohibitive if you have to treat all four

19    million gallons of water.

20         THE COURT:  I can't understand the motivation.

21         MR. ZEULI:  The patent office looked at it and

22    said, yeah, that is patentable.  We're going to give you a

23    patent on that.

24         THE COURT:  Well, I would be interested in some

25    law on that and we'll get to that down the road.

1            MR. ZEULI:  Yes.

2            My only point here is -- I mean it is a pretty

3    neat solution to a problem that was created by having these

4    much larger structures.  The patent office thought so and

5    gave them a patent and he defined the term in there.

6            THE COURT:  You're stuck with it.

7            MR. ZEULI:  Yes.

8            THE COURT:  I can understand that.

9            MR. ZEULI:  Okay.  Thank you, Your Honor.

10           THE COURT:  Anything else, counselor?

11           MR. BRAITHWAITE:  I think there are a couple of

12   brief points.

13           I completely agree that the patentee has acted as

14   their own lexicographer, but the question that is left

15   ambiguous, even though the patentee has put a definition in

16   there, what is left ambiguous is delimited from what?  What

17   we heard was the shuffling of language.  I went back and I

18   found the answer to the question what is recreation, because

19   the claims say a portion of water for recreational purposes.

20           In the 520 patent, and I am here at column two,

21   and the paragraph beginning on line 16, on the second line

22   of that it ends with large water bodies are used for a wide

23   variety of recreational purposes that include bathing,

24   waterskiing, windsurfing, boating and many other activities.

25   So there we know what is meant by recreation.

What you had was a focus on swimming, a subset. Like, oh, well, this part of the lagoon is for swimming, and then the rest of the lagoon is for kayaking and boating and other stuff.

Well, then there is no portion, no part that is delimited for sanitary compliance and recreation because the whole thing is, and that is what we heard is the whole thing. So the question that is going to come down the line is both on infringement and invalidity of this patent.

THE COURT: Well, the question of validity is an entirely different question.

MR. BRAITHWAITE: It is, but claim construction is a part of that. We construe the claims and we understand what is meant by the claims, and then if something after the patent date does what is said by the claims it infringes, but if there is something before the patent was filed, then it invalidates the patent. You still need to understand the scope of the claims.

THE COURT: Well, that is a different question. That is different from the meaning of the claim itself.

MR. BRAITHWAITE: Yes, it is, but it answers the Court's question about how is this going to help us down the line, because what is described in the patent as the prior art is the treatment of an entire large body of water, mixing it all up, the whole thing. They say that is prior

1    art.  That is not what we are doing.

2         I have here again the 520 patent talking about the

3    state of the art.  This is in column four, lines 28 through

4    43.  It is talking about the prior art and what has been

5    done before.  It talks about this U.S. patent number ending

6    in 268 that discloses a method and apparatus for treatment

7    of large water bodies by direct circulation.

8         About halfway down it states that the 268 patent

9    does not mention nor disclose a method for treating a

10   portion of water within a large water body in order to

11   comply with specific micro bacteriological sanitary

12   conditions, but only discloses a method for maintaining

13   circulation within a large water body.

14        The method from the 268 patent does not apply

15   chemicals through diffuser means in order to create a

16   sanitary complaint zone, but maintains circulation within

17   the water body that would disperse chemicals throughout the

18   water body, not allowing the creation of a sanitary

19   compliant zone.

20        So if you are treating the whole thing, you can't

21   even create this zone.  So treatment of everything so that

22   it can be used for recreation would fundamentally destroy

23   the idea of these zones and the potential for any

24   infringement argument.

25        What I brought up here at the Jewish Community

1  Center I think is illustrative.  There are the creation of

2  zones all over the place, but this pool treats the entire

3  water body, it treats the play area, the zero entry, it

4  treats the shallow end and it treats the deep end where

5  there is no swimming.  It treats everything.  So there is no

6  sanitary compliant zone.  The whole thing is.  That is what

7  pools have been doing forever.

8       The principle, and you remember we talked about

9  humans being dirty and they get in the water, and the

10  principle is where you have more people per unit of water,

11  the more you need to clean it.  So hot tubs where you have

12  got people in close quarters sitting together, that is a

13  pretty dirty place, and so you have to circulate that water

14  and clean it a lot quicker to deal with the number of

15  people.

16       In the shallow end you have a lot more kids

17  playing and splashing around and more people are comfortable

18  in the shallow end even if they can't swim, so there is a

19  higher concentration of bodies.  So there is more

20  circulation in the shallow end than there is in the deep end

21  where you don't have a ton of people.

22       Then in a huge lake you're not filling that lake

23  to the brim with people.  There are only a couple of people

24  paddling around out there so you need even less circulation

25  equipment.

1       It has been a principle of water treatment

2   forever.  The Florida Pool Code that predates these patents

3   significantly talks about, hey, if you have one of those

4   zero entry areas where kids are going to be splashing, you

5   need to double your inlets.  There is going to be more

6   people, more dirty people so you have to double your

7   circulation equipment in those areas.  The Texas code says

8   the same thing.

