IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CRYSTAL LAGOONS U.S. CORP. and CRYSTAL LAGOONS TECHNOLOGIES INC., <br><br> Plaintiffs, <br><br> v. <br><br> CLOWARD H2O LLC and PACIFIC AQUASCAPE INTERNATIONAL, INC, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:19-cv-00796-RJS-DAO <br><br> Chief District Judge Robert J. Shelby <br><br> Magistrate Judge Daphne A. Oberg |

Before the court are Defendant Pacific Aquascape International, Inc.'s (Pacific's) Motions in Limine[1] and Motions to Exclude Expert Testimony.[2] Having reviewed the Motions and associated briefing, the court GRANTS IN PART Pacific's Motion in Limine to Preclude Allegations of Noncompliance with Pool Codes, GRANTS Pacific's Motion in Limine to Exclude Unpreserved Evidence and Testimony about Plaintiffs' Testing of the Accused Instrumentality, GRANTS IN PART Pacific's Motion to Exclude Plaintiffs' Expert Christopher D. Lidstone, and GRANTS IN PART Pacific's Motion to Exclude Plaintiffs' Expert Richard F. Bero. Because multiple grounds could potentially render Pacific's Motion to Exclude Plaintiffs' Expert Jennifer Norlin moot, the court will defer ruling on the Motion.

---

[1] Dkt. 362, *Defendant's Motion in Limine to Preclude Allegations of Non-Compliance with Pool Codes* (*Pool Code Motion*); Dkt. 363, *Defendant's Motion in Limine to Exclude Unpreserved Evidence and Testimony about Plaintiffs' Testing of the Accused Instrumentality* (*Instrumentality Motion*).

[2] Dkt. 369, *Defendant's Motion to Exclude Plaintiffs' Expert Richard F. Bero* (*Bero Motion*); Dkt. 372, *Defendant's Motion to Exclude Plaintiffs' Expert Christopher D. Lidstone* (*Lidstone Motion*); Dkt. 375, *Defendant's Motion to Exclude Plaintiffs' Expert Jennifer Norlin* (*Norlin Motion*).

The court received oral argument on these Motions on January 23, 2025.[3]  During the hearing, Plaintiffs made an oral motion seeking to allow their damages expert, Richard F. Bero, additional time to submit a supplemental expert opinion.  For the reasons explained below, that motion is DENIED.

## FACTUAL BACKGROUND

This is a patent-infringement case arising out of Defendant Cloward H2O LLC's (Cloward's) design and Pacific's construction of a large recreational water structure at the Hard Rock Hotel & Casino located on Seminole Tribal land in Hollywood, Florida (the Lagoon).[4]  Specifically, Plaintiffs allege Defendants infringed on three patents during their design and construction of the Lagoon: U.S. Patent No. 8,062,514 (the '514 Patent), U.S. Patent No. 8,753,520 (the '520 Patent), and U.S. Patent No. 9,708,822 (the '822 Patent) (collectively, the Patents).  In their most basic sense, the '514 Patent is a patented structure to contain a large body of water,[5] the '520 Patent is a method for controlling microbiological properties of a portion of water within a large body of water,[6] and the '822 Patent is a patented process to maintain and clean large bodies of water without traditional filtration.[7]  Plaintiffs retained Christopher D. Lidstone as an expert to opine on the infringement and validity of the '514 Patent; Jennifer Norlin as an expert to opine on the infringement and validity of the '520 and '822 Patents (collectively, the Water Treatment Patents); and Richard F. Bero as an expert to opine on the issue of damages.

---

[3] Dkt. 471, *Minute Entry for Proceedings Held before Judge Robert J. Shelby.*

[4] *See Pool Code Motion* at 1.

[5] *See* Dkt. 411, *Plaintiffs' Opposition to Defendant's Motion in Limine to Preclude Allegations of Non-Compliance with Pool Codes* (*Pool Code Opposition*) at 2.

[6] *See* Dkt. 77, *Third Amended Complaint* ¶ 32.

[7] *See Pool Code Opposition* at 2.

## PROCEDURAL BACKGROUND

Plaintiff Crystal Lagoons US Corporation originally brought suit against Cloward in October 2019, alleging Cloward had infringed only on the '514 Patent.[8]  Plaintiff Crystal Lagoons Technologies Inc. later joined in the action, and both Plaintiffs asserted claims against Cloward for direct and induced infringement of all three Patents and sought injunctive relief enjoining Cloward from further infringement.[9]  Cloward asserted counterclaims seeking declaratory judgments of noninfringement and invalidity of the Patents.[10]  Around the same time, Plaintiffs filed a separate and nearly identical Complaint against Pacific,[11] and Pacific asserted nearly identical counterclaims against both Plaintiffs.[12]  Pacific's case was later consolidated into the present action.[13]

The court later dismissed all of Crystal Lagoons US Corporation's claims asserted against Cloward for lack of standing, and as a result, all counterclaims filed by Cloward in relation to those claims were also dismissed.[14]  At the hearing involving the present Motions, the parties agreed Cloward had been dismissed entirely from the case.  Thus, the only claims currently before the court are Plaintiffs' claims for direct and induced infringement of the '514 Patent, the

---

[8] Dkt. 2, *Complaint* ¶ 50.

[9] *Third Amended Complaint* ¶¶ 47, 48, 53, 55, 60.

[10] *See* Dkt. 99, *Cloward H2O LLC's Amended Answer and Counterclaims in Response to Plaintiffs' Third Amended Complaint* ¶¶ 10–42.

[11] *See* Dkt. 161-1, *Complaint*.

[12] *See* Dkt. 23, (case no. 2:21-cv-00507), *Pacific Aquascape International Inc.'s Answer and Counterclaims in Response to Plaintiffs' Complaint* ¶¶ 10–42.

[13] Dkt. 164, *Order Granting Stipulated Motion to Consolidate Actions*.

[14] Dkt. 309, *Memorandum Decision and Order on Standing*.

'822 Patent, and the '520 Patent against Pacific,[15] and Pacific's counterclaims seeking declaratory judgments of noninfringement and invalidity of the Patents.[16]

In February 2024, the court directed Pacific to file only motions in limine and motions to exclude that would directly affect the court's consideration of a summary judgment motion.[17] Pacific filed the present Motions and a Motion for Summary Judgment[18] in May 2024. The evidentiary Motions are fully ripe and ready for review.[19]

## LEGAL STANDARDS

Pacific has filed various Motions in Limine and Motions to Exclude Expert Testimony. With respect to motions in limine, the movant seeking pre-trial exclusion of evidence bears the burden of demonstrating that the evidence is inadmissible on any relevant ground.[20]

With respect to motions to exclude expert testimony, Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert*[21] impose "on a district court a gatekeeper obligation 'to ensure that any and all scientific testimony or evidence admitted is not only

---

[15] Dkt. 2, (case no. 2:21-cv-00507), *Complaint* at 56.

[16] *Pacific Aquascape International Inc.'s Answer and Counterclaims in Response to Plaintiffs' Complaint* at 20–24.

[17] Dkt. 348, *Docket Text Order*.

[18] Dkt. 378, *Defendant's Consolidated Motion for Summary Judgment*.

[19] *Pool Code Opposition*; Dkt. 431, *Defendant's Reply Brief in Support of Motion in Limine to Preclude Allegations of Non-Compliance with Pool Codes* (*Pool Code Reply*); Dkt. 412, *Plaintiffs' Response to Pacific Aquascape International, Inc.'s Motion in Limine to Exclude Unpreserved Evidence and Testimony about Plaintiffs' Testing of the Accused Instrumentality* (*Instrumentality Opposition*); Dkt. 432, *Defendant's Reply Brief in Support of Motion in Limine to Exclude Unpreserved Evidence and Testimony about Plaintiffs' Testing of the Accused Instrumentality* (*Instrumentality Reply*); Dkt 413, *Plaintiffs' Opposition to Defendant's Motion to Exclude Expert Richard F. Bero* (*Bero Opposition*); Dkt. 428, *Defendant's Reply Brief to Motion to Exclude Plaintiff's Expert Richard F. Bero* (*Bero Reply*); Dkt. 414, *Plaintiffs' Opposition to Defendant's Motion to Exclude Plaintiffs' Expert Christopher D. Lidstone* (*Lidstone Opposition*); Dkt. 433, *Defendant's Reply to Motion to Exclude Plaintiffs' Expert Christopher D. Lidstone* (*Lidstone Reply*); Dkt. 420, *Plaintiffs' Response to Defendants' Motion to Exclude Plaintiffs' Expert Jennifer Norlin* (*Norlin Opposition*); Dkt. 434, *Defendant's Reply to Motion to Exclude Plaintiffs' Expert Jennifer Norlin* (*Norlin Reply*).