9       I look again at the Cant patent and let's take a

10  look at this and see what is happening.  You have these

11  evenly spaced inlets from the shallow end down to the deep

12  end, but in the shallow end there is less water so there are

13  more inlets per unit volume of water in the shallow end, as

14  there should be, than in the deep end.

15      The question we're going to get down the line is

16  we're going to be looking at the Hard Rock lagoon and we're

17  going to be saying, okay, does this only treat this little

18  pocket of water where people swim or does it treat the

19  entire thing?

20      In the future, and I understand that this is not a

21  thing for today, but here is a picture of the inlets of this

22  lagoon.  There are 115 in total.  They are all over the

23  place.  Like on the south end here, I have outlined in blue

24  a building and this is the south end filter house.  This is

25  where everything from the skimmers of the little swimming

1  bay pocket up on the top and the whole south end of the lake

2  all go back to this filter house.  It all gets pushed

3  through the same filters.  It all gets pushed through a

4  system that applies the same chlorine and the same chemicals

5  and then it shoots it back out to the entire south end of

6  the lake.

7          At the north end of the lake, shown on the right,

8  it is the same thing.  There is no swimming bay up there,

9  but everything from the north end gets shoved off to the

10  north end mechanical house to be filtered and chemically

11  treated and then shot back into the lake.

12          So we're going to be addressing this question of

13  where are the zones?  What is the zone?  We need some sort

14  of certainty about is a delimiting zone a buoy line that

15  says don't swim under the diving board, because if it is,

16  they are going to have massive invalidity problems.  If it

17  means delimiting zone based upon where you're treating water

18  and where you are not, then that is going to help us with

19  the infringement question next month.

20          That is all I had on that term in rebuttal.  If

21  the Court does not have questions, I can move on to I think

22  our last sets of terms.

23          THE COURT:  You recognize that if you want to play

24  your own lexicographer, you may?

25          MR. BRAITHWAITE:  Yes.

1          THE COURT:  Okay.  Thank you.

2          MR. BRAITHWAITE:  I think the last set of terms

3    for the parties are the determining terms.

4          THE COURT:  Is that a judgment call or is that a

5    matter of measurement?

6          MR. BRAITHWAITE:  Your Honor, I think it is a

7    matter of measurement based on what is stated in the patents

8    themselves.

9          THE COURT:  If it is a matter of measurement, then

10   what is there to construe?

11         MR. BRAITHWAITE:  Well, because we apparently have

12   different understandings of the term.  It is ambiguous to

13   these parties and we need a decision one way or the other to

14   say, Cloward H20, you're right or you are wrong, so we know

15   which definition we're operating under as we approach these

16   future questions.

17         THE COURT:  But you recognize it is a matter of

18   measurement.  It is either saline or it is not.

19         MR. BRAITHWAITE:  Well, I don't think both parties

20   are --

21         THE COURT:  It is either 98 degrees or it is not.

22         MR. BRAITHWAITE:  Correct, Your Honor, but I don't

23   think both parties are operating under the common belief

24   that it is measurement.

25         THE COURT:  Well, we'll find out.  We'll ask.

1       MR. BRAITHWAITE:  Okay.  Thank you, Your Honor.

2       THE COURT:  Okay.

3       MR. ZEULI:  When this building was built there was

4    an engineer that designed -- by the way, congratulations.  I

5    met Senator Hatch many years ago.  He is a fine man and this

6    building is honorably named after him.

7       When this building was designed and before it was

8    named after Senator Hatch, an engineer sat down and

9    determined what the HVAC system should be, and he or she did

10   that because you don't build a building and then go in and

11   stick a probe at the end of the air conditioning duct and

12   say, whoops, we got it wrong.

13      The word in the patent claim is determining.  It

14   is not measure.  It is not test.  The inventor certainly

15   knew and understood empirical measurements like testing and

16   measuring and spoke about it in his patent, but the word

17   that he chose in the claim is determining.  It is a common

18   English word.

19      THE COURT:  How do you determine?

20      MR. ZEULI:  How do you determine?  You can

21   determine a number of different ways.

22      THE COURT:  Well, don't you measure in order to

23   determine?

24      MR. ZEULI:  That might be one way.

25      THE COURT:  Are you measuring two things?

1          MR. ZEULI:  Webster's dictionary says determining

2     is to find out or come to a decision about by investigation,

3     reasoning or calculation.

4          THE COURT:  Sure.  It is a judgment call

5     supposedly.

6          MR. ZEULI:  Not necessarily.

7          THE COURT:  Well, based on what?

8          MR. ZEULI:  Based on scientific principles,

9     information that can be discerned before you build the

10    building.

11         THE COURT:  Sure.  Sure.  But here we're talking

12    about what people do in the way of taking temperature.