[20] *Thomas v. Weber State Univ.*, No. 1:20-CV-00054, 2023 WL 2646905, at *2 (D. Utah March 27, 2023) (citations omitted).

[21] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

relevant, but reliable.'"[22]  Recent amendments to Rule 702 were meant to clarify that there is no presumption of admissibility with respect to expert testimony.[23]  Instead, to be admissible, the proponent of the expert evidence bears the burden to demonstrate it is more likely than not that Rule 702's requirements are satisfied.[24]  The Tenth Circuit draws upon the following framework to determine whether the admission of expert testimony would satisfy Rule 702 and *Daubert*'s requirements.

First, a court must decide "whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion."[25]

Second, the court "must determine if the expert's proffered testimony—whether it concerns scientific, technical, or other special knowledge—has 'a reliable basis in the knowledge and experience of his [or her] discipline."[26]  *Daubert* sets forth several factors, "neither definitive nor exhaustive,"[27] the court may consider in making a reliability determination: "whether a theory has been or can be tested or falsified," "whether the theory or technique has been subject to peer review and publication," "whether there are known or potential rates of error with regard to specific techniques," and "whether the theory or approach has general acceptance."[28]  For experts offering non-scientific opinions based upon personal knowledge or experience, the court asks whether the expert "employs in the courtroom the same level of intellectual rigor that

---

[22] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 589).

[23] Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

[24] Fed. R. Evid. 702.

[25] *Bill Barett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (citing Fed. R. Evid. 702).

[26] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 592).

[27] *Id.* at 1233 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150, 152–53 (1999)).

[28] *Daubert*, 509 U.S. at 593–94.

characterizes the practice of an expert in the relevant field."[29]  Fundamentally, the reliability

analysis is focused not "upon the precise conclusions reached by the expert, but on the

methodology employed in reaching those conclusions."[30]

Federal courts both before and after *Daubert* have found other factors relevant in

determining whether expert testimony is sufficiently reliable to be considered by the trier of

fact.[31]  These factors include: (1) whether the expert is proposing to testify about matters

growing naturally and directly out of research they have conducted independent of the litigation,

or whether they have developed their opinions expressly for purposes of testifying;[32] (2) whether

the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion

(in other words, whether "there is simply too great an analytical gap between the data and the

opinion proffered");[33] (3) whether the expert has adequately accounted for obvious alternative

explanations;[34] (4) whether the expert is being as careful as he would be in his regular

professional work outside his paid litigation consulting;[35] and (5) whether the field of expertise

claimed by the expert is known to reach reliable results for the type of opinion the expert would

give.[36]  Recent amendments to Rule 702 also sought to clarify that it is erroneous for courts to

---

[29] *Kumho Tire Co.*, 526 U.S. at 152.

[30] *Bitler*, 400 F.3d at 1233 (citing *Daubert*, 509 U.S. at 595).

[31] Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

[32] *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)).

[33] *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

[34] *Id.* (citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994)).

[35] *Id.* (citing *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[36] *Id.* (citing *Kumho Tire Co.*, 526 U.S. at 151).

deem "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" as questions of weight instead of admissibility.[37]

Finally, the court determines "whether proposed testimony is sufficiently 'relevant to the task at hand.'"[38]  In other words, in order to "help the trier of fact"[39] as Rule 702 requires, "expert testimony must 'fit'—it must relate to a disputed issue in the case."[40]  To make this determination, the court evaluates "the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact."[41]  In determining whether expert testimony may aid the trier of fact, courts may consider several factors, including "whether it is within the juror's common knowledge and experience" and "whether it will usurp the juror's role of evaluating a witness's credibility."[42]

## ANALYSIS

I.    **Evidence Regarding Pacific's Noncompliance with Pool Codes Is Inadmissible Under Federal Rules of Evidence 402 and 403.**

Pacific's first Motion in Limine seeks to preclude Plaintiffs from presenting evidence or arguing that the Lagoon does not comply with Florida's pool codes or any other pool code.[43]  Such references, Pacific argues, are irrelevant to the pending patent infringement claims and are presented merely "to incite prejudice against Pacific."[44]  Pacific argues this evidence is therefore

---

[37] *Id.*

[38] *Dodge*, 328 F.3d at 1234 (quoting *Daubert*, 509 U.S. at 597).

[39] Fed. R. Evid. 702(a).

[40] *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (quoting *Daubert*, 509 U.S. at 591–92).

[41] *Bitler*, 400 F.3d at 1234.

[42] *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (citations omitted).

[43] *Pool Code Motion* at ii.

[44] *Id.*

barred by Federal Rules of Evidence 402, 403, 404, and 609.[45]  The court agrees with Pacific

that its alleged noncompliance with pool codes is irrelevant and runs afoul of Rule 403.

However, not all evidence related to pool codes is inadmissible.

Evidence is relevant if it has any tendency to make a fact of consequence more or less

probable than it would be without the evidence.[46]  Under Rule 403, a court may exclude

otherwise relevant evidence if its probative value is substantially outweighed by a danger of

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence.[47]  "Unfair prejudice in the Rule 403 context 'means

an undue tendency to suggest decision on an improper basis, commonly, though not necessarily,

an emotional one.'"[48]

The court recognizes from the outset that the Lagoon is not subject to any jurisdiction's

pool codes.  Plaintiffs admit the Lagoon is not subject to Florida or any other state's pool codes

because the Lagoon was built on Seminole Tribal Land.[49]  Thus, to the extent Plaintiffs seek to

argue or introduce evidence suggesting Pacific is or was in violation of a jurisdiction's pool

codes, the Federal Rules of Evidence prohibit it.  The evidence is probative of nothing, let alone

a fact of consequence, because it is admittedly untrue.  It is therefore irrelevant.  It is also

substantially outweighed by Rule 403's concerns.  It would unfairly prejudice Pacific by

suggesting Pacific engaged in improper or illegal conduct when it, in fact, could not.  A jury may

be tempted to unfairly view Pacific as a careless builder of unsafe water structures, as worthy of

---

[45] *Id.*

[46] *See* Fed. R. Evid. 401.

[47] Fed. R. Evid. 403.

[48] *U.S. v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (citing Fed. R. Evid. 403 advisory committee's note).

[49] Plaintiffs have acknowledged that because the Lagoon was built on Seminole Tribal Land, the Lagoon is "not . . . subject to enforcement of such [pool-code] rules by [a state] enforcement agency."  *Complaint* ¶ 31.10.

punishment, or as more likely to have committed the other wrongs it is accused of committing in the present case. This evidence would also confuse the issues, confuse a jury, and waste time in an already highly technical patent case. This evidence is therefore inadmissible.

To the extent Pacific seeks to exclude all evidence of pool codes from other jurisdictions, that request is denied. Evidence may be admissible for one purpose, but not another,[50] and there are potentially relevant and admissible uses of this evidence. For example, Plaintiffs may seek to use pool codes to demonstrate helpful differences between technology used in traditional swimming structures and technology used in water structures implementing the Patents. Or they may seek to use pool codes to undermine Pacific's arguments that the Lagoon employs traditional pool technology.[51] Clearly, the Lagoon's design and use of a filtration system is a fact of consequence as it goes directly to whether Pacific has infringed on the structure-related '514 Patent,[52] and this proposed use of evidence may be admissible. Indeed, comparing accused technology to what has been traditionally employed and regulated by other jurisdictions does not necessarily imply Pacific's own noncompliance with law. But, to avoid any prejudice, Plaintiffs should acknowledge the Lagoon is not subject to the pool codes in question before making such an argument.

Tellingly, Pacific relies heavily on evidence of other jurisdictions' pool codes in its concurrently filed Motion for Summary Judgment, suggesting such evidence likely is relevant to

---

[50] *See* Fed. R. Evid. 105.

[51] *Pool Code Opposition* at 5.

[52] Multiple claims of the '514 Patent relate to the technology employed to clean the large water body. *See* Dkt. 372-4, *United States Patent No. US 8,0620,514 B2* at 19:25–20:18.

the present dispute.[53]  Accordingly, Plaintiffs are not allowed to argue that Pacific is or was

noncompliant with any jurisdictions' pool codes, but arguments and evidence involving pool

code regulations generally are permitted at trial, if they are otherwise admissible.

## II.    All Evidence Related to Plaintiffs' Testing of the Lagoon's Water Is Inadmissible Due to Sanctionable Misconduct.