13         MR. ZEULI:  No, we are not.

14         THE COURT:  Well, you are making a value judgment

15    in not using the scientific means of determining with

16    exactitude the temperature.  You made a healthy guess rather

17    than an instrumental measurement.

18         MR. ZEULI:  Just like in this room it was

19    determined by an engineer what the range of the temperatures

20    would be.  We didn't have to build it and then measure it

21    and determine that we got it right or wrong.

22         Now, of course, you would and have a

23    thermometer --

24         THE COURT:  Don't you take the temperature?

25         MR. ZEULI:  Of course.

1          THE COURT:  And don't you measure the saline

2     content?

3          MR. ZEULI:  Yes, but that is not the only way you

4     determine.  This goes right --

5          THE COURT:  Tell me how else you determine.

6          MR. ZEULI:  An engineer often determines using

7     scientific principles like looking up in a handbook as to

8     what the salinity of the water in a certain area is by using

9     mathematical calculations.  When you build a building of a

10    certain size, for example, what is the amount of airflow

11    that is required?  What do you have to have by way of a

12    blower and whatnot?

13         Our point, Your Honor, is that they are trying to

14    get you to narrow a common English word, determine, to just

15    testing and --

16         THE COURT:  What are the elements of determine?

17    You suggest that determine is --

18         MR. ZEULI:  Investigate --

19         THE COURT:  -- unambiguous.

20         MR. ZEULI:  No.

21         THE COURT:  That it is specific, but it is simple,

22    as I understand your argument.

23         MR. ZEULI:  I think that is right.  I think most

24    people have experience in determining things, and I think

25    that while it can include, and the patent specifically talks

1    about empirical ways, testing and calculation, it is not

2    limited to that.

3            THE COURT:  What function does it serve in this

4    particular instance?  In relationship to the claim as a

5    claim, what function does the determination serve?

6            MR. ZEULI:  You don't want to build a 40-acre

7    structure to the tune of tens of millions of dollars and

8    find out that you determined incorrectly the amount of

9    saline or the temperature range.  That is designed ahead of

10   time to the structure so that when it is built, you can test

11   and confirm that it is correct.

12           THE COURT:  I understand that.  You test.

13           MR. ZEULI:  You can test to confirm.

14           THE COURT:  And you anticipate in your design a

15   particular result.

16           MR. ZEULI:  Correct.

17           THE COURT:  But so what?

18           MR. ZEULI:  That is determining.  Determination --

19           THE COURT:  At what point in time does

20   determination take place?  Is it in the design?

21           MR. ZEULI:  Yes, in the design and in the testing

22   after the design is built.

23           THE COURT:  It requires testing?

24           MR. ZEULI:  It does not require testing.  It

25   requires determining.

1          THE COURT:  Well, tell me when the determination

2     takes place.

3          MR. ZEULI:  It can occur before when the design is

4     being created.

5          THE COURT:  Now, tell me the nature of the

6     determination that occurs in the design.

7          MR. ZEULI:  If you look on the screen, Your Honor,

8     and this is from the patent and it says, for example, with

9     regard to salinity the dilution power may be previously

10    known.  That is known from either handbooks or calculations

11    based on the soil.

12         THE COURT:  Well, you're talking about the manner

13    in which you would diminish the salinity if that is your

14    goal.

15         MR. ZEULI:  I wouldn't agree with that, Your

16    Honor.  Here what the defendant is asking you to do is to

17    take a word, determining, which is clearly broad enough to

18    encompass more than just testing and measuring, and chop it

19    down and say you can only infringe if you test and measure.

20    They are trying to get rid of the prebuild, the design, the

21    determining before when you're designing the construction.

22         THE COURT:  Well, you anticipate that your design

23    is going to create a particular level of salinity and you

24    determine that with the use of particular chemicals.

25         MR. ZEULI:  I would disagree with that, Your

1    Honor.  I would say that you don't anticipate, you design.

2    It is scientific.  It is --

3          THE COURT:  Well, we can talk about scientific.

4    Tell me the process.  Tell me specifically what mental

5    processes are involved in determination.

6          MR. ZEULI:  Sure.  If I go back to the

7    definition -- investigation.  So let's just take salinity.

8    You can investigate the soil.  You can do that obviously

9    with the salinity of the water.

10          THE COURT:  Sure.

11          MR. ZEULI:  You can investigate before the

12   structure is built the salinity of the water by the soil, by

13   books that have publications, certain cities have

14   publications of what the salinity is of their water.  So

15   those are examples of determining that do not require you,

16   the designer, to test or measure.

17          Now, afterwards, of course Your Honor is right

18   that it could include testing and measuring to see if you

19   got it right.  You used the word anticipate.  I don't think

20   that is right.  I think it is determine.  It is an

21   engineer's job and they put a lot of time and a lot of math

22   and a lot of work into it and they come up with a system

23   that they expect based on investigation and reasoning and

24   calculation.  That does not require or is not limited to

25   just testing and measuring, which sounds like after the

1  fact.