Pacific's next Motion in Limine seeks to preclude all evidence related to Plaintiffs'

testing of the Lagoon's water.[54]  Specifically, Pacific argues Plaintiffs' failure to preserve (1)

pre-test water samples from which the test results were derived, (2) the testing instruments (test

kits), and (3) the test results from their testing of the Lagoon water deprived Pacific and the court

of the information necessary to arrive at an informed and fair judgment on the merits of the

patent disputes.[55]  Plaintiffs do not dispute they failed to preserve any evidence depicting the test

results generated from their testing of the Lagoon.[56]  As such, Pacific argues a spoliation

sanction excluding all testimony and evidence about what testing of Lagoon water showed is

appropriate.[57]  The court agrees with Pacific.

Spoliation is either the destruction or the failure to preserve evidence relevant to ongoing

or potential future litigation.[58]  "A spoliation sanction is proper where (1) a party has a duty to

preserve evidence because it knew, or should have known, that litigation was imminent, and (2)

---

[53] *See* Dkt. 380, at 28 ("Each of the IAPMO Uniform Pool Code . . . Perkins, and 2004 Florida Rules disclose (1) pool bottoms and walls covered with a plastic liner made of a non-porous material able to be toughly cleaned; (2) pools of at least 2 meters deep; (3) pools with skimmers; (4) pools filled with water by fresh water feeding pipes; and (5) pool vacuums that can be used to clean plastic liner on the bottoms and walls.").

[54] *Instrumentality Motion* at 8.

[55] *Id.* at 4; *Instrumentality Reply* at 2.

[56] *See generally Instrumentality Opposition*.

[57] *Instrumentality Motion* at 3.

[58] *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1195 (D. Utah 2011).

the adverse party was prejudiced by the destruction of the evidence."[59]  District courts are provided discretion "to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to proof of an issue at trial."[60]  Indeed, "[d]istrict courts have 'substantial weaponry' in their arsenal to shape the appropriate relief for a party's spoilation of evidence."[61]  A district court "may strike witnesses," "issue an adverse inference," "exclude evidence," "or, in extreme circumstances, dismiss a party's claims."[62]  District courts should mold the sanction in a way that best "serve[s] the prophylactic, punitive, and remedial rationales underlying the spoilation doctrine,"[63] though a showing of bad faith is generally required to impose an adverse inference sanction.[64]

Here, the court finds abundant, uncontested, deliberate misconduct by Plaintiffs warranting exclusion of all evidence related to Plaintiffs' testing of the Lagoon's water. Plaintiffs do not dispute they resorted to extrajudicial, self-help methods to obtain the water samples.[65]  Deposition testimony from Sigfrido Grimau, one of Plaintiffs' Water Department Managers who was present for the covert testing, confirms this.[66]  Plaintiffs also do not contest

---

[59] *Burlington N. & Santa Fe Ry. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007).

[60] *Est. of Trentadue v. United States*, 397 F.3d 840, 862 (10th Cir. 2005).

[61] *Helget v. City of Hays*, 844 F.3d 1216, 1225–26 (10th Cir. 2017) (citations omitted).

[62] *Id.* at 1226 (citations omitted).

[63] *Id.* (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)).

[64] *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir.1997); *see also Helget*, 844 F.3d at 1226 n.7 ("The 2015 revisions to Federal Rule of Civil Procedure 37(e) provide courts further guidance on issuing sanctions for destroying or failing to preserve electronically stored information (ESI).  The Rule instructs courts to 'order measures no greater than necessary to cure the prejudice.' . . . But where a party acts with the intent to deprive another from using the ESI in litigation, a court may 'presume that the lost information is unfavorable to the party,' issue an adverse-inference instruction, or 'dismiss the action or enter a default judgment.'" (citations omitted)).

[65] *See, e.g., Instrumentality Motion* at 4 ("As set forth above, Crystal Lagoons evaded the security guards at the Hard Rock Hotel, surreptitiously took water samples, and performed water tests.  All this occurred just days before filing of the original complaint and also *during* litigation . . . .").

[66] *See* Dkt. 363-1, *Videotaped Videoconference Deposition of Sigfrido Grimau* at 51:3–24.

the allegations that they failed to preserve any record of what the test results showed.[67]  They also do not dispute they had a duty to preserve a record of the test results as, at the time of the extrajudicial Lagoon testing, litigation was not only imminent, it was ongoing.[68]

Instead, Plaintiffs insist they "preserve[d] [all] material evidence."[69]  Plaintiffs appear to define "material evidence" as only "the detectable presence of flocculants in suspension in the water samples."[70]  But a record of the actual test results generated from the water samples is far more important to this case than the water samples themselves.  This is because, as Plaintiffs admit, the Lagoon's water chemistry is dynamic.[71]  The water chemistry can change due to the addition or modification of chemical treatments, and flocculants naturally precipitate after three hours.[72]  Thus, later tests of the water samples cannot replicate the conditions as they existed at the time of Plaintiffs' tests, and the unpreserved test results clearly constitute "material evidence."

Plaintiffs acknowledge throughout their briefing just how "material" these test results are to their case.  The test results formed "the foundation of some of Crystal Lagoons' allegations and basis for filing its complaint."[73]  They also provided the basis for a large part of Jennifer Norlin's expert testimony—the expert designated to opine on the infringement and validity of the

---

[67] *See generally Instrumentality Opposition.*

[68] *Instrumentality Motion* at 4; *see generally Instrumentality Opposition.*  Plaintiffs merely argue Mr. Grimau "did not knowingly or intentionally destroy any material evidence in this case" as "the material evidence (the detectable presence of flocculants in suspension in the water samples) changes naturally and quickly."  *Instrumentality Opposition* at 8.

[69] *Instrumentality Opposition* at 2 ("Neither Crystal Lagoons nor Grimau failed to preserve material evidence.").

[70] *Id.* at 8.

[71] *See, e.g.*, *id.* at 3, 7 ("[F]locculants do not last in the water forever, so Pacific would not have been able to test and/or validate the samples for flocculants . . . .").

[72] *Id.* at 3.

[73] *Id.* at 2.

Water Treatment Patents.[74]  Indeed, at least one of Plaintiffs' claims for patent infringement appears to depend entirely on this evidence.  Specifically, the '822 Patent is a process to maintain a water body at "pH 5 to 9," with an oxidation-reduction potential of at least 600 nV for at least 4 hours within a 48 hour cycle, and it requires adding a flocculating agent to the water at a concentration of 0.02 to 1 ppm at a specified frequency.[75]  In Plaintiffs' own words, the water samples were tested for "flocculants," "pH level," and "oxidation-reduction potential,"[76] and they "confirmed (among other things) the presence of flocculants in the water[,] . . . [and a] flocculant concentration range[] between 0.5 ppm and 1.5 ppm . . . ."[77]  These test results depict critical information that goes directly to the potential infringement of the '822 Patent claims; as such, they are not only material, they are central to Plaintiffs' case.

The spoliation of the test results has caused substantial prejudice to Pacific.  Again, later tests cannot replicate the conditions as they existed at the time of Plaintiffs' tests.  As such, Pacific cannot confirm, challenge, or justify what the test results may have indicated in October 2019.  For years, Plaintiffs have forced Pacific to defend costly and highly complex patent infringement claims based on what test results supposedly showed, and exclusion of all evidence related to these test results is a necessary step to remedy the prejudice to Pacific.  Still, Plaintiffs attempt to shift the blame and argue any prejudice suffered by Pacific was self-inflicted.[78]  Plaintiffs claim Pacific knew about the purported test results for nearly three years yet never asked its own expert to take Lagoon samples to challenge the test results.[79]  But Pacific has no

---

[74] *Id.* at 6.

[75] Dkt. 434-2, *United States Patent No. US 9,708,822 B2* at 19:56–65.

[76] *Instrumentality Opposition* at 2.

[77] *Id.* at 1–2.

[78] *Id.* at 7.

[79] *Id.* at 3.

duty or burden to preemptively disprove the evidence underlying Plaintiffs' claims. Pacific is under no obligation to remedy Plaintiffs' lack of admissible evidence in this case, and Pacific was prejudiced by the spoliation of test results regardless of whether Pacific ultimately elected to test the Lagoon.