2  THE COURT:  Well, how do you verify your

3  determination call, your judgment call?  How do you verify

4  that?

5  MR. ZEULI:  Well, you can verify it either through

6  written records as to what the specifications --

7  THE COURT:  No.  How do you verify it?  Once you

8  have designed and once you have put things in place, how do

9  you verify?

10  MR. ZEULI:  Put a thermostat on the wall.

11  THE COURT:  Sure you do.

12  MR. ZEULI:  Sure.  That is included.  Absolutely,

13  that is included in determining, but it is not limited to

14  that.

15  THE COURT:  Well, I am trying to figure out and

16  have you identify for me what is in addition to the testing.

17  You say, well, the design, the design.  So what?  You check

18  out your design by testing, by using the appropriate

19  measuring sticks to measure either the temperature or the

20  chemical content to make sure that people are not harmed,

21  that people are going to be safe.  Maybe your design is

22  faulty.  Maybe your anticipated action is inappropriate.  If

23  we want to distinguish between the thought processes before

24  the testing, then we ought to distinguish that, and when we

25  talk about judgment or talk about determination, we ought to

1    focus in on time and place and what.

2         MR. ZEULI:  I agree with you.

3         Let me show you what the patent says.  Let's go

4    back to the intrinsic record.  On the screen is a snippet

5    from the patent that talks about this.  You can see that

6    this has to do with salinity, and what I have underlined at

7    the top with regard to determining says may be previously

8    known.  That is a temporal statement.  May be previously

9    known.

10        Now, contrast that with the next words, or

11   empirically determined, may be previously known or

12   empirically determined.  So when determined is modified by

13   the adjective or adverb empirically, yes, you can stick a

14   probe in it later and find out if you determined correctly

15   before you built the structure, when you designed the

16   structure.  That is what this is talking about because, you

17   know, it would be backwards to design this building or one

18   of these massive lagoons and not determine beforehand what

19   the salinity requirements are going to be.

20        Yes, you should test it later to make sure that

21   people are safe and that you have determined it correctly,

22   because you may determine it incorrectly, but it does not

23   change the fact that prior to building the structure, in the

24   design phase you are determining, because the definition of

25   determining includes investigation, reasoning or

1   calculation.

2        THE COURT:  Where does it say that in the patent?

3        MR. ZEULI:  It does not use those exact words, but

4   I would say it is included in this statement that I show on

5   the screen where it says may be previously known.  How can

6   something be previously known?  Investigation, calculation

7   and --

8        THE COURT:  They watch it on television.

9        MR. ZEULI:  Perhaps.  Your Honor, perhaps.  Bob

10   the Builder show.

11        THE COURT:  Why is this important at all?

12        MR. ZEULI:  It is not, because what they are

13   trying to get you to do is narrow the term so that Cloward,

14   that is a designer, can argue that, hey, we don't stick a

15   probe in the water.

16        Now, the fact of the matter is, as we'll show you

17   some day or we'll show the jury, Cloward does stick probes

18   in the water and they do test and they do calculate, but

19   they also determine.  This is a common English word.  They

20   are asking you, based on nothing from the patent, and they

21   can't show you where in the claim the word test or

22   calculation is.  It just says determine.  They can't show

23   you in the patent where it says when we say determine, we

24   only mean testing and calculating, because they know that

25   they have got this statement that is on the screen to deal

1    with.  The patent office surely didn't require it.  There is

2    no ambiguity here.  There is no ambiguity with regard to

3    determine.

4        There is a dispute factually as to whether they

5    determine, but there is no dispute with regard to the

6    ambiguity of the term determining.

7        Here is one of the methods, one of the best --

8        THE COURT:  Then what are we talking about?

9        MR. ZEULI:  You would have to ask them.  They want

10   to create a noninfringement defense where there is none.

11   You know it is so interesting, why determining?  Why

12   wouldn't they pick the word minimum?  Why wouldn't they pick

13   the word period?  They picked determining, a common English

14   word, because if they can get you to narrow it to something

15   that they will claim they don't do, testing and calculation,

16   then they can bring an argument for noninfringement, but

17   that would be wrong.

18       One of the other pieces of intrinsic evidence,

19   Your Honor, that is so important is claim 13 in the patent,

20   and it is on the screen.  It specifically is limited to the

21   empirical methods.  That is not the claim we're talking

22   about.  The inventor has the broader claim, number one that

23   we're talking about that uses the word determine, and then

24   he wrote a narrower claim that says determined by empirical

25   methods.  We don't assert that claim.  We are not asserting

1    that claim.

2            THE COURT:  Have you withdrawn that claim?

3            MR. ZEULI:  No.

4            Actually, I may have misspoken.  I think they

5    do --

6            MR. BRAITHWAITE:  No, we don't assert that.

7            MR. ZEULI:  There are so many claims.

8            Right.  We have not asserted that claim in this

9    case, because this one is narrower and it is limited I would

10   say to testing and calculation, the empirical methods.  This

11   is very strong evidence that the broader claim determining

12   means what it says, determining, not just testing or

13   calculation.