As a last resort, Plaintiffs argue a more "appropriate remedy would be to allow the parties to present evidence to the jury regarding the alleged spoliation and argue any inferences they want the jury to draw."[80] Plaintiffs again argue that no "material evidence" was knowingly or intentionally destroyed in this case, so exclusion of the evidence would constitute a "drastic sanction" that is "disproportionate to the alleged harm."[81] But Plaintiffs do not dispute they failed to preserve a record of the test results, which, as explained above, constitutes material evidence. And because Plaintiffs had a duty to preserve the test results and Pacific was prejudiced by their spoliation, an exclusion sanction is entirely proper.[82]

For the foregoing reasons, the court determines all arguments and evidence related to Plaintiffs' testing of the Lagoon's water—including all expert testimony based on this evidence—are inadmissible due to sanctionable misconduct.[83] Relatedly, the court is very concerned with Plaintiffs' pre-litigation misconduct of circumventing established discovery procedure and engaging in self-help methods to obtain the water samples.[84] This misconduct further support the court's decision to impose an exclusion sanction. As this court has already

---

[80] *Id.* at 2–3.

[81] *Id.* at 7–8.

[82] *Burlington N. & Santa Fe Ry.*, 505 F.3d at 1032.

[83] *Id.*

[84] *See, e.g., Instrumentality Motion* at 4 ("As set forth above, Crystal Lagoons evaded the security guards at the Hard Rock Hotel, surreptitiously took water samples, and performed water tests. All this occurred just days before filing of the original complaint and also *during* litigation . . . .").

explained in the *Xyngular Corporation* case where a party was ultimately subject to a dismissal sanction:

> Parties anticipating litigation may not engage in self-help by improperly gathering a potential adversary's property. This conduct is an affront to the established rules of engagement and fair play in lawsuits. It amounts to an end-run around the Federal Rules of Civil Procedure, including the rules governing discovery and the orderly exchange of information relevant to disputes presented for resolution in our courts. This conduct undermines the confidence of both litigants and the public in the fairness of judicial proceedings. . . . Serious sanctions are warranted.[85]

Ultimately, Pacific's Motion in Limine to Exclude Unpreserved Evidence and Testimony about Plaintiffs' Testing of the Accused Instrumentality is granted due to sanctionable misconduct. All evidence related to Plaintiffs' testing of the Lagoon's water is inadmissible. Because multiple grounds could potentially render moot Pacific's Motion to Exclude Plaintiffs' Expert Jennifer Norlin, the court will defer ruling on that Motion until it resolves Pacific's outstanding Motion for Summary Judgment.[86]

### III.    Christopher D. Lidstone's Expert Opinions Regarding the Absence of Non-Infringing Alternatives, Long-Felt Need, and Copying Are Inadmissible.

Next, Pacific moves to exclude expert testimony of Christopher D. Lidstone, who Plaintiffs hired to opine on the infringement and validity of the '514 Patent.[87] Recall that the '514 Patent concerns the structural aspects of a water lagoon.[88]

First, Pacific argues Lidstone is a water geologist, not a recreational water structure designer.[89] As such, he cannot be considered a person of "ordinary skill in the art," which is

---

[85] *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1317 (D. Utah 2016) *aff'd sub nom. Xyngular v. Schenkel*, 890 F.3d 868 (10th Cir. 2018).

[86] Dkt. 375.

[87] *Lidstone Motion* at ii.

[88] *Norlin Opposition* at 1–2.

[89] *Lidstone Motion* at 2.

necessary to opine on the infringement and validity of the '514 Patent.[90]  Plaintiffs respond by pointing to, among other things, Lidstone's 42 years of experience in the field of hydrology; his degrees in Geological Sciences and Geomorphology; his work experience with the design and construction of water supply, water treatment, and storage projects for public water supplies; his work experience with pools and bathing facilities; his experience with water treatment methods and water chemistry (including experience analyzing water chemistry in pools); his experience with the use of liners, geotextiles, and geomembranes in connection with water bodies; his experience previously serving as a technical expert in other patent cases related to groundwater storage; his experience teaching courses on the building blocks for pools, like the use of liners, flocculation, disbursement, cation exchange, water, and concrete; and more.[91]

The court agrees with Plaintiffs that Lidstone has specific, relevant experience related to the '514 Patent to qualify him as a person of ordinary skill in the art with respect to water structure design generally, and there is no requirement that Lidstone have specific design experience with recreational water structures to opine on the validity and potential infringement of the Patent.  After all, the potential for recreational use of these structures is only a small part of the invention.  The '514 Patent involves, among other things, the design and construction of a structure to contain a water body larger than 15,000 m³, the use of a plastic liner to cover the bottom and walls of the structure, the use of a recycling system that uses pipes with injectors that also allow the application of chemicals, the use of a water inlet line and inlet chambers through

---

[90] *See, e.g.*, *Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1377 (Fed. Cir. 2022) (explaining how an expert providing testimony regarding the validity or infringement of a patent must "at least have ordinary skill in the art"); *Sundance, Inc., v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008) ("[I]t is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art."); *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) ("Both the Supreme Court and this court have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art.").

[91] *Lidstone Opposition* at 3.

which water is extracted to feed the fresh water feeding pipe system of the structure, and the use of a system of skimmers positioned along the border of the structure.[92]  And even though Lidstone may lack experience with designing water structures primarily used for recreation, Lidstone's experience with designing other water structures qualifies him to opine on key issues relevant to the structure-related claims of the '514 Patent.

Second, Pacific argues Lidstone lacks a factual basis for his opinion that the '514 Patent is a "foundational" patent.[93]  Pacific also argues Lidstone never defined what the term "foundational" means, and Pacific emphasizes the potential lack of relevance of Lidstone's testimony regarding the foundational nature of the '514 Patent.[94]  Pacific ultimately argues these deficiencies demonstrate Lidstone's testimony on this subject is unreliable and irrelevant to the merits.[95]  The court disagrees.

A review of Lidstone's expert report and deposition testimony demonstrate how Lidstone defined "foundational" and how he relied on an adequate factual basis to make this determination.  In his report, he explained:

> I understand the '514 Patent matured from United States Patent Application No. 12/884,842, which includes the same specification as United States Patent Application No. 11/819,017, which matured into United States Patent No. 7,820,055.  I understand that this was Crystal Lagoons' first United States patent application.  I understand that two U.S. patents that issued from the above application included the structure and process for designing, building and maintaining the invention.  Thus, the original filing of United States Patent Application No. 11/819,017 included the patented process to maintain water bodies larger than 15,000 m³ and the patented structure itself.  In my opinion, both patents that issued from this application, including the '514 Patent are foundational patents because they form the core of Crystal Lagoons' technology.[96]

---

[92] *United States Patent No. US 8,0620,514 B2* at 19:26–40.

[93] *Lidstone Motion* at 4.

[94] *Id.* at 5.

[95] *Lidstone Reply* at 5.

[96] Dkt. 372-1, *Expert Report of Christopher D. Lidstone, CPG Regarding Infringement of U.S. Patent No. 8,062,514* ¶ 19.

A plain reading of this paragraph makes clear Lidstone defined "foundational" as being the original, or foundational, patent filed by an applicant directed to a particular subject matter.[97] Indeed, Lidstone identified the '514 Patent family as the first family of patents filed in the United States by Crystal Lagoons related to this technology, and he acknowledged the fact that other patents issued from the same initial application. Lidstone's conclusions were based on a variety of facts, including (1) his review of the '514 Patent, (2) his personal knowledge of the technology that existed prior to the '514 Patent, (3) his conversations with Crystal Lagoons' founder and a Water Development Manager about the inventions, (4) conversations with Plaintiffs' expert Jennifer Norlin, and (5) his own experience in water treatment and water chemistry.[98] The court finds Lidstone's reliance on and analysis of the available data and facts reliable. The court also finds the testimony relevant to material questions related to secondary considerations, discussed below. Lidstone's opinions related to the foundational nature of the '514 patent are therefore admissible.

Third, Pacific argues Lidstone relied on no data or facts whatsoever to support his opinion that there are no non-infringing alternatives to the technology of the '514 Patent.[99] The court agrees with Pacific and concludes Lidstone's testimony is unreliable on this subject.

"To prove the absence of acceptable, non-infringing alternatives, the patentee may prove either that the potential alternative was not acceptable to potential customers or was not available at the time [of infringement]."[100] This is the second prong of the *Panduit* analysis, which is

---

[97] *Lidstone Opposition* at 5 (citing *Bayer Healthcare Pharms., Inc. v. River's Edge Pharms., LLC*, No. 11-CV-01634-LMM, 2016 WL 8609982, at *9 (N.D. Ga. Oct. 26, 2016)).

[98] *Id.* at 5.

[99] *Listone Motion* at 6.