14           THE COURT:  Claim one --

15           MR. ZEULI:  Yes.

16           THE COURT:  -- is testing.

17           MR. ZEULI:  No, determining.

18           THE COURT:  No.  Look at claim 13.

19           MR. ZEULI:  Uh-huh.

20           THE COURT:  The method of claim one wherein the

21   O.R.P. and the salinity and the temperature of the water are

22   determined by empirical methods.

23           Claim one talks about determination, does it not?

24           MR. ZEULI:  Yes, but it --

25           THE COURT:  And this explains the method for

1    determining.

2              MR. ZEULI:  No, Your Honor.

3              THE COURT:  It says what it says.

4              MR. ZEULI:  Yes, it does, Your Honor, but remember

5    that this claim is not asserted.  This claim is --

6              THE COURT:  Well, it is part of the history of

7    this thing.

8              MR. ZEULI:  No.

9              THE COURT:  It is part of what is there.

10             MR. ZEULI:  No, Your Honor.  It is not.  It is

11   evidence of our position being correct and the defendant's

12   position being wrong.

13             THE COURT:  You're not asserting that they take

14   temperature?

15             MR. ZEULI:  We are not asserting this claim.

16             THE COURT:  You are not asserting it.  In your

17   complaint you are not asserting that they take temperature?

18             MR. ZEULI:  Yes, we are.

19             THE COURT:  You are asserting that they take

20   temperature?

21             MR. ZEULI:  Yes, they take temperature.

22             THE COURT:  Does that include the claim in number

23   13?

24             MR. ZEULI:  It possibly could.

25             THE COURT:  Sure it could.  Sure it could.

1     MR. ZEULI:  But the point is, Your Honor, that

2  this narrower claim 13 is evidence that claim number one,

3  which does not limit determining to empirical methods, is

4  broader.  Because if you said in claim one determining means

5  testing and calculation only and those are the empirical

6  methods, claim one and 13 would be the same.  That would be

7  wrong.

8     THE COURT:  It says the method of claim one -- the

9  method of claim one.

10     MR. ZEULI:  I understand, Your Honor, but the way

11  that the claim structure works --

12     THE COURT:  One of the methods of claim one is

13  different than the method of claim one.

14     MR. ZEULI:  No.  It does not work that way.  It

15  does not work that way.

16     THE COURT:  It does not mean --

17     MR. ZEULI:  Pardon?

18     THE COURT:  "The" does not mean "the"?  It means

19  everything.

20     MR. ZEULI:  It does mean -- let me try it this

21  way.  Let me try it this way.

22     Claim one claims a car that has tires, a steering

23  wheel and windshield wipers.  Claim 13 says that the car of

24  claim one, wherein the steering wheel is blue.  That is

25  strong evidence that claim number one is not limited to a

1    blue car steering wheel.

2              THE COURT:  Let's have counsel respond.

3              MR. ZEULI:  Okay.

4              MR. BRAITHWAITE:  Thank you, Your Honor.

5              To preface this I think I want to go back to the

6    question the Court asked.  So what?  Why is any of this

7    going to matter?

8              Here is why it does.  Cloward H20 is a collection

9    of a handful of engineers down in Provo, Utah.  They sit I

10   think on the second or third floor of a small building down

11   there up against the mountains.  They are not in Florida

12   dumping chlorine into a pool.  They are not in Florida

13   taking the measurements of a pool.  They are architects and

14   engineers that design structures and come home.  They are

15   not a pool maintenance company.

16             What we have in the claims of the 520 patent is as

17   it is titled at the top of the claim one, a method for

18   controlling microbiological properties of a portion of water

19   within a water body.  It is not a method for designing and

20   coming up with calculations for form and design.  This is

21   talking about actually dipping your sticks into the water,

22   looking at what color they are and whatever measurements

23   you're taking and dumping chlorine in, and that is

24   subsection C of claim one, and it says dispensing an

25   effective amount of chemical agent into the identified

1    portion of water, and that is not done in design.  We're

2    talking about active maintenance on the ground.

3         So Cloward H20 is sitting here saying why am I

4    accused of patent infringement for a method patent of

5    treating water?  We don't do water treatment.  We design

6    these structures.  The goal was to design something that

7    worked similar to a typical swimming pool that would

8    operate.

9         The background of swimming pools -- I think a

10   little bit of technology here is potentially useful.  What

11   you do with a swimming pool is there is a concept called

12   O.R.P. and it stands for oxidation reduction potential, but

13   in more layman's terms it is the cleaning power of water.

14   So in general, and once you get down into the super

15   scientific level, it is not always true, but in general the

16   more chlorine, the more cleaning power of water and the

17   higher the O.R.P. would be.

18        Sometimes it depends.  It depends on the pH of the

19   water.  That can affect the cleaning power of the water and

20   the O.R.P.  Typical pool maintenance relies on keeping an

21   O.R.P. level at 650 or above.  It depends on the pool and it

22   depends on the location, but you keep a pretty high O.R.P.