[100] *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed Cir. 2017) (citation omitted).

often used to calculate lost profit damages and is discussed in more detail below.[101]  The *Panduit* factors "are not easy to prove," and the second prong, the absence of acceptable non-infringing alternatives, is often considered "the most difficult obstacle for patent holders."[102]  In his expert and rebuttal reports, Lidstone does not appear to engage in any separate, "non-infringing alternatives" analysis, and Plaintiffs cannot identify any such analysis in their briefing.[103] Instead, Plaintiffs point to Lidstone's opinions on the "foundational" nature of the '514 Patent and Crystal Lagoons' commercial success as the bases for this opinion.[104]  It is unclear to the court how these opinions independently constitute a sufficiently reliable basis for an "absence of non-infringing alternatives" opinion.  The most relevant expert testimony the court could identify potentially relating to this issue is when Lidstone testified how "the technology covered by the '514 Patent constituted a significant departure from the technologies for building and maintaining large bodies of water for recreational purposes available at the time" as it allowed for "the design, construction, and operation of sustainable, clear lagoons of virtually unlimited sizes."[105]  He later testified how prior to Crystal Lagoons' Patents, "there really was not a means—an economic means of handling large lagoons, large bodies of water, and develop them for recreational purposes.  The '514 [P]atent . . . actually provided the foundations for that."[106]

Critically missing from Lidstone's report and testimony, however, are any facts or analysis suggesting how at the time of Pacific's alleged infringement there was an absence of

---

[101] *Id.*

[102] *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017).

[103] *Lidstone Opposition* at 6.

[104] *Id.* at 6–7.

[105] *Expert Report of Christopher D. Lidstone, CPG Regarding Infringement of U.S. Patent No. 8,062,514* ¶ 21.

[106] Dkt. 372-3, *Videotaped Videoconference Deposition of Chris Lidstone* at 61:11–25.

acceptable, non-infringing alternatives.[107]  Indeed, this *Panduit* prong is analyzed "on a customer-by-customer basis,"[108] and there is no analysis of this factor at the time Defendants were customers of Crystal Lagoons.  At best, Lidstone provides an opinion on the novelty of the invention but cabins it to the exact moment Crystal Lagoons first patented its lagoon technology in the United States (in 2007)[109]—he does not opine on the existence of non-infringing alternatives when Pacific allegedly infringed on the Patent by building the accused Lagoon (in 2018).[110]  This does not reliably demonstrate how in 2018, at the time of the alleged infringement, there was an absence of acceptable, non-infringing alternatives.  Eleven years of technological advancements may have altered the lagoon technology landscape significantly, and it is a crucial consideration for any expert opinion regarding whether non-infringing alternatives existed at the time of infringement.  This expert testimony is unreliable and inadmissible.

Fourth, Pacific argues Lidstone has no factual basis for his opinion that the '514 Patent fulfilled a "long-felt need."[111]  Plaintiffs contend Lidstone's factual basis for this opinion permissibly rests on (1) his opinion that the '514 Patent is a foundational patent, and (2) the increase in demand for lagoons after the '514 Patent was issued.[112]  The court agrees with Pacific.  Evidence of long-felt need "is closely related to the failure of others,"[113] though "they

---

[107] *See Presidio Components, Inc.*, 875 F.3d at 1381.

[108] *Mentor Graphics Corp.*, 851 F.3d at 1286.

[109] *Third Amended Complaint* ¶ 8; *Expert Report of Christopher D. Lidstone, CPG Regarding Infringement of U.S. Patent No. 8,062,514* ¶ 19 ("Thus, the original filing of United States Patent Application No. 11/819,017[, which was filed in 2007,] included the patented process to maintain water bodies larger than 15,000 m³ and the patented structure itself.").

[110] *Expert Report of Christopher D. Lidstone, CPG Regarding Infringement of U.S. Patent No. 8,062,514* ¶ 47.

[111] *Lidstone Motion* at 6.

[112] *Lidstone Opposition* at 7.

[113] *In re Cyclobenzaprine Hydrocholoride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012).

are distinct considerations."[114]  This "[e]vidence is particularly probative of obviousness when it demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand."[115]  Lidstone's rebuttal expert report contains only two, conclusory sentences that the '514 Patent "fulfilled a long felt need to develop and treat large bodies of water such as lakes and ponds."[116]  He later testified he based his long-felt-need opinion on the nature of the patent, the history that predated the patent, and what happened after the patent came into play.[117]  Specifically, Lidstone indicated how, based on his understanding of the relevant pool-related technology, "prior to this patent, there were no large lagoons that had been developed, and subsequent to the patent, lagoons were built,"[118] but he admittedly could not identify any statements or other evidence prior to 2006 indicating a long-felt need.[119]  The court is unpersuaded that merely pointing to some level of eventual demand for a patented product renders reliable expert testimony regarding long-felt but unresolved need.  If this were the case, all patented products that happen to generate sales over the life of the patent would essentially enjoy a presumption of satisfying a long-felt need.  While a rapid increase in demand for the patented product may be suggestive of long-felt need, Lidstone does not analyze the rate of increase of demand for lagoons.  He only analyzed and described Crystal Lagoons' current success in the lagoon industry.[120]  In fact, when deposed about his long-felt need opinion, Lidstone acknowledged that he never took into account the fact that it took Crystal Lagoons

---

[114] *In re Depomed, Inc.*, 680 F. App'x 947, 952 (Fed. Cir. 2017) (unpublished).

[115] *In re Cyclobenzaprine Hydrocholoride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012) (citation omitted).

[116] *Invalidity Rebuttal Expert Report of Christopher D. Lidstone, CPG* ¶¶ 69, 78.

[117] *Videotaped Videoconference Deposition of Chris Lidstone* at 120:22–121:2.

[118] *Id.* at 121:14–122:6.

[119] *Id.* at 118:20–25.

[120] *Invalidity Rebuttal Expert Report of Christopher D. Lidstone, CPG* ¶¶ 92–93.

eight years from the filing of the '514 Patent to secure its first agreement in the United States and 11 years to build the first lagoon.[121]  Ultimately, Lidstone's lack of any analysis on this subject renders his long-felt need opinion inadmissible.

Fifth, Pacific argues Lidstone lacks sufficient facts and data supporting his opinion that the '514 Patent has been commercially successful.[122]  Pacific admits Lidstone takes about a page of his report discussing various indicators of Plaintiffs' commercial success,[123] but Pacific insists Lidstone never analyzed data to reach his opinion that the commercial success *resulted from* the '514 Patent.[124]  Instead, Pacific argues the only part of Lidstone's report demonstrating a causal nexus[125] is the portion stating: "[a]s there are no real practical alternatives to the technology of the '514 Patent, it is my professional opinion that Crystal Lagoons' commercial success is due, in significant part, to the '514 Patent and that there is a nexus between the '514 and Crystal Lagoons' commercial success."[126]

But when, as here, the patented invention is a component of a commercially successful machine or process, the patentee need only "com[e] forward with evidence sufficient to constitute a prima facie case of the requisite nexus," and show "a legally sufficient relationship between that which is patented and that which is sold."[127]  A prima facie case in this context has

---

[121] *Videotaped Videoconference Deposition of Chris Lidstone* at 120:12–121:13.

[122] *Lidstone Motion* at 7.

[123] *Id.* at 8.

[124] *Id.* at 7.

[125] To demonstrate commercial success for purposes of countering a challenge of obviousness, a patentee must show "that the commercial success of the product *results* from the claimed invention.  Furthermore, the asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art."  *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) (emphasis added).

[126] *Invalidity Rebuttal Expert Report of Christopher D. Lidstone, CPG* ¶ 96.

[127] *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

been defined as when a "judge, using ordinary reasoning, may determine that fact A might reasonably be inferred from fact B."[128]  A patentee meets this deferential burden by merely introducing testimony as to the advantage of using a claimed invention with the commercially successful machine or process.[129]  And when the patentee presents prima facie evidence of a nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger, as in any civil litigation.[130]

Lidstone's opinions on this subject are reliable and relevant as they adequately demonstrate and describe how the '514 Patent is advantageous to Crystal Lagoons' commercial success.  Lidstone described various indicators of Crystal Lagoons' ongoing commercial success in his rebuttal report,[131] and he linked the success to the '514 Patent by relying on his previous opinion that the technology of the '514 Patent provides the foundation for Crystal Lagoons' technology to create large bodies of water for swimming and recreational use.[132]  As discussed above, his opinion on this subject is also reliable and admissible.  Moreover, a correct understanding of Crystal Lagoons' business model, which Lidstone understood, also supports his commercial success opinion.  Crystal Lagoons generates revenue by issuing a collective license of all its intellectual property—which necessarily includes the'514 Patent— to lagoon builders for the design, construction, and operation of its lagoon technology.[133]  Notably, Crystal Lagoons does not design, build, and operate artificial water lagoons, nor does it license its Patents and

---

[128] *Id.* (citation omitted).