23   and you keep it 24-7.  It is always maintained.  That is why

24   you have lifeguards out there at the swimming pool dipping

25   their sticks in the water to make sure that the water is

1    still sanitary.

2          The 520 patent was about something different.  In

3    the claims it talks about figuring out how low you can go.

4    What is the minimum O.R.P. level that we can maintain and

5    still be sanitary?  What is the minimum amount of time that

6    we need to treat the water and still be sanitary?  That is

7    what subsection B of claim one goes to.  It says maintaining

8    at least a minimum O.R.P. level in the portion of water for

9    at least a minimum period of time, wherein the minimum

10   O.R.P. level and the minimum period of time cannot be lower

11   than the values calculated by, and then it gives your

12   determination step.  It is talking about calculation.

13          In subset B-1 it says determine the salinity of

14   the water at the most unfavorable zone.  Actually go do it.

15   Put a salinity meter in the water.  What is the salinity?

16   Then use that value to determine the minimum O.R.P.  It says

17   in subsection little ii, Romanette ii, determining the

18   minimum O.R.P. value based upon the salinity of the water,

19   the thing you determine, and for salinities of water between

20   zero and 1.5 percent use a minimum O.R.P. of 550.  For

21   salinities of water between 1.5 and 2.5, plug your salinity

22   value into this equation and that is going to help you

23   figure out the minimum period of time.

24          For salinities higher than 2.5, the minimum O.R.P.

25   is 500, but that is always below the typical O.R.P. level of

a regular swimming pool that is maintained 24-7. A typical swimming pool is 650 all the time. They are saying, well, if the water is salty, then you can get away with less cleaning power of the water, get away with a lower O.R.P., but you have to do these determination steps to figure out what that is.

Then the next step is to figure out how long to maintain that low level of cleaning power. So you determine the temperature of the water, not in general, in the most unfavorable zone. Someone needs to go out and do it. They need to figure out what is the worst part of the water and what is the temperature in the worst part of the water, and then determine the minimum period of time based upon that temperature using, again, a set of recited equations. For temperatures between five Celsius and 35 Celsius, there is one equation, and for temperatures between 35 Celsius and 45 Celsius, there is another equation. So you have to actually do this stuff.

Now, the reality is that in designing a typical pool or in designing the Hard Rock Hotel lagoon, you don't care about the temperature and salinity, because you're going to maintain that high O.R.P. of 650 or above permanently, 24-7, and you always want to maintain it everywhere that high. So you're not worried about taking the temperature.

1    If it is a cold pool, 60 degrees, high O.R.P.  It

2    does not matter.  Who cares about the temperature.  If it is

3    a really warm pool, 95 degrees.  It does not matter, high

4    O.R.P. all the time.  Temperature does not come into it in

5    the design or in the actual maintenance, which is what is

6    claimed here.

7    The same is true with salinity.  If there happens

8    to be more salt in the water coming from the well, maintain

9    the high O.R.P.  Maintain it all the time.  If it is low

10   salinity coming from the well, high O.R.P. all the time and

11   nobody cares about the salinity.

12   What the accusation has been and the reason that

13   this case is being brought against a few engineers in Provo,

14   Utah, that aren't touching the water anymore, is they want

15   to say, well, someone could go and determine the

16   temperature.  It is possible to figure it out.  If it is 70

17   degrees outside for multiple days, then the water is going

18   to be near that.  The salinity you just generally know and

19   no one has to really do anything.

20   If we take the patent and we say, well,

21   determination just requires that you could figure it out,

22   that you could look it up in a book, then everything

23   collapses down to treating the water with chlorine in a 2012

24   patent.  That is ridiculous and no person of skill in the

25   art would approach this patent and think, well, Crystal

Lagoons got a patent on treating water with chlorine. That
is not a reasonable interpretation of these claims.

We have asked the Court to not just say what the
word determining means, but, instead, we're asking the Court
about the full phrase determining the salinity of the water
at the most unfavorable zone. What is within the scope of
that is just the water having salinity good enough or does
someone actually have to do something? The claims make it
clear that they do, because they have got to take their
value and plug it into an equation to figure out how long to
treat the lagoon.

There is another portion of the specification that
also draws this out and it is similar to the slide that
counsel for Crystal Lagoons showed the Court.

THE COURT: Why is it ambiguous?

MR. BRAITHWAITE: It is ambiguous because of how
it is being asserted. It is ambiguous because of how it is
being asserted. You have counsel for Crystal Lagoons come
up here and say, well, it does not mean that you have to do
anything. It could just be known in the esoteric and
ethereal sense. It is just known. That is not what
determining means.

Let's look at the specification. This is from
column 15, lines 22 through 33, and it specifically talks
about how salinity and temperature can be determined. This

1      is almost like the patentee being their own lexicographer.