[129] *See id.* (citing *R.R. Dynamics, Inc. v. A. Stucki Co.*, 579 F. Supp. 353, 366–67 (E.D. Penn. 1983) where the court held "the testimony as to the advantage of the spaced structure with the biasing spring easily supports the inference that the claimed invention itself was responsible for this success").

[130] *Id.* at 1393.

[131] *Invalidity Rebuttal Expert Report of Christopher D. Lidstone, CPG* ¶¶ 91–96.

[132] *Id.* ¶ 95.

[133] *Id.* ¶ 108 (citing Dkt. 369-1, *Expert Report of Richard F. Bero, CPA, CVA* ¶¶ 20, 154, 178–80).

other intellectual property on a patent-by-patent basis; instead, it licenses all of its technology only when it has ongoing involvement in a project such as providing (and getting paid for) its ongoing systems fees services.[134] Thus, the '514 Patent necessarily forms a part of each sale of the collective license, and likely plays a part in the development of each resulting lagoon. In other words, Lidstone's testimony reliably demonstrates a "relationship between that which is patented and that which is sold,"[135] which is relevant to establishing the required nexus. Ultimately, the court finds Lidstone's opinions on this subject to be sufficiently reliable and relevant to be admissible.[136]

An understanding of Crystal Lagoons' business structure and the foundational nature of the '514 Patent also undermines Pacific's next argument. Pacific argues Lidstone failed to link any "industry praise" to the actual inventions of the '514 Patent.[137] The court disagrees. Lidstone's explained how "based on the invention of the technology of the '514 Patent," Mr. Fischmann (the inventor of the '514 Patent), has been honored many times with prestigious international awards, including Entrepreneur of the Year, Innovator of the Year, Businessman of the Year, the Innovation Stevie Award, the Real Innovator Award, the Green Apple Award, and two Guinness World Record Awards related to lagoons built and operated using Crystal Lagoons' technology.[138] He also explained how hundreds of lagoon projects around the world currently use Crystal Lagoons' technology.[139] As explained above, these awards presented to

---

[134] *Expert Report of Richard F. Bero, CPA, CVA* ¶ 20.

[135] *Demaco Corp.*, 851 F.2d at 1392.

[136] For nearly identical reasons, Lidstone's opinion that there is a nexus between the '514 Patent and Crystal Lagoons' licensing by others is sufficiently reliable, relevant, and admissible. *See Lidstone Motion* at 10.

[137] *Lidstone Motion* at 9.

[138] *Invalidity Rebuttal Expert Report of Christopher D. Lidstone, CPG* ¶¶ 97–100.

[139] *Id.* ¶ 92.

Mr. Fischmann for his lagoon-related inventions necessarily relate, at least in part, to the '514 Patent because this Patent is included in each sale of Crystal Lagoons' collective license, and the technology likely forms a part of each resulting lagoon. Lidstone's analysis and opinions on this subject are reliable and admissible.

Finally, Pacific argues Lidstone fails to provide any factual basis to support his conclusion that Pacific "copied" the '514 Patent.[140] To rebut this argument, Plaintiffs cite to Lidstone's expert report detailing how the Lagoon infringes on the claim elements of the '514 Patent.[141] But Plaintiffs erroneously conflate the terms "copying" and "infringement" and attempt to treat the two as the same.

"Copying 'requires evidence of efforts to replicate a specific product,'" which necessarily involves more evidence than mere patent infringement.[142] Indeed, "[n]ot every competing product that arguably falls within the scope of a patent is evidence of copying. Otherwise every infringement suit would automatically confirm the nonobviousness of the patent."[143] Efforts to replicate a specific product may be shown either through "internal documents"; "direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica"; "or access to, and substantial similarity to, the patented product (as opposed to the patent)."[144] Here, Plaintiffs do not direct the court to any reliable support for Lidstone's opinions regarding copying of '514 Patent technology; they only argue Lidstone's opinions regarding Pacific's infringement are sufficient to support his copying

---

[140] *Lidstone Motion* at 9.

[141] *See Lidstone Opposition* at 10.

[142] *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011) (citation omitted).

[143] *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

[144] *Id.* (citations omitted).

opinion.[145]  But precedent forecloses this argument.  A review of Lidstone's expert reports and deposition testimony reveals he similarly conflated the terms "copying" and "infringement." Tellingly, the only explicit support for his copying opinion is his analysis of another lagoon's infringement of the '514 Patent in a related case.[146]  And when pressed about the basis for his copying opinion, Lidstone testified how "[he] look[ed] at similarities in designs and so forth,"[147] but he admitted, "[w]hat Pacific Aquascape did to get there, I don't know."[148]  A reliable copying opinion would have focused on what Pacific "did to get there," i.e., their efforts to replicate a specific product, not on the mere similarities between the accused device and the patent claims.  The court therefore concludes Lidstone's opinions and testimony on this subject are unreliable and inadmissible.

## IV.    Richard F. Bero's Expert Testimony Regarding Infringement Damages is Unreliable and Inadmissible.

Pacific's final motion challenges the admissibility of expert testimony offered by Richard F. Bero, who Plaintiffs retained primarily to opine on issues related to the amount of infringement damages.[149]  Pacific dedicates a few sentences of their Motion to argue Bero's opinions regarding the commercial success of the asserted Patents are unreliable.[150]  But the court finds this testimony sufficiently reliable as Bero relied, in part, on Lidstone's analysis

---

[145] *Lidstone Opposition* at 10 (citing *Expert Report of Christopher D. Lidstone, CPG Regarding Infringement of U.S. Patent No. 8,062,514* ¶¶ 49–115).

[146] *Invalidity Rebuttal Expert Report of Christopher D. Lidstone, CPG* ¶¶ 102–06.  And even in the related *Desert Color* case, Lidstone only supports his copying opinion by referencing his analysis in the present case where he describes how the Hard Rock Lagoon infringes the '514 Patent.  *See* Dkt. 317-1, (case no. 2:20-cv-00851), *Amended Invalidity Rebuttal Expert Report of Christopher D. Lidstone, CPG* ¶ 99.

[147] *Videotaped Videoconference Deposition of Chris Lidstone* at 242:10–243:21.

[148] *Id.* 243:20–21.

[149] *Bero Motion* at 1.

[150] *Id.* at 10.

regarding this subject and on the same facts upon which Lidstone relied.[151]  As explained above, Lidstone's testimony is sufficiently reliable and admissible on this subject; it therefore provides a reliable basis for Bero to form his own opinion.[152]

The bulk of Pacific's Motion challenges Bero's calculation of infringement damages. Patent infringement damages are customarily computed by calculating lost profits or a reasonable royalty,[153] and Pacific challenges the admissibility of Bero's testimony with respect to each calculation.  The court agrees with Pacific and discusses each calculation in turn.

A.  Bero's Testimony Regarding Lost Profits Is Inadmissible.

In order to recover lost profits, the patentee must show a "reasonable probability that, 'but for' infringing activity, the patentee would have made the infringer's sales."[154]  Such a determination is often governed by the traditional, four-part *Panduit* test, where a patentee is entitled to lost profits only if it can prove (1) demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capacity to exploit the demand; and (4) the amount of profit it would have made.[155]  Bero's lost profits analysis in his report largely tracked the four *Panduit* elements, and Pacific challenges the admissibility of Bero's testimony with respect to each one.  The court agrees with Pacific that Bero's opinions

---

[151] *Bero Opposition* at 10.

[152] *Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1144 (D. Utah 2021) ("[T]here is nothing objectionable about an expert relying upon the work [of] a colleague[.]").

[153] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citation omitted) (explaining how the "two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining").

[154] *Crystal Semiconductor Corp. v. TriTech Microelects. Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001).

[155] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

related to the second and fourth *Panduit* elements are unreliable, rendering his lost profits opinion inadmissible.[156]

Regarding the fourth element, Pacific takes issue with Bero's assumption that Crystal Lagoons' profit would have been the ████████████████ offered by Crystal Lagoons to Hard Rock in an unsigned letter of intent.[157]  The primary bases for Bero's lost profits opinion are an unsigned letter of intent between Hard Rock and Crystal Lagoons for ████████,[158] the fact that the offer was "in line with" two other projects,[159] and an unpreserved (and apparently forgotten) conversation between Bero and Crystal Lagoons' Chief Executive Officer, Mr. Man.[160]  But the Federal Circuit is clear that a proposed license has "limited"[161] evidentiary value in calculating infringement damages "by virtue of its being an offer, rather than a license agreement."[162] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[163]  But Bero admitted that "each lagoon and lagoon setting is different" so "there are no directly comparable or identical license agreements."[164]  And the only evidence supporting Hard Rock's lack of

---

[156] *Bero Motion* at 5.  Because Bero's lost profits opinions related to the '514 Patent and the Water Treatment Patents are "essentially the same," *Expert Report of Richard F. Bero, CPA, CVA* ¶¶ 208–09, all of Bero's lost profits opinions are inadmissible.