2              It says the salinity can be determined by

3      empirical or analytical methods such as a visual test,

4      salinometers, I think is how you say that, that are based on

5      the conductivity of the electricity in the water,

6      hydrometers that are based on the specific gravity of the

7      water, or refractometers that are based on the index of

8      refraction of the water.  Apart from determining by

9      empirical or analytical methods, it then says apart from

10     being determined they might be publicly known or can be

11     information from other sources.

12             So if you're getting it from some public knowledge

13     or information from other sources, but you're not

14     determining by empirical or analytical methods, then you're

15     not doing the determination.  Just being known the spec says

16     is not determination.

17             The same thing is true with temperature.  That

18     same setup is there.  The temperature of the water can be

19     determined by empirical or analytical methods such as visual

20     tests, thermometers, thermocouples, resistance temperature

21     detectors, pyrometers or infrared devices or may be publicly

22     known.  So apart from being determined it could also be

23     publicly known.  That is not part of determination.  That is

24     just being known in some ethereal sense.

25             That is what we're asking the Court to resolve is

1   do these terms about determining the minimum O.R.P. values

2   actually require what they say or is it just some

3   theoretical exercise in the ether, because if it is some

4   theoretical exercise in the ether, then, great, we know how

5   we can invalidate the claims with the simple chlorination of

6   water which has been going on forever.

7          If these steps actually have to be performed and

8   they actually have to be performed by Cloward H20, then

9   there is zero evidence of that happening, because they are

10  designers and architects and not water maintenance providers

11  and we can deal with that issue on summary judgment.

12         THE COURT:  Tell me why the claim is not clear in

13  your mind.

14         MR. BRAITHWAITE:  Your Honor, the reason we have

15  asked for claim construction and it is not clear is because

16  of the strange way that Crystal Lagoons is asserting it.  We

17  have people sitting on chairs in Provo, Utah that are being

18  accused of maintaining water on the Seminole Reservation in

19  Florida by supposedly performing this determining step.  It

20  seems unclear, because whatever understanding they are

21  operating under is so odd and esoteric that it cannot be

22  possible.  So it is unclear what their understanding is.

23         As for the claim itself and what reasonable people

24  would think, the claim is clear as day.  You have got to

25  perform those steps.  You have got to do those equations and

1    if you don't, you don't infringe.

2         THE COURT:  Okay.  Well, we'll let counsel

3    respond.

4         MR. ZEULI:  I think what we have here, Your Honor,

5    is a factual dispute.  You asked Mr. Braithwaite twice tell

6    me what is ambiguous about the word determining.  He did not

7    provide you an answer other than to say we disagree with how

8    Crystal Lagoons is applying that term.  That is not a

9    dispute over language.  That is a dispute over factual

10   matters with regard to infringement, and apparently factual

11   matters with regard to invalidity, and that is fine and we

12   will someday have that discussion with regard to whether in

13   fact Cloward's engineers determine.

14        Bill, can you bring up claim one of the 520

15   patent?  I want to point out something to the Judge first.

16        One of the things that Mr. Braithwaite said that I

17   think makes the point I just made clear -- Bill, if you can

18   blow up the first two -- no.  Excuse me.  The first two

19   lines of number one.  Right here, if you can see my finger.

20   Make that bigger, please.  Thank you.  Perfect.  There you

21   go.  Make that as big as you can.

22        When Mr. Braithwaite was trying to answer your

23   question about what is ambiguous about the word determining,

24   he said, you know, the engineers in Provo are being accused

25   of sitting in their chairs and maintaining the lagoon in

1    Florida, but that is not what this claim says.  This claim

2    says a method for controlling microbiological properties.

3    Method for controlling.  That gets to my whole point.

4            I think Your Honor has grasped the temporal issue

5    here, which is can determining as part of controlling the

6    chemistry in a lagoon be done during the design?  The answer

7    is absolutely.

8            Now, this gets into factual things, but I am going

9    to show it anyway because Mr. Braithwaite mentioned it.

10           Bring up the purple and orange photo.

11           One of the ways that that is done is by putting

12   more nozzles in certain areas.  That comes from the design.

13   So this is part of the design of the lagoon at a Hard Rock

14   Hotel.  You can see that the Cloward designers in Provo,

15   Utah created many more inlets in the swimming area than they

16   did in the rest of the lagoon.  So that is a determination

17   as to the microbiological content in that lagoon.  Of course

18   it is going to be measured later to confirm.  You called it

19   an assumption.  I call it determining.  That determination

20   will be confirmed, but it can be done temporally before and

21   that is why there is nothing wrong with the word

22   determining.

23           Bill, finally if you could just bring up column 11

24   of the 520 patent, lines 22 to 33.

25           Again, going back to the intrinsic evidence, we

1    asked ourselves where is the ambiguity?  Is the claim

2    ambiguous?  No, it is not.  It uses the word determine, a

3    common word and easy to understand.  There may be a dispute

4    as to application, but that is not for today.  Nothing in

5    the file history.  The patent owner didn't say anything.