[157] *Bero Motion* at 5; *Expert Report of Richard F. Bero, CPA, CVA* ¶ 130.

[158] *Expert Report of Richard F. Bero, CPA, CVA* ¶ 121.

[159] *Id.* ¶ 155.

[160] Mr. Man testified during his deposition that he did not think he ever spoke to Bero and was not familiar with Bero's name.  Dkt. 369-3, *Videotaped Zoom Deposition of Uri Man* at 21:2–10.

[161] *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012).

[162] *MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*, No. CV 14-804-RGA, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017).

[163] *Bero Opposition* at 7; *Expert Report of Richard F. Bero, CPA, CVA* ¶ 62.

[164] *Expert Report of Richard F. Bero, CPA, CVA* ¶ 155.

negative reaction to the offer is a conversation between Bero and Mr. Man.  Mr. Man admitted

he could not recall having this or any other conversation with Bero.[165]  Moreover, Bero was

aware of but did not consider conflicting communications that came directly from Hard Rock to

Crystal Lagoons wherein ███████████████████████████████████████████

███████████████████████████.”[166]  The court also observes Crystal Lagoons'

willingness at one point to provide a licensing fee discount of $8 million during the

negotiation.[167]  Ultimately, a draft proposed letter of intent, two dissimilar projects, and

speculative inferences regarding Pacific's willingness to enter the agreement at the █████

█████████ are insufficient bases to deem this expert testimony sufficiently reliable.

    Pacific also argues Bero's failure to apportion the value of the license between the

Patents and the other basket of services included in the agreement renders his lost profit opinion

unreliable.[168]  The court agrees.  Notably, the license agreement would have provided Pacific

with a license to the asserted patents, other additional intellectual property and services, design

services, plans, drawings, know-how, equipment, trade secrets, and other assets and services.[169]

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████.”[170]  Bero should have done so.  When

"agreements indisputably do not cover the patents alone, and instead also provide [a party] with a

---

[165] *Videotaped Zoom Deposition of Uri Man* at 21:2–10.

[166] *See* Dkt. 369-4, *Correspondence from Miriam Richter, Attorney at Law, P.L.*; Dkt. 369-2, *Videoconferenced Deposition of Richard Bero Taken via Zoom* at 101:9–103:16.

[167] *Expert Report of Richard F. Bero, CPA, CVA* ¶ 63.

[168] *Bero Motion* at 7.

[169] *Id.*

[170] *Videoconferenced Deposition of Richard Bero Taken via Zoom* at 179:17–180:5.

host of additional services that also have value, [the expert is] required to analyze those agreements and apportion: (a) the value attributable to the patent license rights from (b) the value attributable to the additional 'basket of services' provided by the agreements."[171]

At oral argument, Plaintiffs pointed to *Mentor Graphics Corporation v. EVE-USA, Inc.* for the proposition that an expert's analysis of the *Panduit* factors eliminates the apportionment requirement generally applicable in "both reasonable royalty and lost profits analys[e]s."[172]  The court does not read *Mentor Graphics* as creating such a categorical rule.[173]  There was no need to apportion damages in *Mentor Graphics* because "[i]n th[at] case, apportionment was properly incorporated into the lost profit analysis and in in particular through . . . *Panduit's* requirement that patentees prove demand for the product as a whole and the absence of non-infringing alternatives . . . ."[174]  And regardless, while Bero's analysis followed the *Panduit* factors, his analysis of the second factor—the absence of non-infringing alternatives—was entirely unsupported.  As described in *Mentor Graphics*, a reliable analysis of this factor is essential to for the *Panduit* factors to encompass the apportionment requirement.[175]  The totality of Bero's opinion on this factor consists of the following statement: "[a]s noted earlier, I understand there are no practical or viable alternatives to the Structure Patent or the patented lagoons at issue."[176]  A review of his expert report reveals how the only evidence supporting this conclusion is a

---

[171] *SUNOCO Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, 2020 WL 7330715, at *5 (D. Del. Jan. 13, 2020).

[172] *See Mentor Graphics Corp.*, 851 F.3d at 1287–88.

[173] The Federal Circuit further clarified it did not create such a categorical rule by reiterating how "the basic principle of apportionment . . . [still] applies in all of patent damages" and how "in this case, on these facts, apportionment is achieved [through] the court's use of the *Panduit* factors."  *Id.* at 1283 n.3.

[174] *Id.* at 1288.

[175] *Id.*

[176] *Expert Report of Richard F. Bero, CPA, CVA* ¶ 116.

"[d]iscussion with Chris Lidstone."[177]  But as discussed above, Lidstone's opinions on this subject are unreliable and inadmissible.  Thus, Bero has no reliable basis for the second *Panduit* requirement, rendering the *Mentor Graphics* holding inapplicable here.  Ultimately, the court agrees with Pacific that Bero's lost profits opinion is unreliable and inadmissible.[178]

### B.  Bero's Testimony Regarding a Reasonable Royalty is Inadmissible.

Pacific also argues Bero's reasonable royalty opinions are unreliable and inadmissible.[179] The court agrees with Pacific that Bero never adequately analyzed how the individual Patents constitute the basis for customer demand of Crystal Lagoons' collective license, which is critical to his reliance on the entire market value rule.[180]

The Federal Circuit is clear that "apportionment is an important component of damages law generally, and . . . it is necessary in both reasonable royalty and lost profits analysis."[181] Indeed, upon finding infringement of a valid patent, a patentee is entitled to damages "in no event less than a reasonable royalty for the use made of the invention by the infringer," but such damages "must reflect the value attributable to the infringing features of the product, and no more."[182]  Thus, "in every case" the patentee must "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented features and

---

[177] *Id.* ¶ 116 n.195.

[178] To the extent Bero attempted to rely on the entire market value rule to avoid apportioning damages between the allegedly infringed Patents and the other basket of services, his reliance does not change the court's conclusion.  A patentee may only rely on the entire market value of the accused product if the patentee demonstrates that "the feature patented constitutes the basis for customer demand."  *LaserDynamics, Inc. v. Quanta Comput. Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (citation omitted).  As will be discussed in more detail in Part IV(B), Bero failed to adequately perform such an analysis, rendering his reliance on the entire market value rule unreliable and his damages opinions inadmissible.

[179] *Bero Motion* at 9.

[180] *Id.*

[181] *Mentor Graphics Corp.*, 851 F.3d at 1287.

[182] 35 U.S.C. § 284; *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

the unpatented features."[183]  Expert testimony failing to apportion damages in this way is generally unreliable and inadmissible, unless the expert relies on the entire market value rule.[184]

Under the entire market value rule—which has been described as a "narrow exception" to the apportionment requirement[185] and potentially applies regardless of whether the patentee relies on a reasonable royalty or lost profits calculation[186]—the patentee may rely on the entire market value of the accused product if the patentee demonstrates that "the feature patented constitutes the basis for customer demand."[187]  Importantly, a patentee cannot make such a showing by merely demonstrating how the technology is viewed as valuable, important, or even essential to the use of the product implementing the patented technology.[188]  Nor is it enough to show that the product containing the patented technology would be commercially unviable without it.[189]  Instead, the patentee must demonstrate how "the presence of [the patented] functionality is what motivates consumers to buy a [product] in the first place."[190]  This is considered a "higher degree of proof,"[191] requiring a party to demonstrate a product is purchased "*because* it had" the particular patented feature.[192]

---

[183] *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

[184] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("To be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" (citation omitted)).

[185] *LaserDynamics, Inc.*, 694 F.3d at 67.

[186] *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (citations omitted).

[187] *LaserDynamics, Inc.*, 694 F.3d at 67 (citation omitted).

[188] *Id.* at 68.

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] *Id.* at 68–69 (citation omitted) (emphasis in original).