6    Can we use sticking a probe in there?  So Mr. Braithwaite is

7    left with trying to find something in the specification, but

8    it is not there.

9          Bill, if you could blow up column 11, lines 22 to

10    33.  Blow up is not a very technical term.  22 to 33.  There

11    we go.  Try one more time.

12          I am sorry.  Maybe I have this wrong.  Maybe it is

13    column 15, lines 22 to 33.  It is what Mr. Braithwaite had

14    on the screen a moment ago.

15          I apologize, Your Honor.

16          Keep going.  22 to 33.  There we go.  There it is.

17    Good.

18          So what Mr. Braithwaite had you focus on was the

19    fact that in the patent specification -- it does not say it

20    has to be this way.  It says can be.  If you're looking for

21    a disclaimer where you would change the word determining to

22    mean something narrower, you would have to see, like, must,

23    always, and you don't.  It just says can be determined.  So

24    it says one way you can do it and then he listed off all

25    these fancy science gadgets.  That is fine and good.

1        What he left off was at the bottom where it says

2   or may be publicly known, right, and that is certainly

3   temporally before.  You wouldn't have public knowledge --

4   you know, there is no public knowledge of what the

5   temperature is in this room.  That public knowledge as to

6   what the temperature should be in this room would have been

7   before this room was designed.  Or it can be information

8   from other sources, among others, calculations, engineering

9   books.

10        The same thing with temperature.  Mr. Braithwaite

11  talked about all these fancy science instruments.  I am not

12  even going to try to pronounce them.  He left off the end

13  where it says or may be publicly known or can be informed

14  from other sources.

15        THE COURT:  The universe of other subjects -- you

16  know, I am always amazed at the redundancy that occurs in

17  matters of this kind, but I think you made your point, but I

18  think that we'll probably indicate that no construction is

19  necessary at this point in reference to that particular

20  matter.

21        MR. ZEULI:  Thank you, Your Honor.

22        THE COURT:  What is left, if anything?

23        MR. BRAITHWAITE:  I think those are all the terms,

24  Your Honor.

25        THE COURT:  Okay.  You have got a pending motion

1    you tell me and it may or may not be the subject of

2    reconsideration by you after the determinations that have

3    been made today, but I will not worry about that.  That is

4    your problem.  If there is a response down the road, we'll

5    set it down.  Maybe we have set it down already.  I don't

6    know whether we fixed a date already.

7            Eventually we're going to get to pretrial, and I

8    want to emphasize in reference to pretrial, disputed issues

9    identified, both legal and legal propositions, a roster of

10   all of your witnesses for your respective cases in chief,

11   not rebuttal, cases in chief, a roster of all of your

12   exhibits for your respective cases in chief.  If you have

13   common exhibits, you ought to work together to get them in

14   without worrying about foundation if they are offered by

15   both sides.

16           Have we yet fixed a pretrial date?  We have, have

17   we not?

18           MR. BRAITHWAITE:  No, Your Honor, we have not.

19           THE COURT:  Okay.  Tell me the date that you have

20   for your motion.

21           MR. BRAITHWAITE:  Your Honor, the pending motion

22   right now is set for October 7th, I believe.

23           THE COURT:  Okay.  Well, let's deal with that, and

24   either deal with that beforehand or deal with that, and on

25   that date we'll give you a pretrial date at that time.  But

1    in anticipation of the fact that we're moving ahead as best

2    we can with the resurge, think about what generally is in

3    dispute and think about what witnesses are going to be

4    helpful to us and who knows what.  Think about exhibits.

5         Anything else that we need to talk about at this

6    point?

7         MR. BRAITHWAITE:  I don't believe so, Your Honor.

8         MR. ZEULI:  No, Your Honor.

9         THE COURT:  Thanks a lot.  Appreciate your help.

10   It is an interesting case it seems to me.  I think the whole

11   relationship of language and the law and how language

12   functions is intimately tied in with what we're trying to do

13   as best we can, but language itself has inherent defects,

14   and I think it is appropriate in cases of this kind that we

15   try to get behind dealing with language and look at the

16   events, what is done and what has happened and who did what

17   on an item specific basis so that we are not just discussing

18   philosophically what is going on in the world.

19        I think people should be awfully careful about how

20   they run up and down the level of abstraction that people

21   enjoy dealing with.  Lawyers love to deal with high-level

22   abstractions.  I think, as a practical matter, all of us

23   need to deal with specificity and simplicity and identity

24   with an accurate label of what it is that we're talking

25   about, in spite of the fancy rules that may exist.  The

1  specificity of specific things is going to be terribly

2  important in my opinion.  Quite frankly, high-level

3  abstractions just don't cut it.

4           Thank you for your help.

5           We'll be in recess and we'll see you down the

6  road.

7           MR. BRAITHWAITE:  Thank you, Your Honor.

8           THE COURT:  Okay.

9           (Proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25