Here, Plaintiffs do not sell products.  Instead, as explained above, Crystal Lagoons primarily generates revenue by issuing a collective license of all its intellectual property to lagoon developers, which includes the Patents, for the design, construction, and operation of its lagoon technology.[193]  Crystal Lagoons does not build the lagoons, but as part of its business Crystal Lagoons has ongoing involvement in the lagoon to ensure the lagoon is built and managed properly.[194]  It does not license its Patents or other intellectual property on a patent-by-patent basis; instead, it licenses all of its technology only when it has ongoing involvement in a project such as providing (and getting paid for) its ongoing systems fees services.[195]  These license agreements provide customers with a license to the asserted Patents, other additional intellectual property and services, design services, plans, drawings, know-how, equipment, trade secrets, and other assets and services that admittedly "have some value."[196]  Thus, to be admissible, Bero's testimony and opinions must demonstrate how "the presence of [a particular Patent] is what motivates consumers to buy [Crystal Lagoons' collective license] in the first place."[197]

In his report, Bero dedicated one short paragraph to demonstrate the '514 Patent forms the basis for customer demand:


[198]

---

[193] *Lidstone Opposition* at 9–10.

[194] *Expert Report of Richard F. Bero, CPA, CVA* ¶ 20.

[195] *Id.*

[196] *Videoconferenced Deposition of Richard Bero Taken via Zoom* at 179:17–180:5.

[197] *LaserDynamics, Inc.*, 694 F.3d at 68.

[198] *Expert Report of Richard F. Bero, CPA, CVA* ¶ 145.

Similarly, Bero dedicated one short paragraph to demonstrate how the Water Treatment Patents form the basis for customer demand:



Relatedly, in their brief, Plaintiffs' sole argument attempting to bolster Bero's opinion is that "because lagoons of such size and water quality are inoperable and economically unfeasible without using the Structure Patent . . . Bero's application of the entire market value rule was sound."[200] But again, merely showing how the patented technology is viewed as valuable, important, or even essential to the use of the product implementing the patented technology is not enough.[201] This is precisely what Bero does. And the Federal Circuit is clear that merely pointing to the commercial unviability of other alternative lagoons is not enough to justify an expert's reliance on the entire market value rule.[202] This is precisely what Plaintiffs attempt to do.

Here, similar to the *LaserDynamics, Inc.* case, Bero "never conducted any market studies or consumer surveys to ascertain whether the demand for [the collective license] is driven by the [Patents]" in dispute.[203] Bero never points to or acknowledges a specific instance where a customer purchased Crystal Lagoons' collective licenses because of the inclusion of the '514 Patent or the Water Treatment Patents. Instead, Plaintiffs and Bero rely solely on the

---

[199] *Id.* ¶ 219.

[200] *Bero Opposition* at 9.

[201] *LaserDynamics, Inc.*, 694 F.3d at 68.

[202] *Id.*

[203] *Id.*

"foundational" and "core" nature of the Patents, the fact that the Patents are included in every purchase of Crystal Lagoons' collective licenses, and the lack of viable lagoons in the marketplace to make an impermissible inference that the Patents drive consumer demand for all of Crystal Lagoons' intellectual property.[204]  None of these are adequate bases to warrant reliance on the entire market value rule.

For all we know, demand for the Crystal Lagoons' collective license is driven primarily by any one of the other technologies or properties included in the license.  Ultimately missing from Bero's opinions are any sufficiently reliable facts or data suggesting a particular Patent is what motivates consumers to purchase the Crystal Lagoons' portfolio of property.  And if the patentee cannot satisfy the entire market value rule, as is the case here, then the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative."[205]  As already explained above, Bero has not attempted to apportion profits and damages in this way.  As such, Bero's testimony regarding a reasonable royalty is unreliable and inadmissible.

Relatedly, at oral argument, Plaintiffs made an oral motion seeking to allow Bero additional time to submit a supplemental expert opinion, which would address some of the deficiencies with his expert report.  This motion is denied.  Because all deadlines related to expert discovery have passed, this motion is governed by Federal Rules of Civil Procedure 6(b)(1)(B) and 16(b)(4), which require Plaintiffs to demonstrate "good cause" and "excusable

---

[204] *Bero Opposition* at 9.

[205] *Uniloc USA, Inc.*, 632 F.3d at 1318.

neglect" to justify an extension of the expert discovery deadline.[206]  But here, neither good cause nor excusable neglect exists to justify an extension.  Good cause requires a showing of diligence by the movant,[207] but Plaintiffs waited an unreasonable amount of time to bring this motion.  Specifically, Plaintiffs waited until long after the expert discovery deadline had passed and until the final minutes of the January 23, 2025 hearing to bring this motion.  This is despite the court apprising the parties of its preliminary intention to rule in favor of Pacific regarding the admissibility of Bero's testimony on January 10, 2025.[208]  On these facts, Plaintiffs cannot demonstrate reasonable diligence.  Moreover, Plaintiffs cannot demonstrate excusable neglect.  When asked about the basis for this motion at oral argument, counsel for Plaintiffs argued only that the apportionment requirement in a lost profits analysis is not a predictable requirement for an expert report.  But this court's review of relevant case law reveals the need to tie damages to the worth of a product's patented features is well-established, and apportionment is undoubtedly "an important component of damages law generally" and "necessary in both reasonable royalty and lost profits analysis."[209]  Federal courts are clear that a movant's ignorance of the law is

---

[206] *See, e.g.*, *Taitt-Phillip v. Lockheed Martin Corp.*, No. CV 21-150 DHU/GBW, 2022 WL 1262217, at *1 (D.N.M. Apr. 28, 2022) (citing *Lay v. Wal-Mart Stores E., L.P.*, Civ. No. 20-280 SCY/KK, 2020 WL 6709541, at *2–3 (D.N.M. Nov. 16, 2020) (explaining that a plaintiff must show both good cause pursuant to Rule 16(b)(4) and excusable neglect under Rule 6(b)(1) to obtain the court's leave to disclose a new expert and report after the expert disclosure deadline had passed).

[207] *See Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014).

[208] *See* Dkt. 465, *Instructions for Oral Argument*; Dkt. 466, *[Draft] Memorandum Decision and Order*.

[209] *Mentor Graphics Corp.*, 851 F.3d 1275 at 1287; *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."); *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) ("[D]amages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'") (quoting *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)); *Ericsson*, 773 F.3d at 1226 ("[A]pportionment is required even for non-royalty forms of damages.").  Indeed, the Federal Circuit has explained that the apportionment requirement dates back to *Garretson v. Clark*, 111 U.S. 120 (1884), where the Supreme Court held that "[t]he patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features."  *Mentor Graphics Corp.*, 870 F.3d at 1299 (Stoll, J. concurring) (citing *Garretson*, 111 U.S. at 121).

insufficient to demonstrate excusable neglect;[210] accordingly, Plaintiffs have not satisfied their burden under Rules 6(b)(1)(B) and 16(b)(4) to modify the already expired expert discovery deadline.

## CONCLUSION

For the foregoing reasons, the court orders as follows:

1. Pacific's Motion in Limine to Preclude Allegations of Noncompliance with Pool Codes is GRANTED IN PART.[211]  Evidence and arguments suggesting Pacific violated a jurisdiction's pool codes are inadmissible.  Other evidence related to pool codes is admissible, provided Plaintiffs clarify how the Lagoon is not required to comply with the relevant pool code, when necessary.

2. Pacific's Motion in Limine to Exclude Unpreserved Evidence and Testimony about Plaintiffs' Testing of the Accused Instrumentality is GRANTED.[212]

3. Because multiple grounds exist that could render Pacific's Motion to Exclude Plaintiffs' Expert Jennifer Norlin[213] moot, the court will defer ruling on the Motion.

4. Pacific's Motion to Exclude Plaintiffs' Expert Christopher D. Lidstone is GRANTED IN PART.[214]  Lidstone's opinions regarding the absence of non-infringing alternatives, long-felt need, and copying are unreliable and inadmissible.

---

[210] *See, e.g.*, *Xiong v. McCormick*, 809 F. App'x 496, 498 (10th Cir. 2020) (unpublished) (citing *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000)); *Krum v. Chubb Ltd.*, No. 20-CV-03616-RM-GPG, 2022 WL 1558883, at *5 (D. Colo. Jan. 10, 2022), *report and recommendation adopted*, No. 20-CV-03616-RM-GPG, 2022 WL 1558885 (D. Colo. Feb. 10, 2022).

[211] Dkt. 362.

[212] Dkt. 363.

[213] Dkt. 375.

[214] Dkt. 372.

5.  Pacific's Motion to Exclude Plaintiffs' Expert Richard F. Bero is GRANTED IN

    PART.[215]  Bero may testify regarding the commercial success of the '514 Patent.  His

    opinions related to infringement damages (lost profits and reasonable royalty) with

    respect to all Patents are inadmissible.

6.  Plaintiffs' oral motion for leave to file a supplemental expert report is DENIED.

SO ORDERED this 4th day of February 2025.

                                        BY THE COURT:

                                        _____
                                        ROBERT J. SHELBY
                                        United States Chief District Judge

---

[215] Dkt. 369.